UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------X
SANDRA C. BARKLEY,

                Plaintiff,

                                   ORDER

    -against-

                                   04-CV-875 (RJD) (KAM)

OLYMPIA MORTGAGE COMPANY, *et al.*,

                Defendants.
----------------------------------------X

----------------------------------------X


                                   05-CV-187  (RJD)(KAM)
AND ACTIONS CONSOLIDATED FOR PRE-TRIAL    05-CV-4386 (RJD)(KAM)
DISCOVERY                           05-CV-5302 (RJD)(KAM)
                                 05-CV-5362 (RJD)(KAM)
                                 05-CV-5679 (RJD)(KAM)


----------------------------------------X

MATSUMOTO, United States Magistrate Judge:

        The Court has considered the plaintiffs' motion to
compel discovery against the various defendants in the six above
referenced actions, which have been consolidated for pre-trial
purposes (see plaintiffs' submissions dated June 23, 2006; July
20, 2006; August 18, 2006; September 6, 2006; September 11, 2006;
and September 15, 2006), and the responses of the defendants (as
noted below), and grants in part and denies in part plaintiffs'
motion to compel.  The Court has also considered and grants the
July 14, 2006 motion to compel discovery by defendants United
Homes, LLC, United Property Group, LLC, Galit Network, LLC, and

Yaron Hershco (the "UH defendants") against plaintiffs.

## I. Background

The plaintiffs in these six actions are individuals or couples who purchased homes between September 2002 and January 2003 from the UH defendants. Plaintiffs' amended complaints commonly allege that the UH defendants, and the mortgage lenders, appraisers, and attorneys who are also defendants in these actions, "engaged in a pattern and practice of property flipping which targeted first-time minority homebuyers, such as plaintiff[s], for predatory home purchase and financing transactions in which they were sold grossly overpriced and damaged properties supported by intentionally inflated financing." (Am. Complaints ¶ 2.)[1] Specifically, plaintiffs allege a "scheme, which has been ongoing," in which the UH defendants "purchase damaged properties, conduct cosmetic repair work, and, conspiring with various mortgage lenders, appraisers and attorneys, cause the properties to be fraudulently and significantly over-appraised." (Id.) The UH defendants then sell the properties to "minority victims . . . vulnerable to defendants' high pressure deceptive sales tactics . . . for far

---

[1] Where the Amended Complaints in each of the six actions contain identical allegations, citations are made to the paragraph or paragraphs shared by the Amended Complaints. Otherwise, citations are made to the Amended Complaint of a particular plaintiff or plaintiffs.

more than the true value of the property." (<u>Id.</u>) Plaintiffs allege that the defendants obtained financing for the purchases through "'low' or 'no documentation' mortgage products that mask the victims' insufficient income and assets to repay these loans, or through the use of intentionally inflated loans which are backed by Federal Housing Administration (FHA) insurance," thus "impos[ing] significant hardship on the minority homebuyers, saddling them with debt and monthly payments in excess of their ability to pay." (<u>Id.</u>) Defendants then allegedly sold the mortgage loans into the secondary market or insured the loans through the FHA. (<u>Id.</u>)

The majority of plaintiffs' discovery requests concern discovery related to their "pattern and practice" allegations. As discussed below, plaintiffs seek a broad range of discovery regarding not only the specific transactions at issue in each action, but also the pattern and practice of various defendants in the alleged property flipping scheme targeting minority homebuyers with inflated mortgages. Plaintiffs seek such discovery from each of the defendants in their motion to compel, namely: the UH defendants; mortgage lenders Alliance Mortgage Banking Corp. ("Alliance") and Olympia Mortgage Corp. ("Olympia"); attorneys Michael B. Cheatham and Mario Sfantos; appraisers Joseph D. Gaeta, Michael Masciale, and Thomas Messina; the secondary mortgage market defendants, Credit Suisse First

Boston, LLC ("CSFB"), DLJ Mortgage Capital, LLC ("DLJMC"), and Credit Suisse First Boston Mortgage Securities, Inc. ("CSFBMS")(collectively, the "CSFB defendants"); and the Rule 19 necessary defendant parties to this action, JP Morgan Chase Bank ("Chase"), Federal National Mortgage Association ("Fannie Mae"), Alliance Mortgage Company d/b/a EverHome Mortgage Company ("EverHome"), Wilshire Credit Corporation ("Wilshire"), Bayview Loan Servicing, LLC ("Bayview"), Wachovia Bank, N.A. ("Wachovia"), and US Bank, N.A. ("US Bank"), corporations which serve as the trustees, assignees, or servicers of the mortgages at issue in these actions. As discussed below, the Court finds the majority of these requests to be relevant, but limits them as necessary to limit the burden placed on defendants.

## II. Discussion

Given the number of defendants and discovery requests at issue, the Court addresses the discovery issues related to each defendant in turn.

### A.   The UH Defendants

#### 1. "Pattern and Practice" Related Discovery

Plaintiffs submit that discovery related to their pattern and practice allegations is relevant to their claims arising under the Fair Housing Act, 42 U.S.C. §§ 3604 and 3605,

and the Civil Rights Act of 1866, 42 U.S.C. §§ 1981, 1982 and 1985, under both intentional discrimination and disparate impact theories. Plaintiffs also claim such discovery is relevant to their claims of deceptive business practices under N.Y. Gen. Bus. Law § 349, and to their common law fraud and civil conspiracy claims. (Pltfs' 6/23/06 Ltr. at 2.) They assert that "[i]f plaintiffs are to succeed on these counts, they must demonstrate not only that their home purchase prices and loans were inflated based on grossly exaggerated appraisals, and unaffordable, but that the defendants had a pattern and practice of making loans under similar circumstances." (Id.)

As a result, plaintiffs seek from the UH defendants discovery regarding not only the particular transactions entered into by each of the plaintiffs, but additionally discovery related to: (1) other transactions and agreements involving the co-defendants in these actions; (2) transactions in which the race of a buyer is identified; (3) the UH defendants' purchase of homes under foreclosure; (4) advertising purchased by the UH defendants; and (5) prospective buyers who were shown properties and the addresses of the properties shown. The Court addresses each request in turn.

(a)  Transactions and agreements between the UH
defendants and other defendants

Plaintiffs request that the UH defendants identify by

5

address and date of sale all properties sold by the UH defendants involving any of the mortgage lenders, attorneys or appraisers who are defendants in these actions, and that the UH defendants provide all documents associated with these transactions. (INT 1:16-18; DR 2:1.)[2] Similarly, the plaintiffs have requested "[a]ll documents concerning any agreements, business relationships, or residential real estate transactions between or involving [the UH defendants] and any defendant named in any of the six above captioned actions." (DR 1:4.)

The UH defendants object to the requests regarding transactions on the grounds that responding to these requests would be extremely burdensome because it would require the UH Defendants "to sort through and/or produce documents concerning over 1000 real estate transactions that occurred over a five year period, but have no connection to plaintiffs' transactions." (UH Defts' 6/30/06 Ltr. at 5.) The UH defendants state that they do not maintain an electronic record that would allow them to easily identify such transactions, that documents for each transaction

---

[2] Plaintiffs' discovery requests include both "document requests" and "document demands"; the Court will follow the plaintiffs' designation of their discovery requests. Given the large number of discovery requests and the issuance of multiple sets of discovery requests, the Court will cite to interrogatories as "INT", document requests as "DR", and document demands as "DD", and will indicate the set to which a particular discovery request belongs and the number of the request. Thus, for example, plaintiff's seventh interrogatory in its second set of interrogatories will be cited as INT 2:7.

are not stored in a single location or file, and that plaintiffs
have not tailored their transactions to seek only information
about "similar sales transactions." (Id. at 5-6.)  The UH
defendants further argue that this information is available from
other defendants, and that the burden imposed on them should be
viewed in light of the UH defendants' motion to dismiss currently
pending before Judge Dearie.  (Id. at 5.)

        The Court finds that given the allegations in
plaintiffs' complaints of a predatory lending scheme involving
the various defendants, transactions, agreements and business
relationships between the UH defendants and the other defendants
named in these actions are clearly relevant.

        Fed. R. Civ. P. 26(b)(1) provides that "[p]arties may
obtain discovery regarding any matter, not privileged, that is
relevant to the claim or defense of any party . . . ."  Other
transactions between the UH defendants and the mortgage lenders,
attorneys and appraisers who are defendants in these actions may
provide support for plaintiffs' claims that a predatory lending
scheme existed targeting minority first-time homebuyers.  In
another case involving allegations of fraudulent lending, a
district court affirmed a magistrate judge's decision to allow
plaintiffs to seek discovery regarding loans between the
defendants and other borrowers, as limited by geographic
location, time and type of loan.  Marks v. Global Mortg. Group,

<u>Inc.</u>, 218 F.R.D. 492 (S.D.W.V. 2003).  The Court similarly orders
that information and documents regarding other transactions
between the defendants are relevant to plaintiffs' pattern and
practice allegations and should be produced as follows.

While mindful that plaintiffs have alleged that the
property flipping scheme is "ongoing" (Am. Complaints ¶ 2), the
Court is also required to balance the burden of discovery with
the likely benefit.  Because the transactions at issue all
occurred between September 2002 and January 2003, the Court
limits the time period of these interrogatories and document
requests to the period January 1, 2002 through December 31, 2003.

### (b)  <u>Transactions in which the race of a buyer is identified</u>

In connection with their claims that the UH defendants
targeted minority homebuyers, plaintiffs seek discovery regarding
the percentage of homes sold by the UH defendants to buyers who
identified themselves, or who the UH defendants identified, as
"(i) non-Hispanic whites or Caucasians" or "(ii) Black, African-
American, Carribean-American, Latino, Hispanic, Asian, or Pacific
Islander."  Plaintiffs seek the addresses of such properties, the
dates and prices at which these properties were purchased and
sold, and all documents relating to these properties. (INT 2:1-3;
DR 3:1-2.)  Plaintiffs further seek all documents identifying or
otherwise referring to the race, ethnicity, color or national

origin of any person who purchased or sought to purchase a
property from the UH defendants, including all purchase
agreements or loan applications that identify the race of the
purchaser or applicant. (DR 3:3; DR 1:18.)

In response, the UH defendants argue that they do not
maintain independent records of the race of a buyer or potential
buyer, and thus "have no way of identifying which homebuyers
belonged to specific racial or ethnic groups." (UH Defts'
6/30/06 Ltr. at 7.) The UH defendants do acknowledge, however,
that such information is listed in lender documents, such as the
Uniform Residential Loan Application, which were found in the
files of one of the six transactions at issue. (Id.) However,
they assert that they "should not be required to search every
single transaction file for a five-year period for documents that
they have no custom of keeping in their records in any easily
retrievable way." (Id.) The UH Defendants do not, however,
dispute that such documents are relevant to plaintiffs' claims.

The Court finds that any documents identifying the
race, ethnicity, color or national origin of a buyer or potential
buyer of a property from the UH defendants are relevant to
plaintiffs' claims that the UH defendants targeted minority
homebuyers. While cognizant of the UH defendants' statements
that they do not maintain independent records of a buyer's or
potential buyer's race, the Court finds that such documents, even

if created by third parties, are relevant.  The Court therefore grants plaintiffs' motion to compel as to these discovery requests but, as above, limits them to the period January 1, 2002 through December 31, 2003.

(c)   The UH defendants' purchase of homes under foreclosure

Plaintiffs request that the UH defendants "[i]dentify all 1-4 family residential properties which [the UH defendants] purchased in foreclosure sales in Kings and Queens Counties, New York, between January 1, 2002 and December 31, 2004, from Federal National Mortgage Association ("Fannie Mae") or Chase Manhattan Mortgage Corporation" and seek all documents related to such purchases.  (INT 1:10; DR 2:1.)

Defendants object on the grounds that "[n]either Fannie Mae nor Chase Manhattan are defendants in any of these actions. Nor are there any allegations concerning these third parties in any of the complaints."  (UH Defts' 6/30/06 Ltr. at 7.) Plaintiffs argue that the request is narrowly tailored, and that the UH defendants' "traffic in foreclosed properties is probative of plaintiffs' property-flipping allegations, in particular if defendants can be shown to have repeatedly engaged in transactions involving the same or similar properties."  (Pltfs' UH Defts Discovery Chart dated 9/6/06 at 4.)

The Court notes that the plaintiffs' complaints allege

that the UH defendants "buy damaged properties in minority communities, often at foreclosure auctions or from estates." (Am. Complaints ¶ 31.) The home at issue in the <u>Barkley</u> case was purchased at foreclosure, and the homes in the <u>Mathis</u> and <u>McDale</u> actions were purchased from estate administrators. (Barkley Am. Complaint ¶ 151; Mathis Am. Complaint ¶ 123; McDale Am. Complaint ¶ 149.) Given the allegations in the complaints, and because the request is otherwise narrowly tailored, the Court finds that the discovery requested is relevant. The Court grants plaintiffs' motion to compel discovery regarding request but limits it to the time period January 1, 2002 to December 31, 2003.

### (d)  <u>Advertising purchased by the UH defendants</u>

Plaintiffs seek discovery regarding the UH advertising purchased by the UH defendants; the nature and geographic location of the advertising; the UH defendants' communications regarding advertising; and the amounts the UH defendants spent to advertise in publications directed at non-minority and minority audiences. (INT 2:4 and 5; DR 3:2 and 4; DR 1:13 and 14.) The UH defendants have narrowed the time period of these requests from five to two years, arguing that the complaints "lack any allegations that the . . . scheme either started prior to 2002 or continued past 2003." (UH Defts' 6/30/06 Ltr. at 13.) The UH defendants have also offered to obtain information from third-

11

party vendors responsive to these discovery requests. (Id.)

The Court finds these discovery demands to be relevant and finds that limiting the period to January 1, 2002 through December 31, 2003 is reasonable. The Court orders the UH defendants to respond to plaintiffs' interrogatories and document requests based on the records in their possession, custody or control and by arranging for their third-party advertising vendors to assist UH with providing a full and complete response.

(e) <u>Prospective buyers who were shown properties and the addresses of the properties shown</u>

Plaintiffs seek discovery regarding "[a]ll documents identifying all persons to whom you have shown a residential property or properties for prospective sale; the street addresses of all such properties; and the dates that you showed such properties, since 2002." (DR 1:9.) Plaintiffs assert that this discovery is relevant in that "United's practice of showing property and following up with potential customers may be probative of plaintiffs' allegations that United engaged in a pattern and practice of intentionally targeting minority homebuyers for disadvantageous sales." (Pltfs' UH Defts Discovery Chart dated 9/6/06 at 19-20.)

The UH defendants object to the relevance and burden of this request, noting that they "do not maintain any electronic or other systematic record of the names of individuals who viewed

particular properties." (UH Defts' 6/30/06 Ltr. at 8.)  In
addition, although prospective buyers visiting the UH defendants'
offices complete information sheets, these information sheets "do
not always indicate whether the prospective homebuyer actually
viewed a property or which property was viewed." (Id.)
Furthermore, the UH defendants assert that the information sheets
do not indicate a prospective homebuyer's race. (Id.)

The Court finds that this discovery request, like the
plaintiffs' advertising-related discovery requests, is relevant
to plaintiffs' allegations that the UH defendants targeted
minority homebuyers.  However, the Court finds the discovery
request to be overbroad as to the time period requested and
accordingly narrows the request to the period August 1, 2002 to
January 1, 2003.  The UH defendants shall provide information
regarding all prospective homebuyers during this time period,
and, to the extent available, the addresses of the properties
shown to these individuals during this time period.


2. Financial and Corporate Discovery

(a)  Requests regarding related companies and abuse of
the corporate form

Plaintiffs seek discovery related to individual
defendant Yaron Hershco's ownership of the UH defendant companies
and other related companies, and financial information regarding
the UH defendant companies.  In their complaints, plaintiffs

13

allege that Hershco owns and dominates the three defendant companies United Homes, United Property Group and Galit Network, and that, "[u]pon information and belief, the three companies fail to observe corporate formalities, freely substitute each other's corporate names on legal documents and seamlessly assume each other's contractual obligations." (Am. Complaints ¶ 41.) The plaintiffs assert that "[u]pon information and belief, defendant Hershco conceived of and directed the illegal activities against plaintiff[s]" and that "defendant Hershco dominated the three companies and caused them and their employees to engage in the property flipping scheme . . . directly causing injury to each of the related victims . . . ." (Id. ¶¶ 45, 46.) As a result, plaintiffs assert that "Hershco is personally liable for the United Homes entities' legal violations, both under the theory of piercing the corporate veil and directly for his own tortious conduct." (Id. ¶ 46.)

In support of their allegations, plaintiffs note that Hershco signed each of the deeds related to the transactions at issue (id. ¶ 45); that he owns a number of other companies sharing an office address also used by defendant Galit Network (id. ¶ 44); that United Property Group owned the properties at issue in these actions, but United Homes managed the sales process (id. ¶ 42); that a Hershco-owned company named KJ Development is listed as the seller for one of the properties at

14

issue (Pltfs' 7/20/06 Ltr. at 7); and that the UH defendants'
have indicated in responses to interrogatories that "Hershco's
companies do not have boards of directors, do not have board
meetings and do not have certain basic corporate documents" (id.
at 6).

The UH defendants object to these discovery requests,
arguing that plaintiffs have failed to allege with specificity
that Mr. Hershco was involved in a discriminatory property-
flipping scheme, or that he dominated the UH companies and abused
the corporate form.  (UH Defts' 6/30/06 Ltr. at 9.)  The Court
addresses each of the discovery requests in turn.


(b)  Discovery regarding corporate ownership and
inter-company relationships

Plaintiffs seek discovery regarding any corporation,
partnership, sole proprietorship or other entity in which
Hershco, his spouse, children, parents and/or any other relative
"to the third degree of consanguinity" owns more than a 10%
interest.  (INT 1:5.)  Plaintiffs also seek any debts, expenses
or monies greater than $100 paid by Hershco or one of the three
UH defendants on behalf of another of the UH defendants.  (INT
1:6-9.)  Finally, plaintiffs seek all documents concerning any
agreements or business relationships between any of the UH
defendants and/or AP Development and KJ Development, two
companies alleged to be owned by Hershco.  (DR 1:6.)

Notwithstanding the UH defendants' objections that the plaintiffs have not alleged specific facts about defendant Yaron Hershco's abuse of the corporate form, the Court finds that the plaintiffs have alleged sufficient facts to support the possibility that the corporate veil may be pierced in these actions.  Under New York law:

> Generally, piercing the corporate veil requires a showing that: (1) the owners exercised complete domination of the corporation in respect to the transaction attacked; and (2) that such domination was used to commit a fraud or wrong against the plaintiff which resulted in plaintiff's injury.  While complete domination of the corporation is the key to piercing the corporate veil, such domination, standing alone, is not enough; some showing of a wrongful or unjust act toward the plaintiff is required.  The party seeking to pierce the corporate veil must establish that the owners, through their domination, abused the privilege of doing business in the corporate form to perpetrate a wrong or injustice against that party that a court in equity should correct.

Fannie Mae v. Olympia Mortg. Corp., No. 04 CV 4971, 2006 U.S. Dist. LEXIS 70175, at *26 (E.D.N.Y. Sept. 28, 2006) (citing Morris v. New York State Dep't of Taxation and Finance, 82 N.Y.2d 135, 141-42, 623 N.E.2d 1157, 1160-61 (1993); see also Abu-Nassar v. Elders Futures Inc., No. 88 Civ. 7906, 1991 WL 45062, at *16 (S.D.N.Y. Mar. 28, 1991) ("[R]ecognizing that cases involving an attempt to pierce a corporate veil are complicated, the courts have held that when a party seeks discovery about the

relationships between individuals and a corporation, relevance is broadly and liberally construed") (internal quotations and citations omitted). Plaintiffs here have alleged sufficient facts with regard to Yaron Hershco's domination of the UH defendant companies and his use of the companies to perpetrate a wrong against the plaintiffs, to permit discovery on these issues.

Furthermore, KJ Development is listed as the seller in some of plaintiff Lodge's lending documents. (<u>See</u> UH Defts' 7/27/06 Ltr., Ex. 1.) Although these documents are not signed by a representative of KJ Development, the Court finds that plaintiffs have demonstrated that discovery of the UH defendants' relationships with other companies owned by or related to Hershco, including KJ Development, is relevant to their claims or reasonably likely to lead to the discovery of admissible evidence.

The Court thus directs the UH defendants to respond to these discovery requests, but limits the time period to January 1, 2002 to December 31, 2003.


<u>(c)</u>  <u>Financial documents and tax information</u>

Plaintiffs also seek financial documents and tax information from the UH defendants, including copies of any "net worth statement prepared by you at any time since 2001, including

17

but not limited to any loan or credit applications made by you";
any audits by CPAs for 2002-04; and copies of the UH Defendants'
tax returns for 2002-04.  (DR 1:17, 37, 38.)

Plaintiffs assert that discovery regarding the UH
defendants' finances is relevant to their claims that Hershco has
abused the corporate form.  Although plaintiffs do not allege in
their complaints that Hershco undercapitalized the UH defendant
companies, they do assert that undercapitalization is a common
form of abuse of the corporate form, and that, given their other
allegations of abuse, they are entitled to this information "to
see whether these entities are properly capitalized as part of
their proof of their piercing claims" (Pltfs' 7/20/06 Ltr. at 8.)
The Court finds that the plaintiffs have alleged that Hershco
abused the corporate form and that the requested financial
information is relevant.

The Court, however, denies without prejudice
plaintiffs' request for tax returns.  Although such information
may be relevant to whether the UH defendant companies have been
undercapitalized, plaintiffs have not adequately demonstrated a
compelling need for the tax returns by establishing that the
information contained therein is not otherwise available.  See
Securities & Exch. Comm'n v. Cymaticolor Corp., 106 F.R.D. 545,
547 (S.D.N.Y. 1985)(noting that a plaintiff seeking disclosure of
tax returns must show both relevance and "compelling need for the

returns because the information contained therein is not otherwise readily obtainable")(<u>citing</u> <u>Smith v. Bader</u>, 83 F.R.D. 437, 438 (S.D.N.Y. 1979)).  Plaintiffs should be able to determine whether the UH defendant companies are undercapitalized by examining any net worth statements, accounting audits or other information provided by the UH defendants.  If those avenues prove to be unproductive, plaintiffs may renew their application for tax returns.  Finally, consistent with its previous rulings, the Court limits plaintiffs' requests to the period January 1, 2002 to December 31, 2003.

        (d)  <u>Other documents</u>

        Plaintiffs' remaining discovery requests relate to the UH defendants' payroll lists for 2002 and 2003, and documents created by the UH defendants' CFOs, bookkeepers and accountants. (DR 1:3; DR 2:2, INT 1:11.)  The Court notes the UH defendants' assertion that they do not maintain "payroll lists," but "remain amenable to working out a solution to provide plaintiffs with information that they sought from the payroll lists concerning the individuals who were involved in the plaintiffs' transactions."  (UH Defts' 6/30/06 Ltr. at 13-14.)  The Court finds that information regarding the employees of the UH defendants who were involved in the subject transactions is relevant, and directs the UH defendants to produce the payroll

records it has for these employees for 2002 and 2003.

With regard to plaintiffs' request for "all reports, memos and other documents" created by the CFOs, bookskeepers and accountants identified by the UH defendants, the Court finds this request to be overbroad and vague as to subject matter and time, and denies the request.

### 3. Plaintiffs' Request to Depose Records Custodians

Plaintiffs have requested the opportunity to depose the records custodians of the UH defendants and other defendants, based on their belief that the defendants have failed to provide a full and complete response to certain of plaintiffs' discovery requests. (Pltfs' 6/23/06 Ltr. at 5.) For instance, plaintiffs have noted that the UH defendants have provided no or limited documents in response to plaintiffs' requests for the UH defendants' business licenses; any emails, internal memos or correspondence, or other documents regarding the plaintiffs or subject transactions and properties; any documents regarding the UH defendants' policies and procedures concerning the screening, acceptance and/or rejection of applications to purchase property; and personnel files for any employees involved in the subject transactions. (See Pltfs' 9/6/06 Discovery Chart for UH Defts, DR 1:7, 8, 10, 12.)

Plaintiffs' request for the depositions comes in the

context of the Court's decision to allow written discovery but not depositions to proceed prior to a decision on the defendants' pending motions to dismiss these actions. Notwithstanding plaintiffs' assertions that "these depositions would not be substantive, but would be solely directed to determine whether defendants have met their written discovery obligations" (Pltfs' 6/23/06 Ltr. at 5), the Court declines to allow such depositions to occur at this time. The defendants in these actions represent that they have produced documents in response to all discovery demands that they have not otherwise objected to, and shall supplement their responses in light of the discovery rulings made by the Court in this order. In lieu of depositions, each defendant shall provide a verified affidavit that it has provided all documents responsive to plaintiffs' discovery demands. Defendants are also reminded of their continuing obligation to supplement their productions based on the discovery of any responsive documents not previously located after a reasonable search. If depositions ultimately proceed and plaintiffs determine that defendants have withheld documents without a proper basis, plaintiffs may seek appropriate relief from the Court.

4.  <u>Sanctions</u>

Finally, pursuant to Fed. R. Civ. P. 26(g) and 37(a),

the plaintiffs seek sanctions against the UH defendants for their failure to respond to discovery in good faith, pointing specifically to the UH defendants' refusal to provide discovery regarding the UH defendants' alleged pattern and practice of discrimination and their abuse of the corporate form. (Pltfs' 6/23/06 Ltr. at 6.) The Court finds that the UH defendants have provided non-frivolous support for their opposition to these discovery requests, and, although the Court has determined that plaintiffs' discovery requests seek relevant information and documents as set forth above, it declines to impose sanctions at this time.

B.   The Mortage Lenders

    1.   Alliance Mortgage Banking Corp.

        As with the UH defendants, plaintiffs seek pattern and practice, and financial and corporate discovery from Alliance in the Mathis, McDale and Washington cases.

        (a)  "Pattern and Practice" Related Discovery

        In the three actions naming Alliance as a defendant, plaintiffs allege that "Alliance conspired with the United Homes entities to arrange for the over-appraisal of the [sic] several of the related victims' properties, including the property sold to plaintiff." (Mathis, McDale and Washington Am. Complaints ¶

51.) Plaintiffs assert that Alliance assisted in the scheme by providing purchase mortgages that were guaranteed by FHA insurance, which "guarantees that Alliance or any subsequent purchaser of the inflated loans can collect on the full over-inflated amounts of the loans in the event of default" (Id. ¶ 55). Plaintiffs also allege that:

> Upon information and belief, Alliance manipulated FHA guidelines, exaggerated related victims' ability to pay, and used the Nehemiah gift program to make up for insufficient assets to put them into loans that were unaffordable, but which covered the inflated purchase price. Through these practices Alliance was able to hide the fact that the related victims possessed neither the assets nor the income necessary to complete the purchase transactions as disclosed on their HUD-1s.

(Id. ¶ 56).

The Court addresses plaintiffs' motion to compel as it relates to Alliance below.

### (i) Transactions and agreements between Alliance and other defendants

Plaintiffs have requested discovery regarding loans made by Alliance for which the UH defendants were the sellers of the property, and for which the buyers identified themselves, or Alliance identified the buyer, as a minority or non-minority (INT 1, 2; DD 1, 2.) Plaintiffs also request all mortgage loan applications involving the UH defendants or any of the defendant

appraisers and attorneys in this action. (DR 11.) Alliance has

provided a spreadsheet of 16 loans for which the UH defendants

acted as the seller, but appears not to have produced documents

regarding loans involving any of the defendant appraisers or

attorneys. (Pltfs' Alliance Discovery Chart dated 9/6/06 at 1,

10.)

The Court finds that these discovery requests are

relevant to plaintiffs' pattern and practice allegations, and

orders that Alliance respond to these interrogatories and

document requests for the period January 1, 2002 to December 31,

2003. Alliance shall redact the social security numbers of loan

applicants and produce responsive documents subject to the

confidentiality order in effect.


## (ii) Discovery not limited to other party-defendants

Plaintiffs have requested all documents identifying or

otherwise concerning the race or ethnicity of any person to whom

Alliance made a loan, noting that standard form FHA loan

documents include such information. (DD 3.) Plaintiffs also

seek discovery regarding Alliance-originated loans, and whether

the loans were foreclosed, FHA backed or insured, or involved

Nehemiah gifts or other non-profit entity funds. (INT 7-9; DD

1.) Plaintiffs note that they have not limited these requests to

transactions with United, because transactions not involving

United are relevant to plaintiffs' pattern and practice allegations against Alliance. (Pltfs' Alliance Discovery Chart dated 9/6/06 at 4-5). The Court agrees that these discovery requests are relevant and directs Alliance to respond for the period January 1, 2002 to December 31, 2003.

Similarly, the Court finds that plaintiffs' discovery requests regarding advertising purchased by Alliance (INT 3,4; DD 2) are relevant, and directs Alliance to respond for the period January 1, 2002 to December 31, 2003.

### (iii) Discovery regarding employees involved in transactions with plaintiffs

Plaintiffs have requested that Alliance provide discovery regarding all employees or contractors who had any communications with plaintiffs or were involved in transactions with plaintiffs. Plaintiffs also seek information and documents regarding Alliance's relationship with Gateway and Edmund Israel, a former employee involved with the McDale transaction (McDale Compl. ¶¶ 120-25, 132, 134), and Gateway and Israel's involvement in the subject transactions. (INT 5, 6; DR 32.)

The Court finds that this discovery seeks relevant information and documents, and directs Alliance to respond to the requests. Plaintiffs have also noted that Alliance's responses to these discovery requests regarding its employees appear inconsistent or incomplete, insofar as some responses identify

certain employees as being involved with the transactions, and other responses identify other employees. The Court directs Alliance to clarify and supplement its responses as necessary to remedy any ambiguities and inconsistencies in its responses.

<u>(b)</u>  <u>Financial and Corporate Discovery</u>

Plaintiffs have requested all documents related to Alliance's incorporation, licensing and/or registration with any government agency. (DR 2.) In response, Alliance has provided documents regarding its certificate of incorporation and a banking department name approval. Plaintiffs assert that they are entitled to discovery regarding Alliance's status with any government agencies, including the Quality Control Plans that Alliance submits to the Department of Housing and Urban Development ("HUD"), Alliance's sponsor and affiliate qualifications with HUD, and all documentation regarding any Alliance employees disciplined, warned or restricted from participation in HUD or FHA programs. (Pltfs' Alliance Discovery Chart dated 9/6/06 at 7-9.) The Court finds that the discovery requested is relevant to plaintiffs' pattern and practice allegations and directs Alliance to produce the requested documents.

Plaintiffs have also requested copies of Alliance's corporate tax returns, and copies of compilations, reviews or

audits performed for Alliance by certified public accountants for the period 2002-04. (DR 29, 30.) In response, Alliance has produced a "privilege log" for these documents on which it asserts that the documents are "Confidential, irrelevant and not likely to lead to discovery of information relevant to the claims in these cases." (Alliance privilege log, attached to Pltfs' 9/6/06 Ltr.)

The Court finds that the requested discovery is relevant to plaintiffs' allegations of financial impropriety, and grants plaintiffs' request for compilations, reviews or audits performed for Alliance by certified public accountants, which may be produced pursuant to the confidentiality order. However, the Court denies without prejudice plaintiffs' request for Alliance's tax returns, because plaintiffs have not demonstrated a compelling need for the tax returns by establishing that the information contained therein is not otherwise available. If plaintiffs determine that avenues other than the tax returns are not productive, plaintiffs may renew their application for tax returns.

### (c) Alliance's Relationship with U.S. Bank and Other Secondary Market Lenders

Plaintiffs have alleged that the defendants in these actions obtained financing for the loans through "'low' or 'no documentation' mortgage products that mask the victims'

insufficient income and assets to repay these loans." (Am.
Complaints ¶ 2.) Defendant U.S. Bank, which services the
mortgages in the Mathis and Washington actions, is joined as a
Rule 19 necessary party in those actions. (Mathis Am. Compl. ¶
13; Washington Am. Compl. ¶ 14.) Plaintiffs have requested
discovery regarding: the underwriting criteria Alliance used to
extend the subject mortgages; any payments made or received by
Alliance in connection with the subject mortgages; and Alliance's
agreements with and relationship with U.S. Bank, including any
agreements and documents regarding the purchase of mortgages.
(DR 21, 22, and 26.) Plaintiffs note that while Alliance has
indicated that it has produced all responsive documents, Alliance
has not produced its underwriting guidelines for U.S. Bank,
documents reflecting the sale of any mortgages into the secondary
market, or any documents regarding its relationship with U.S.
Bank, other than an unexecuted Mortgage Purchase Agreement.
(Pltfs' Alliance Discovery Chart dated 9/6/06 at 12-14, 16-17.)
The Court directs Alliance to respond to these requests in full
and to indicate by Bates numbers which documents are responsive
to plaintiffs' individual discovery requests.


   2.   Olympia

        Plaintiffs have alleged that defendant Olympia Mortgage
Corporation "conspired with the United Homes entities to arrange

for the overappraisal" of the properties in the <u>Barkley</u>, <u>Lodge</u> and <u>Gibbons</u> actions; that Olympia intentionally provided loans based on over-appraisals of plaintiffs' properties; that it provided plaintiffs with unaffordable loans structured as "piggyback" mortgages combining a first mortgage and a second, high-interest rate mortgage; and that it processed these loans through "No income, no asset" and "no" or "low" documentation programs. (Barkley, Gibbons and Lodge Am. Complaints ¶¶ 51-58.) Plaintiffs also allege that Olympia "rapidly sold plaintiff's mortgage loans into the secondary market . . . earning a profit on both the excessive upfront fees and on the sale prices of the mortgage loans." (<u>Id.</u> ¶ 59.)

### (a) Olympia's purported discovery burdens

Plaintiffs have propounded discovery requests directed at a broad range of issues: Olympia's involvement with the <u>Barkley</u>, <u>Lodge</u>, and <u>Gibbons</u> transactions; its alleged pattern and practice of providing inflated mortgages and/or targeting minority homebuyers; Olympia's finances and corporate status; and Olympia's underwriting guidelines and relationship with the secondary mortgage market.

In response, Olympia, which is in receivership, has provided responses to discovery requests, but noted that nearly all of its pre-receivership employees have left the company, and

its electronic and hard copy files have been removed from its premises. Given the limited resources available to the receiver, Olympia has offered to provide plaintiffs with access to a computer database that may contain information regarding loan applications, and access to the hard-copy loan files it presently has in storage. (Olympia 9/8/06 Ltr. at 2.) Olympia states that plaintiffs should bear the costs of reactivating the database and locating and retrieving responsive documents from storage. (Id.)

Fed. R. Civ. P. 26(b)(2) provides that a court may limit discovery where, *inter alia*, "the burden or expense of the proposed discovery outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues." The Court finds that the majority of plaintiffs' discovery requests are highly relevant to the issues at stake in this litigation. As to the parties' resources, the Court notes that Olympia has offered no financial information or documentation in support of its alleged inability to bear the burden of production. Olympia has also failed to provide an estimate of what the cost of production would be, or the provisions regarding the receiver's authority and responsibility with respect to litigation involving Olympia. The Court directs that Olympia provide this information to plaintiffs, and that the

parties confer further regarding the most cost-effective and efficient means of providing discovery and how the costs should be allocated or shared.  Should plaintiffs, Olympia and its receiver be unable to come to agreement, they shall promptly seek judicial assistance.  Given Olympia's representations, the Court also directs that Olympia respond to plaintiffs' interrogatory no. 9 by providing the names, titles and functions of Olympia staff employed by the receiver.

### (b)  Plaintiffs' discovery requests upon Olympia

With regard to the substance of plaintiffs' discovery requests, the Court determines the following discovery requests to be relevant, and directs Olympia to respond to the requests for the time period January 1, 2002 to December 31, 2003: Olympia's transactions with the UH defendants (INT 1, 2; DR 2:1, 2); Olympia's agreements and transactions involving other defendants (DR 1:11, 19, 34); Olympia's advertising (INT 3, 4; DR 2:2, 4; DR 1:15); information regarding investigations, complaints, and actions against Olympia (INT 8; DR 1:16, 17); documents concerning training, guidance or instruction regarding federal and New York state consumer protection laws (DR 1:19); and documents in Olympia's loan files concerning the race or ethnicity of any person to whom Olympia made a loan (DR 2:3).

The Court also finds the following requests to be

relevant for the time periods set forth in plaintiff's discovery demands, and directs Olympia to respond: information regarding Olympia employees' communications with or involvement in plaintiffs' transactions (INT 5-7; DR 1:38); documents regarding Olympia's incorporation, licensing and/or registration with any government agency and its Fed. R. Civ. P. 7.1 disclosure (DR 1:2,32); documents reflecting any payments made or received in connection with the subject mortgages (DR 1:30); and discovery regarding Olympia's underwriting guidelines and its relationship with the secondary mortgage market (DR 1:12-14, 24-29, 31).

The Court notes that in response to plaintiffs' requests related to the subject transactions (DR 1:3-10, 20, 35), Olympia appears not to have produced any documents related to the Gibbons loan because the "Gibbons loan file was transferred to the purchaser when the underlying mortgage was sold" (Pltfs' Olympia Discovery Chart dated 9/6/06 at 8-9). The Court directs that Olympia work with plaintiffs to determine where the Gibbons loan file may be located and retrieved.

With regard to plaintiffs' request for Olympia's corporate tax returns and audits (DR 1:36-37), the Court directs Olympia to produce its audits, and denies without prejudice the request for tax returns, because plaintiffs have not demonstrated a compelling need for the information by establishing that the information is not available from other sources. Plaintiffs may

renew their request if they cannot obtain the financial

information they seek from other sources.


<u>C.</u>   <u>The Attorneys and Appraisers</u>

The Court next addresses the outstanding discovery

disputes between plaintiffs and defendant-attorneys Cheatham and

Sfantos, and defendant-appraiser Masciale.


<u>1.</u>   <u>Attorneys Cheatham and Sfantos</u>

Attorney Cheatham is a named defendant in the <u>Barkley</u>,

<u>Lodge</u>, and <u>Washington</u> actions.  Plaintiffs' discovery requests

for Cheatham include "all documents concerning any business

relationships, agreements, legal work, or real estate

transactions AND all documents constituting, reflecting or

referring to any correspondence, communications, or meetings

between" Cheatham and other co-defendants, individuals and

entities whose names appear in the <u>Barkley</u>, <u>Lodge</u>, <u>McDale</u> and

<u>Washington</u> complaints.  (DD 5, 6.)  Plaintiffs request that

Cheatham"identify, by name, race and last known address and

telephone number, all persons whom you have represented in the

purchase of a residential property which also involved in any

way" the UH defendants, Olympia, David Unger,[3] or Alliance, and

---

[3]   Unger is an Olympia employee described in the <u>Barkley</u> and
<u>Lodge</u> Amended Complaints.

to "indicate the dates of each such representation and who first contacted you about representing the purchaser." (INT 5.)

Attorney Sfantos is a named defendant in the <u>Gibbons</u> and <u>Mathis</u> actions. Plaintiffs similarly ask Sfantos to identify "by name, race and last known address and telephone number" all persons he has represented in the purchase of a residential real property which also involved in any way" the UH defendants, Alliance, Olympia, David Unger, Thomas Messina, Joseph Gaeta or Davanand Singh, and to "indicate the dates of each such representation and who first contacted you about representing the purchaser." (INT 7.)

Cheatham and Sfantos first object to these requests on the basis that such pattern and practice discovery is not relevant to plaintiffs' claims. Cheatham argues that "evidence concerning real estate transactions which did not involve the Plaintiffs is not relevant to Plaintiffs' claims against Cheatham or the claim that Cheatham 'targeted' Plaintiffs because they were minority first time home buyers." (Cheatham 6/29/06 Ltr. at 2.) The Court, as discussed above, disagrees. Discovery regarding Cheatham's and Sfantos's relationships, agreements and transactions with the other defendants in these actions is relevant to the plaintiffs' allegations that the defendants together conspired to target minority first-time homebuyers.

Cheatham and Sfantos also object to these discovery

requests on the basis that their ethical duties as lawyers under Disciplinary Rule 4-101 of the New York Code of Professional Responsibility, codified in N.Y. Comp. Codes R. & Regs. tit. 22, § 1200.19 (2006), prevent them from disclosing the requested information. Disciplinary Rule 4-101 states that a lawyer "shall not knowingly . . . reveal a confidence or secret of a client," where "[c]onfidence refers to information protected by the attorney-client privilege under applicable law, and secret refers to other information gained in the professional relationship that the client has requested be held inviolate or the disclosure of which would be embarrassing or would be likely to be detrimental to the client." Rule 4-101(a), (b).

Plaintiffs argue that the fact of representation in a real estate transaction is not subject to the attorney-client privilege, and that in any case information regarding an attorney's representation of a client in a real estate transaction is a part of the public record. (Pltfs' 6/23/06 Ltr. at 4.) They also argue that Cheatham and Sfantos have not demonstrated "why their representation of a client in the purchase of a home represents a secret," how revealing the information would amount to using a "secret of a client to the disadvantage of the client," or how it "would be embarrassing or would be likely to be detrimental to the client." (Id.)

The Court agrees that Cheatham and Sfantos have not

demonstrated how providing the requested information will cause them to reveal client secrets as contemplated in Disciplinary Rule 4-101 or breach their duty to uphold the attorney-client privilege.

A party seeking to invoke the attorney-client privilege "must demonstrate that there was: (1) a communication between client and counsel, which (2) was intended to be and was in fact kept confidential, and (3) made for the purpose of obtaining or providing legal advice." <u>United States v. Construction Prods. Research</u>, 73 F.3d 464, 473 (2d Cir. 1996). The privilege protects communications between a client and an attorney but does not shield facts underlying the communications. <u>Upjohn Co. v. United States</u>, 449 U.S. 383, 395 (1981). Moreover, the Second Circuit has held that "[a]s a general rule, a client's identity and fee information are not privileged." <u>Lefcourt v. United States</u>, 125 F.3d 79, 86 (2d Cir. 1997); <u>see also</u> <u>Vingelli v. United States</u>, 992 F.2d 449, 552-53(2d Cir. 1993).

Cheatham and Sfantos have not demonstrated that providing the "name, race and last known address and telephone number" of their clients as requested in plaintiffs' discovery requests would reveal a client secret, where such information is available in public documents, and where providing such information pursuant to a confidentiality order would not embarrass, disadvantage or injure their clients. Cheatham also

has not demonstrated that the attorney-client privilege covers the documents requested by plaintiffs in document demands no. 5 and 6, because these demands seek documents concerning Cheatham's relationships, transactions and communications with other co-defendants, not his clients.

The Court thus directs Cheatham and Sfantos to answer the interrogatories and provide non-privileged responsive documents pursuant to the confidentiality order in effect. Documents claimed to be privileged must be noted on a privilege log, as required by the federal and local civil rules, to enable plaintiffs to determine if privileges were appropriately invoked. See 40 Gardenville LLC v. Travelers Property Casualty, No. 02-CV-788, 2004 U.S. Dist. LEXIS 8846, *8-9 (W.D.N.Y. April 22, 2004) (noting that party seeking to invoke attorney-client privilege over its real estate attorney's files must provide privilege log and demonstrate whether attorney's representation "was merely a scrivener service and assistance in the simple transfer of title or legal counseling and advice").

Sfantos shall also respond to plaintiffs' discovery requests regarding any complaints made against him, his agents, employees, contractors, partners and principals (DD 14). With regard to interrogatory no. 7, Sfantos need not include in his response transactions involving defendant Davanand Singh, in whose office Sfantos worked. (See Pltfs' Sfantos Discovery Chart

dated 9/6/06 at 4-5.)

2.    Appraiser Masciale

Plaintiffs have requested pattern and practice
discovery from defendant Masciale, an appraiser in the McDale and
Washington transactions.  Masciale has represented that he either
does not possess responsive documents, or he refuses to produce
them.  (Pltfs' Masciale Discovery Chart dated 9/6/06.)
Notwithstanding Masciale's objections to the relevance of this
discovery (see Masciale Ltr. dated 7/7/06), these requests seek
discovery relevant to plaintiffs' allegations.  Accordingly,
Masciale shall produce documents in his possession, custody or
control, that are responsive to plaintiffs' discovery requests
regarding: Masciale's transactions with other defendants (DD 3);
compensation that Masciale received in connection with his
appraisals of the subject properties, except that Masciale shall
not produce tax returns absent a showing of compelling need by
plaintiffs (DD 9); Masciale's business and professional licenses,
and those of his agents, including but not limited to Donna
Kianca, who were involved in the appraisal of the subject
properties (DD 12); all appraisal reports that Masciale performed
for any of the defendants, as limited by the Court to the period
January 1, 2002 to December 31, 2003 (DD 15); and the bank
statements for Masciale's business for the period three months

prior to and three months after the subject transactions, as requested by plaintiffs (DD 18).

D.    The Secondary Market Mortgage Lenders

    1.    The CSFB defendants, Chase, Fannie Mae, EverHome and Wilshire

Plaintiffs have alleged that the CSFB defendants "aided and abetted the fraudulent property flipping scheme" in the Barkley, Lodge, and Gibbons actions, "by creating and promoting origination of piggyback mortgages under 'No income, No asset' and/or 'no' or 'low documentation' guidelines that provided Olympia access to subprime secondary market funding for the inflated, unsuitable, and unaffordable mortgages it made to plaintiff and other related victims."  (Barkley, Lodge and Gibbons Am. Complaints ¶ 90; see also id., ¶¶ 280 et seq., Plaintiffs' Tenth Cause of Action.)  Plaintiffs allege that "[t]he CSFB entities' lending guidelines and their lack of due diligence in following up on the questionable appraisals enabled the United Homes entities, Olympia, and other defendants to over-appraise the homes of plaintiff and other related victims; to arrange for the purchase of plaintiff's home--and those of other related victims--with mortgage loans that were unaffordable; to profit by charging excessive up-front fees; and to safely sell those mortgage loans into the secondary market despite the fact that the loans were wholly unaffordable and were not supported by

39

sound appraisals." (Id. ¶ 103.)

Specifically, plaintiffs allege that "CSFB made its products, underwriting guidelines, and pricing available to lenders like Olympia through its website, CSFBconnect.com," and that "CSFB guidelines allowed Olympia to originate the mortgage loans of two related victims through a 'No income, No asset' program, and another related victims [sic] under a similar 'low documentation' or 'no documentation' program." (Id. ¶¶ 94, 95.) Plaintiffs assert that, "[u]pon information and belief, Olympia began promoting 'No income, No asset' (NINA) loans and/or various 'no' or 'low documentation' loans on its website shortly after it entered into its Loan Sale Agreement with DLJMC in 2001" and that "Olympia did not originate piggyback loans prior to its relationship with CSFB." (Id. ¶ 98.) The complaints allege that the CSFB entities sold the mortgages purchased from Olympia, including the second mortgages in the Barkley, Lodge and Gibbons actions, into CSFB Home Equity Mortgage Trusts, issued certificates for shares in these trusts, and sold these certificates to investors. (Id. ¶¶ 99-101.)

Plaintiffs make no specific allegations of wrongdoing with regard to Chase, Fannie Mae, EverHome, and Wilshire, corporations which are joined as necessary parties under Fed. R. Civ. P. 19 and which serve as trustees, assignees, or servicers of the mortgages in the Barkley and Gibbons actions.

40

Plaintiffs, as noted in their September 15, 2006
letter, seek the following discovery from these secondary
mortgage market defendants.

### (a) Rating agency reviews

Plaintiffs seek rating agency reviews of the
certificates in the CSFB/DLJMC mortgage pools, noting that the
Home Equity Mortgage Trust 2003-2 and 2003-3 Prospectus
Supplements state that CSFBMS requested such reviews from Moody's
and Standard and Poor's.  (Pltfs' 9/15/06 Ltr. at 6; DR 7 to
CSFB, DLJMC, Wilshire and Chase.)  Defendants claim not to have
responsive documents.  The Court directs the defendants to review
their records to confirm that they are not in possession, custody
or control of any relevant rating agency reviews, and to provide
a verified response stating whether they are aware of any such
reviews and contact information for all entities and/or
individuals who may have knowledge about such rating agency
reviews.

### (b) CSFB/DLJMC's decision to enter into and terminate the Seller's Agreement with Olympia

Plaintiffs seek discovery regarding the bases upon
which CSFB and DLJMC decided to enter into a seller's agreement
with Olympia and their later decision to terminate the
relationship.  (DLJMC INT 16, 18, 19, 22 and DR 2:2,3; CSFB INT

4, 7, 9 and DR 2:1,2.)  Plaintiffs note that DLJMC's Rule 30(b)(6) witness, Bruce Kaiserman, testified that Olympia would have submitted certain documents, including an application, in connection with its request to enter into a seller's agreement with DLJMC, and that CSFB/DLJMC's outside counsel provided information leading to the decision to terminate the relationship with Olympia.  (Pltfs' 9/15/06 Ltr. at 6.)  The defendants have noted that they have searched for and been unable to locate the application by Olympia, and have referred plaintiffs to a portion of Kaiserman's deposition in response to plaintiffs' request for documents regarding the decision to terminate the relationship with Olympia.

The Court directs CSFB and DLJMC to affirm that they do not have any additional information or documents responsive to these requests and to identify any other individuals and/or entities who have responsive information or documents.  CSFB and DLJMC shall also produce any documents that they have regarding the decision to wind down their relationship with Olympia (including any documents referenced in the Kaiserman deposition) and/or designate the Bates numbers of responsive documents previously produced.  CSFB and DLJMC shall provide a privilege log for any documents for which they claim a privilege.

<u>(c)</u>  <u>Guidelines and procedures for purchasing mortgages</u>

Plaintiffs have requested discovery regarding the standards that CSFB, DLJMC, EverHome and Fannie Mae communicated to Olympia Mortgage about the kinds of mortgages they would buy, including underwriting guidelines, rate sheets, product matrices, and pricing matrices.  (DLJ DR 1:13, 14, 31; CSFB DR 1:13, 14, 33; EverHome DR 13, 14; Fannie Mae DR 13, 14, 24, 25, 29, 31.) The requests cover the time period January 1, 2002 to either December 31, 2003 or June 1, 2004, and specifically refer to the dates on which the <u>Barkley</u>, <u>Lodge</u> and <u>Gibbons</u> plaintiffs entered into the subject mortgages.

Plaintiffs note that although DLJMC has provided a summary of the guidelines and matrices in effect on the three dates the plaintiffs' mortgages closed, none of the defendants have provided any of the program or pricing matrices requested. (Pltfs' 9/15/06 Ltr. at 7.)  Plaintiffs assert that "[t]he broader time frame encompassed by plaintiffs' requests is relevant to determining what product guideline changes the CSFB defendants introduced after plaintiffs' loans were purchased." (<u>Id.</u>)

The Court finds that plaintiffs have properly requested and that the defendants must produce the underlying documents which provide the guidelines and procedures by which the plaintiffs' mortgages were purchased.  However, because of the

43

burden in producing the requested documents for each day for an entire two year period, the Court orders CSFB, DLJMC, EverHome and Fannie Mae to produce only the relevant underwriting guidelines, rate sheets, product matrices, pricing matrices, and so forth, applicable on the dates on which the plaintiffs' mortgages closed, and on the first of each month in 2002 and 2003. The defendants shall also designate the Bates numbers of documents responsive to plaintiffs' requests.

> ### (d) <u>Documents regarding defaults, delinquencies, etc. of the piggyback lending program and the no and low documentation programs</u>

Plaintiffs seek discovery regarding defaults, delinquencies, pre-payments, violations of representations and warranties, repurchase requests, rates of default, credit losses and foreclosures in the mortgage pools into which the piggyback and no and low documentation mortgages were sold, as well as monthly and annual reports to investors. (DLJ INT 25 and DR 1:8-12, 32; CSFB INT 12 and DR 1:8-12, 32; EH DR 9-12, 28, 37, 38; Wilshire 9-12, 20-22; Chase 1, 9-13, 20-22; Fannie Mae 8, 28.)

Plaintiffs note that Chase has produced no annual reports, and that the CSFB defendants "assert that they have no documents showing the defaults and credit losses on their piggyback lending program, despite the fact that all of the mortgages in their Home Equity Mortgage Trusts are second

mortgages." (Pltfs' 9/15/06 Ltr. at 8.) The Court directs that
Chase and the CSFB defendants produce any additional documents
they may have in response to plaintiffs' discovery requests, and
affirm that they have conducted a diligent, good faith search and
produced all responsive documents.

Fannie Mae has provided a summary document that does
not distinguish between mortgages that have been paid off and
mortgages which have been refinanced. (Pltfs' 9/13/06 Ltr. at
8.) The Court directs Fannie Mae to provide the requested
information.

### (e)  Appraisals and other underwriting documents

Plaintiffs seek discovery regarding appraisals,
appraisal reviews, automated valuations, quality control reviews,
due diligence and underwriting reviews undertaken by the CSFB
defendants and Fannie Mae with respect to certain mortgages and
mortgage purchases.

Plaintiffs, for example, seek discovery regarding "the
number and percentage of . . . mortgage loans DLJMC purchased or
considered purchasing from Olympia . . . where the Hansen Quality
Preview or other automated valuation showed the property securing
the loan had been overvalued by more than 10%." (DLJMC INT 24
and DR 2:8.) Similarly, plaintiffs seek discovery regarding
appraisals, appraisal reviews, and automated valuation
documentation and quality reviews of any collateral for loans

bought from Olympia or repurchased by Olympia for the period
January 1, 2002 to June 1, 2004.  (DLJMC DR 1:28-29; CSFB DR
1:30-31.)

        The CSFB defendants object to the relevance of these
requests, and note that DLJMC purchased a total of 829 loans from
Olympia, and that review of these loan files would be burdensome.
The Court finds that the requests are relevant to plaintiffs'
claims, but limits the requests to the time period January 1,
2002 to December 31, 2003 and the geographic region of Kings and
Queens County, New York.

        Plaintiffs have also requested any underwriting and
other reviews performed by CSFB's agent, Lydian Trust Co./Lydian
Data Services ("Lydian"), for first or second mortgages secured
by properties in Brooklyn, New York, closed under CSFB's
piggyback loan program, and either purchased by CSFB or rejected
during the period January 1, 2002 to May 1, 2004.  (DLJMC DR
1:34-36; CSFB DR 1:37-39.)  The CSFB defendants state that they
do not possess any Lydian documents for Olympia-originated loans
in Brooklyn, New York during this time period.  (CSFB Defts'
9/8/06 Ltr., Exh. A.)  Plaintiffs note that CSFBMC produced
selected Lydian documents in response to a 2005 order by the
Court to comply with plaintiffs' subpoenas, and that "[w]hile
defendants may not possess these documents, they have access to
and are in control of them" and "[t]hey should be produced."

(Pltfs' CSFB Defts' Discovery Chart, First Document Requests, dated 9/6/06 at 7-8.)  The Court agrees and orders the CSFB defendants to produce any responsive documents in its possession, custody or control.

Plaintiffs seek from Fannie Mae documents representing all underwriting and other review performed by Fannie Mae or on its behalf for first and second piggyback mortgages, either purchased or rejected by Fannie Mae, which were documented as "no income, no asset" loans and secured by properties in Brooklyn, New York, between January 1, 2002 to May 1, 2004.  (Fannie Mae Dr: 34, 37.)  Fannie Mae objects to the relevance of the request and to the burden since it purchases "thousands of mortgages in Brooklyn, New York."  (Fannie Mae 9/15/06 Ltr., Attachment at 4.) The Court finds that these requests are of minimal relevance based on the current allegations related to Fannie Mae's involvement in the secondary mortgage market and that the burden on Fannie Mae in responding to this request is therefore not justified.  Accordingly, the Court denies plaintiffs' motion to compel discovery regarding this request.

2.  Wachovia/Bayview

Wachovia and Bayview are Rule 19 necessary parties in the Lodge action: Wachovia is the trustee for the trust containing Lodge's first mortgage, and Bayview services the first

mortgage. Both defendants object to the discovery requests
served on them insofar as they request discovery related to the
Gibbons action, since neither is a party to that action. They
argue that jurisdiction has not been obtained over them in any
action other than Lodge, that they have not been privy to the
proceedings in the other actions, and that to require them to
respond to discovery regarding the Gibbons transaction "would
result in any non-party being subject to the demands of parties
to a lawsuit without appropriate notice being provided."
(Wachovia/Bayview 9/8/06 Ltr. at 2.) Plaintiffs assert that
Wachovia/Bayview purchased and serviced the Gibbons' first
mortgage (Pltfs' 6/23/06 Ltr. at 5.)

Notwithstanding Wachovia and Bayview's objections, the
Court notes that Fed. R. Civ. P. 45 provides for the service of a
subpoena on a non-party to obtain documents and/or testimony.
Accordingly, if plaintiffs serve Wachovia and Bayview with a
subpoena for documents relating to the Gibbons mortgage, the
Court will order that Wachovia and Bayview respond, because
plaintiffs seek relevant information and documents.

Wachovia and Bayview also object to providing names,
addresses, social security numbers and telephone numbers on loan
schedules produced to plaintiffs; they have redacted this
information from their production but left unredacted the
location and zip codes of the subject properties. Wachovia and

Bayview argue that customers have a clear privacy interest in not having their identity revealed, that "individualized privacy interests cannot be waived or protected by a confidentiality agreement to which those persons are not a party," that the identity of these customers is not relevant, and that customer identities are protected by the Financial Services Modernization Act of 1999 (the "Gramm-Leach-Bliley Act"), 15 U.S.C. § 6802. (Wachovia and Bayview 9/8/06 Ltr. at 3.)

The Court finds, however, that the confidentiality order entered into by the parties is sufficient to protect the identities of Wachovia and Bayview customers.  Moreover, the Gramm-Leach-Bliley Act provides for an exception allowing disclosure of nonpublic personal information "to respond to judicial process."  15 U.S.C. § 6802(e)(8).  See Marks, 218 F.R.D. at 495-96 (finding that the Gramm-Leach-Bliley Act "permits disclosures made to respond to judicial process" and affirming magistrate judge decision to allow such disclosure pursuant to confidentiality order).  Accordingly, Wachovia and Bayview shall produce the loan schedules subject to the confidentiality order between the parties, redacting only the social security numbers of the customers.

Finally, the Court notes that Bayview previously produced a disc containing corrupt data to plaintiffs.  Although Bayview stated that it would provide copies of the documents

retrieved from the disc to plaintiffs, it appears not to have done so. (<u>See</u> Plaintiff's 9/15/06 Ltr. at 9.) Bayview shall provide the documents or a copy of the non-corrupted disc to plaintiffs immediately if it has not already done so.

3. <u>US Bank</u>

U.S. Bank services the mortgages in the <u>Mathis</u> and <u>Washington</u> actions, and is a Rule 19 necessary party to those actions. (Mathis and Washington Am. Compl. ¶ 13.) U.S. Bank also previously held the McDale mortgage by assignment from Alliance, but that loan has been refinanced and is no longer held by U.S. Bank. (U.S. Bank 6/30/06 Ltr. at 3-4.)

(a) <u>Underwriting guidelines</u>

Plaintiffs seek U.S. Bank's underwriting guidelines, rate sheets, and product matrices for FHA loans and conventional mortgage loans in 2002 and 2003, including for September 17, 2002, November 15, 2002 and January 13, 2003, the dates on which the Mathis, Washington and McDale mortgages closed. (DR 40, 41, 43.) U.S. Bank has objected that these demands are unduly burdensome, irrelevant and seek confidential and/or proprietary information. (Pltfs' U.S. Bank Discovery Chart dated 9/6/06 at 19-21.) Plaintiffs respond that they are "entitled to review and evaluate the standards Alliance was required to meet in making loans . . . and whether the underwriting and design of certain

mortgage products facilitated the alleged scheme." (<u>Id.</u>)

The Court finds that the requested discovery is relevant, and directs U.S. Bank to provide the underwriting guidelines, rate sheets, and product matrices for FHA loans and conventional mortgage loans for the dates on which the Mathis, McDale and Washington loans closed, and for the first of each month from September 2002 to September 2003. U.S. Bank may provide the documents subject to the confidentiality order already in place.

<u>(b) Discovery regarding loans originated by Alliance</u>

Plaintiffs seek discovery regarding loans originated by Alliance and held or serviced by U.S. Bank, including discovery regarding Nehemiah program grants, prepayments, defaults, FHA insurance fund claims, foreclosures, appraisal reviews, and repurchases. (DR 16, 18-20, 36-39, 44, 46, 47; INT 2-9.)

U.S. Bank has agreed to provide the requested information in a spreadsheet format, including the borrower's name and address, for a sample of Alliance loans in 2002 and 2003. (Pltfs' U.S. Bank Discovery Chart dated 9/6/06 at 8-9 et seq.) However, plaintiffs note that U.S. Bank seeks a court order to produce this information, so that it will not violate any privacy laws, and that U.S. Bank requires the loan numbers of Alliance loans, which Alliance has refused to provide to plaintiffs. The Court orders Alliance to provide to plaintiffs

the loan numbers for loans originated in 2002 and 2003, and further directs U.S. Bank to provide the agreed upon spreadsheet to plaintiffs upon receiving the loan file numbers.

(c) <u>Other requests</u>

Plaintiffs have requested documents concerning any FHA review of Alliance's loans and documents concerning any civil suits naming U.S. Bank and Alliance as defendants. (DR 52, 53.) Plaintiffs state that U.S. Bank has represented that it would provide responses to these requests, but it has not yet done so. (Pltfs' U.S. Bank Discovery Chart dated 9/6/06 at 24.) The Court directs U.S. Bank to provide the agreed upon discovery.

E. <u>UH Defendants' Motion to Compel against Plaintiffs</u>

The UH Defendants have moved to compel plaintiffs to identify the UH employees described but not named in the <u>Gibbons</u> and <u>Lodge</u> amended complaints (<u>see</u> Gibbons Am. Compl. ¶¶ 112, 116; Lodge Am. Compl. ¶¶ 119-20.) They also move to compel plaintiff Lodge to identify the two young women who were tenants at 102 Decatur St., the property Lodge lived in before purchasing the property at issue in her litigation, and the granddaughter and nephew who were tenants at the subject property. (<u>See</u> UH Defts' 7/14/06 Ltr., Exh. 4, Lodge Response to UH Defts' First Set of Interrogatories and Second Request for Production of Documents, Interr. 5.) Finding that the requests are relevant, and there

being no objection by plaintiffs, the Court directs that plaintiffs, to the best of their ability, provide the name, present or last known address and telephone number, and present or last known place of employment of the individuals requested by the UH defendants.

## III. Conclusion

The parties shall respond to the discovery requests as ordered herein by March 16, 2007. The parties shall also include with their supplemental productions, verified affirmations stating that they have provided all documents in their possession, custody or control that are responsive to the relevant discovery requests.

If any additional discovery disputes arise, the parties shall attempt to resolve them and, if such resolution is not forthcoming, raise them before the Court as soon as possible, and in any case by March 26, 2007, with any opposition to be served and filed by March 29, 2007. The UH defendants shall initiate a telephone status conference in these cases on April 5, 2007 at 12:00 p.m.

**SO ORDERED.**

Dated: February 27, 2007
       Brooklyn, New York

_____/s/_____
Kiyo A. Matsumoto
United States Magistrate Judge
Eastern District of New York