UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------X
SANDRA C. BARKLEY,

NOT FOR PUBLICATION

       Plaintiff,

**MEMORANDUM & ORDER**

    -against-

04-cv-875 (KAM) (RLM)

OLYMPIA MORTGAGE CO., *et al.*,

       Defendants.
----------------------------------------X
MARY LODGE,

       Plaintiff,

    -against-              05-cv-187 (KAM) (RLM)

UNITED HOMES, LLC, *et al.*,

       Defendants.
----------------------------------------X
DEWITT MATHIS,

       Plaintiff,

    -against-              05-cv-4386 (KAM) (RLM)

UNITED HOMES, LLC, *et al.*,

       Defendants.
----------------------------------------X
RODNEY GIBBONS and SYLVIA GIBBONS,

       Plaintiffs,

    -against-              05-cv-5302 (KAM) (RLM)

UNITED HOMES, LLC, *et al.*,

       Defendants.
----------------------------------------X

```
-----------------------------------------X
```
MILES MCDALE and LISA MCDALE,

       Plaintiffs,

    -against-                05-cv-5362 (KAM) (RLM)

UNITED HOMES, LLC, *et al.*,

       Defendants.
```
-----------------------------------------X
```
CHARLENE WASHINGTON,

       Plaintiff,

    -against-                05-cv-5679 (KAM) (RLM)

UNITED HOMES, LLC, *et al.*,

       Defendants.
```
-----------------------------------X
```
MATSUMOTO, United States District Judge:

      Pending before the court are the motions of defendants United Homes, LLC ("United Homes" or "UH"), United Property Group, LLC, Galit Network, LLC and Yaron Hershco (collectively, the "UH Defendants"), and defendants Wachovia Bank, N.A. ("Wachovia") and Bayview Loan Servicing, LLC ("Bayview") (collectively, the "Wachovia Defendants"), for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Also pending is plaintiffs' motion to consolidate the above-captioned actions for trial pursuant Federal Rule of Civil Procedure 42. For the reasons set forth herein, defendants' summary judgment motions are denied and plaintiffs' motion to consolidate is granted.

# I. INTRODUCTION

Plaintiffs, eight African-American first-time homebuyers, commenced the six above-captioned actions against the UH Defendants, lenders, appraisers, lawyers and others, claiming that defendants conspired to sell them overvalued, defective homes, financed with predatory loans, and targeted them because they are minorities. Plaintiffs allege that the UH Defendants discriminated against them in violation of the Fair Housing Act ("FHA"), 42 U.S.C. §§ 3604 and 3605, and 42 U.S.C. §§ 1981, 1982, and 1985(3). Plaintiffs further assert state law claims for fraud and conspiracy to commit fraud, and violations of New York General Business Law § 349, and state and local anti-discrimination laws, namely, New York State Executive Law § 296(5) ("NYHRL") and Title 8 of the New York City Administrative Code ("NYCHRL"). *See Barkley*, 2007 U.S. Dist LEXIS 61940, at *8-9. The UH Defendants move for summary judgment seeking dismissal of all six actions against them.

The Wachovia Defendants seek summary judgment dismissal of plaintiff Mary Lodge's action (05-cv-187). Although Lodge does not assert any causes of action against the Wachovia Defendants in her Amended Complaint (ECF No. 62, "Lodge

Am. Compl."),[1] Wachovia allegedly is the trustee for a trust into which one of Lodge's mortgage loans was sold, and Bayview is allegedly the servicer of that mortgage. (Lodge Am. Compl. ¶¶ 17-18.) Among other relief sought, Lodge seeks an order declaring unenforceable "the subject notes and mortgages" and an injunction enjoining enforcement of the same. (*Id.*, *ad damnum* clause ¶ 3.) Lodge additionally seeks an order declaring void any mortgage liens on her property. (*Id.*, *ad damnum* clause ¶ 2.) Thus, the Wachovia Defendants were joined as necessary parties pursuant to Federal Rule of Civil Procedure 19. (*Id.* ¶¶ 17-18.)

## II. BACKGROUND[2]

The following undisputed facts are taken from the Local Civil Rule 56.1 ("Rule 56.1") statements of the parties in connection with the Wachovia Defendants' motion for summary

---

[1] References to submissions on the public court docket refer to documents filed in the *Barkley* (04-cv-875) and *Lodge* (05-cv-187) actions.

[2] The court presumes the parties' familiarity with the facts and procedural history of the related cases. A summary of the allegations in the complaints can be found in the court's August 22, 2007 Memorandum and Order in *Barkley v. Olympia Mortgage Co.*, No. 04-cv-875, 2007 U.S. Dist LEXIS 61940 (E.D.N.Y. Aug. 22, 2007) (the "August 2007 Order").

judgment and plaintiffs' Rule 56.1 Statement in opposition to the UH Defendants' motion for summary judgment.[3]

## A. The UH Defendants' Summary Judgment Motion

### a. Sandra C. Barkley

In or around 2002, plaintiff Sandra Barkley, an African-American woman, became interested in purchasing her first home. (ECF No. 470, Plaintiffs' Rule 56.1 Statement in Opposition to the UH Defendants' Motion for Summary Judgment ("Pls. 56.1 Stmt.") ¶¶ 1, 3.) Through an acquaintance, Barkley was referred to Shaun Caesar, a United Homes employee. (*Id.* ¶ 4; *see generally* ECF No. 470, Affidavit of Sandra Barkley ("Barkley Aff.").) According to Ms. Barkley, Caesar assured her that UH "would take care of all aspects of the home-buying process." (Barkley Aff. ¶ 7.) Barkley later learned that her acquaintance was paid $1,000 for referring her to United Homes. (*Id.* ¶ 5.)

In January 2003, Caesar showed Barkley three homes, and she liked one home in particular located at 557 Hancock Street in the Bedford-Stuyvesant section of Brooklyn. (Pls. 56.1 Stmt. ¶¶ 2, 8.) Ms. Barkley asked Caesar about certain necessary repairs to the Hancock Street house and Caesar assured

---

[3] The UH Defendants did not submit a Local Civil Rule 56.1 statement of undisputed material facts supported by admissible evidence, as required.

her that the repairs would be completed before closing. (Barkley Aff. ¶ 8.)  According to Ms. Barkley, Caesar would not tell her the price of the house, but instead assured her that she could afford it.  (*Id.*)  At the time, Barkley earned approximately $2,332 per month as an employee of the New York City Housing Authority.  (*Id.* ¶ 4.)

A few days later, Barkley met with attorney Michael Cheatham at UH's offices in Brooklyn.  (*Id.* ¶ 9.)  Mr. Cheatham advised Ms. Barkley that he would represent her during the home-buying process.  (*Id.* ¶ 10.)  United Homes asked Ms. Barkley to provide a check for a $4,000 down payment on the house, and she gave a $4,000 check to Mr. Cheatham.  (*Id.* ¶ 9.)  According to Ms. Barkley, Cheatham asked her to "sign some papers" but told her that she need not worry about reading them.  (*Id.* ¶ 10.) When Barkley asked Cheatham about the price of the house, he allegedly did not provide the "exact price" but "assured" her that she could afford the property because she would be able to rent the upstairs unit for $1,600 per month.  (*See id.* ¶ 10.) Although not initially disclosed to Ms. Barkley, an appraisal report dated January 6, 2003, prepared by defendant Thomas Messina valued the property at $359,000.  (Pls. 56.1 Stmt. ¶ 20.)

Following her meeting with Mr. Cheatham, Ms. Barkley scheduled an appointment with another attorney for January 14,

2003, and she advised Cheatham of her intention to work with another lawyer. (Barkley Aff. ¶ 13.)  On January 13, however, a UH employee contacted Barkley and advised that the closing would occur the following day.  (*Id.* ¶ 14.)  Mr. Barkley "felt like [she] had no choice but to cancel [her] appointment."  (*Id.*) Still, on January 14, Barkley advised Cheatham that she did not want him to represent her at the closing and wanted another attorney.  (*Id.* ¶ 15.)  Shortly thereafter, Barkley received a call from another attorney, Benjamin Turner, who advised that he would represent Barkley at the closing that evening.  (*Id.*)

Later that day, Ms. Barkley and Caesar walked through the property and Barkley noticed "numerous problems" with the house.  (*Id.* ¶ 16.)  Ms. Barkley informed Caesar and Turner of the needed repairs.  (*Id.*)

The closing occurred during the evening of January 14, 2003 at UH's offices.  (*See id.* ¶ 17.)  Turner represented Barkley and he handed her "many documents and told [her] to sign" them.  (*Id.*)  Ms. Barkley states that she "felt very rushed" during the closing.  (*Id.*)  Barkley also provided another check in the amount of $6,000.  (*Id.*)  Barkley first learned of the purchase price of the house—$359,000—and that she was entering into two mortgages, which required monthly payments in excess of her salary.  (*Id.* ¶¶ 17-19.)

Ms. Barkley executed two mortgages on January 14, 2003. The first is a 30-year adjustable-rate mortgage in the amount of $287,200 for the benefit of Olympia Mortgage Company ("Olympia") and the second is a 15-year balloon mortgage with monthly payments based on a 30-year amortization, fixed at 12.5% interest, in the amount of $53,850 for the benefit of Olympia. (Pls. 56.1 Stmt. ¶ 22.)

Ms. Barkley was "so distraught" by the purchase price and monthly mortgage payments that she sent a letter to Turner, Cheatham and Olympia requesting to cancel the mortgages. (Barkley Aff. ¶ 20.) After she sent the letter, Caesar called her to say that she had gotten a good deal. (*Id.* ¶ 21.)

When Barkley moved into the home, she discovered that many of the repairs had not been made. (*Id.* ¶ 22.) Over the next several months, Barkley contacted UH regarding the many problems with her home and provided a detailed list of needed repairs. (*Id.* ¶ 23.) Although UH sent a plumber and contractor to the house, many of the repairs were "never completed or not completed properly." (*Id.*) She was also unable to rent the upstairs apartment for $1,600; instead, Barkley rented out the apartment for $1,200 per month. (*See id.* ¶ 24.)

### b. Rodney and Sylvia Gibbons

In 2002, plaintiff Rodney Gibbons and his wife, Sylvia, both African Americans, became interested in purchasing

their first home.  (Pls. 56.1 Stmt. ¶ 34.)  That year, the
Gibbonses saw a United Homes television commercial and a
billboard in Brooklyn advertising "dream homes."  (*Id.* ¶¶ 35-
36.)  They decided to visit UH's offices.  (*Id.* ¶ 37.)  There,
the couple first met a United Homes manager, who was Caucasian.
(*Id.*)  The manager then introduced them to an African-American
man named Barry Braxton.  (*Id.*)  Mr. Braxton told the Gibbonses
that he attended church and that he takes care of "his own
people" so he would take care of them.  (*Id.* ¶ 38.)

Braxton showed the couple houses on several occasions,
mostly in Brooklyn's Bushwick neighborhood.  (*Id.* ¶ 42.)  They
liked a property at 1148 Halsey Street.  (*Id.* ¶ 43.)  During a
walk-through of the house, Mr. Gibbons observed a number of
problems, including water stains on the walls and uneven floors.
(*Id.* ¶ 43.)  Braxton promised that everything would be fixed.
(*Id.*)

Although Mrs. Gibbons was concerned that the couple
could not afford the house, Braxton assured them that they could
afford it by renting the upstairs apartment unit for $1,600 per
month.  (*Id.* ¶¶ 44, 46.)  At the time, the couple's combined net
monthly income was approximately $2,500.  (*Id.* ¶ 49.)  The
Gibbonses decided to purchase the property.  (*Id.* ¶ 44.)

Shortly after viewing the property, another United
Homes employee told the Gibbonses that UH had a lawyer to

represent them, and they were introduced to Marios Sfantos.
(*Id.* ¶ 46.)  Mr. Sfantos met with the couple at UH's offices and
told them that United Homes had an inspector who could evaluate
the property, but they could hire their own inspector.  (*Id.* ¶
47.)  Mr. Sfantos also told the Gibbonses that if they
discovered problems with the house after they moved in, United
Homes would fix them.  (*Id.*)

Soon after this meeting, the Gibbonses met with a
United Homes supervisor and David Unger, a representative from
Olympia, to discuss a mortgage.  (*Id.* ¶ 49.)  The couple met
with Mr. Unger several times at UH's offices and a UH
representative was usually present during the meetings.  (*Id.* ¶
51.)  During the meetings, the couple was told to take out two
mortgages.  (*Id.*)  At one of the meetings, the Gibbonses made a
$15,000 down payment on the property, by check, payable to
"Galit Property."  (*Id.* ¶ 52.)  The couple was told to bring an
additional $3,000 to the closing.  (*Id.* ¶ 53.)

At the closing, the Gibbonses again expressed concern
that they could not afford the monthly mortgage payments based
on their income.  (*Id.* ¶ 56.)  Mr. Braxton and a UH employee
assured them that the mortgage payments would be affordable with
rental income.  (*Id.*)  Mr. Gibbons, however, became sick and
suffered a heart attack at the closing, requiring the closing to
be interrupted.  (*Id.* ¶ 57.)

After the failed closing, Braxton called Mrs. Gibbons several times and pressured her to complete the closing by telling her that there were other offers on the property. (*Id.* ¶ 58.) Thereafter, Mrs. Gibbons asked UH to confirm that it could help the couple find a tenant and advised that if so, they would purchase the property. (*Id.* ¶ 59.) A UH employee assured Mrs. Gibbons that United Homes would help the Gibbonses find a tenant and that the property would be affordable with the rental income. (*Id.*) The Gibbonses agreed to close on the property. (*See id.* ¶ 62.)

On the evening before the closing, the Gibbonses walked through the property with Mr. Braxton. They were unable to view parts of the house due to a lack of lighting. (*Id.* ¶ 60.) During the walk-through, the Gibbonses observed many problems with the house, including extensive water damage. (*Id.* ¶ 61.) Mr. Braxton noted the problems and indicated that UH would fix them. (*Id.*)

On November 13, 2002, the Gibbonses closed on the property. At the closing, a UH employee told Mrs. Gibbons that UH had reduced the sale price from $369,000 to $359,000 and again assured them that they could afford the house with rental income. (*Id.* ¶ 65.) Defendant Thomas Messina, who prepared an appraisal report dated November 7, 2002, estimated the value of the house at $359,000. (*Id.* ¶ 66.) During the closing, the

Gibbonses executed two mortgages for the benefit of Olympia, the terms of which are identical to the mortgages executed by plaintiff Barkley. (*See id.* ¶¶ 22, 69.)

After moving in, the Gibbonses discovered numerous defects, including extensive water damage and rodent infestation. (*Id.* ¶ 72.) Although UH unsuccessfully attempted to fix a leaking roof, they made no other repairs. (*Id.* ¶ 73.) Further, despite Mr. Braxton's assurances, UH did not assist the Gibbonses in finding a tenant for months. (*Id.* ¶ 74.) After six months, Mr. Braxton recommended a tenant who was willing to pay $1,200 per month. (*Id.*) The delays in finding a tenant caused the Gibbonses financial hardship. (*Id.*)

### c. Dewitt Mathis

In 2002, plaintiff Dewitt Mathis, an African-American man, became interested in purchasing his first home. (*Id.* ¶ 118.) Mathis went to United Homes after seeing an advertisement which, to Mathis, made the home-buying process accessible notwithstanding any credit problems. (*Id.* ¶ 119.) During his first meeting with United Homes, a UH salesman named Oren showed Mathis two houses located in the Bushwick and East New York sections of Brooklyn. (*Id.* ¶ 120.) Mathis liked a house located at 21 Marconi Place but it appeared to be under construction. (*Id.* ¶ 121-22.) Oren told Mathis that UH was

completely renovating the house and that all necessary repairs would be completed in a week. (*Id.* ¶ 122.)

Thereafter, Mathis and his domestic partner, Karen Jenkins, met with a UH employee to discuss financing and the details of the sale. (*See id.* ¶ 124.) The couple was told that Jenkins's mother, Jessie Jenkins would have to co-sign the mortgage because Karen Jenkins was unemployed at the time. (*Id.* ¶ 125.) Thereafter, United Homes introduced attorney Marios Sfantos to Mr. Mathis and they met at United Homes's offices. (*Id.* ¶ 127.) United Homes also arranged for Mathis to meet with a representative of Alliance Mortgage Banking Corporation ("Alliance"), which qualified Mathis and Jessie Jenkins for 6.5% fixed-rate mortgage in the amount of $319,978. (*See id.* ¶¶ 134, 137.)

After moving in, Mathis discovered numerous problems with the house. (*Id.* ¶ 140.) Among other significant problems, electrical wiring was improperly installed; the floors, concealed by carpeting, were unfinished; there was extensive water leaking and water damage; debris was hidden underneath a layer of dirt in the backyard; and the house was infested with rodents and insects. (*Id.*) United Homes attempted some repairs but many of the problems persisted. (*Id.* ¶ 141.)

### d. Miles and Lisa McDale

In 2002, Miles McDale and his wife, Lisa, both African Americans, became interested in purchasing their first home. (*Id.* ¶ 144.) At the time, their combined monthly income was $3,200. (*Id.*) The couple had seen advertisements in newspapers, subways and buses for United Homes depicting African-American couples. (*Id.* ¶ 146.) The McDales went to United Homes's offices in Brooklyn and met with Robert Cadoch. (*Id.* ¶ 147.) Mr. Cadoch arranged for an African-American man named Gregory Copeland to show the McDales several houses in the East New York, East Flatbush, Bedford-Stuyvesant and Brownsville sections of Brooklyn, some of which were in significant disrepair. (*Id.* ¶ 149; *see* ECF No. 470, Declaration of Meghan Faux ("Faux Decl."), Ex. 26, UH Defendants' Responses to Plaintiffs' First Set of Interrogatories ("UH Defs. Interrogatory Responses") at 4.) According to Ms. McDale, when she asked Copeland about United Homes's customer base, he responded that it "was Puerto Ricans and African-Americans, mostly African-Americans." (Pls. 56.1 Stmt. ¶ 150.) Further, according to the McDales, when asked why he was showing them the specific houses he chose, Copeland "indicated that he believed United Homes was trying to sell the McDales a home in certain neighborhoods." (*Id.*)

After several days of viewing houses, one evening, Mr.
Copeland took the McDales to 2126 Union Street in Brooklyn.
(*Id.* ¶ 152.) Because there were no lights in the house, the
couple was shown the house by flashlight. (*Id.*) The couple
concluded that the property was a "crack house" and needed work,
but that its "size and layout" fit their needs better than the
other properties they had seen. (*Id.*)

The following day, the McDales asked Cadoch about the
possibility of buying the house "as is." (*Id.* ¶ 154.)
According to Mr. McDale, another United Homes employee, Jerry
Reznik, advised that UH could not profit from the house if it
was sold "as is." (*See id.*) Mr. Cadoch assured the McDales
that UH would "totally rehabilitate the house for them and
restore it based on the exact size and layout of the house as
they had seen it." (*Id.*) Reznik then told the McDales that the
sales price was $385,000 and that the couple "need not worry"
about the price because the property would generate rental
income. (*Id.* ¶¶ 155-56.)

Thereafter, the McDales were introduced to a loan
broker from Alliance named Mr. Israel. (*Id.* ¶ 158.) Mr. McDale
advised Israel that he had a child support obligation of over
$500 due every two weeks. (*Id.*) Reznik and Israel told the
McDales that because of the child support obligation, the couple
could only qualify for a "no doc" loan with an adjustable rate

mortgage.  (*Id.* ¶ 162.)  Mr. Reznik also dropped the property's sales price by $20,000, to $365,000.  (*Id.* ¶ 159.)  Donna Kianka, an appraiser retained in connection with the home sale, created an appraisal report dated November 12, 2002, which estimates the value of the property at $365,000.  (*Id.* ¶ 160.)

Mr. Reznik or Mr. Israel then told the McDales that they would need an attorney, and that they could get their own attorney or use one provided by United Homes who was already familiar with UH.  (*Id.* ¶ 167.)  Minutes later, the couple met with Mr. Turner, who, according to the McDales, advised the couple that they could get their own attorney, but that he was familiar with UH and would ensure that the "house and the deal were up to par."  (*Id.* ¶ 168.)

Over the next two weeks, the McDales expressed concerns about the repairs needed on the house.  (*Id.* ¶ 170.) According to the McDales, Mr. Reznik told them that they could hire their own inspector but that UH "always" commissioned an inspection.  (*Id.*)  Thereafter, the McDales were introduced to Paul, a construction manager for UH who, according to the McDales, promised to restore the house to its original condition and to install new sheetrock and flooring.  (*Id.* ¶ 171.)  Paul also assured the McDales that PVC pipes would not be used, because they are toxic if burned.  (*See id.*)

During the weeks following their meeting with Paul, the McDales attempted to gain access to the Union Street house but were told by UH that they could not enter because of ongoing construction. (*Id.* ¶ 172.) When the McDales entered the first floor, they were asked to leave. (*Id.*) Before leaving, however, the McDales observed that contractors were installing new windows without insulation. (*Id.*) When the McDales confronted Paul about this, Paul said that insulation was too costly and that if they wanted it, they would have to purchase it. (*Id.*) The McDales could not afford insulation. (*Id.*) The next time they saw the house, window and carpet installation was complete. (*Id.*) The McDales also observed that UH had reconfigured the layout of the house, contrary to their prior representation. (*Id.*)

At the closing, the McDales met attorney Raj Maddiwar, who advised that he was Turner's associate. (*Id.* ¶ 177.) The McDales asked why Mrs. McDale's name was not on the title, but Mr. Maddiwar told the couple not to ask because the closing had to occur that day otherwise the interest rates would increase. (*Id.* ¶ 179.) Mr. Maddiwar rushed Mr. McDale through the execution of closing documents without providing enough time to read them. (*Id.* ¶ 182.)

Mr. McDale took title to the Union Street house on November 15, 2002. That same day, he conveyed title to himself

and Mrs. McDale. (*Id.* ¶ 183.) The McDales executed a 30-year fixed-rate mortgage on November 15, 2002 in the amount of $346,750 for the benefit of Alliance. (*Id.* ¶ 184.) The monthly mortgage payments were $2,678, approximately 80% of the McDales's net monthly income. (*Id.* ¶ 185.)

Shortly after the closing, a United Homes rental agent came to the house and advised the McDales that they could get $1,700 in monthly rental income for the upstairs unit. (*Id.* ¶ 189.) The McDales were able to rent the upstairs unit for $1,348 per month because United Homes had divided the upstairs so that only three rooms qualified as bedrooms. (*Id.*)

Problems with the house surfaced after the McDales moved in. (*Id.* ¶ 190.) Among other problems, there was flooding and water damage, walls and floors had crumbled, and the couple had enormous gas bills because they could not keep the house properly heated due to the lack of insulation. (*Id.* ¶¶ 190-91, 196.) The McDales contacted United Homes about the problems which, initially, offered to "redo the whole house" but then offered an insufficient amount of money to cover the repairs. (*Id.* ¶ 192.) The couple ultimately defaulted on their mortgage and subsequently refinanced and borrowed an additional $50,000 to assist in the cost of repairs and cover monthly mortgage payments. (*Id.* ¶ 194.)

**e. Charlene Washington**

In 2002, plaintiff Charlene Washington, an African-American woman, became interested in purchasing her first home. (*Id.* ¶ 200.) In November 2002, she was referred by a friend to Robert Wright, a member of her church who was in the real estate business. (*Id.* ¶ 201.) According to Ms. Washington, Wright told her that he worked for United Homes. (*Id.* ¶ 202.) Ms. Washington had previously seen advertisements for United Homes which typically featured an African-American couple standing in front of a house. (*Id.* ¶ 203.)

Wright showed Ms. Washington two two-family homes in Brooklyn which were under repair. (*Id.* ¶ 205.) The lights were not functioning in the second house she visited, located at 2422 Dean Street in Brooklyn, so she was unable to visually inspect it thoroughly. (*See id.* ¶ 206.) Washington preferred this second house because it was within walking distance of her church. (*Id.*)

After Washington decided that she wanted to purchase the house, she arranged to meet with Wright at United Homes's offices. There, Wright informed her that UH worked with an attorney named Michael Cheatham, who could assist her, or she could choose her own attorney. (*Id.* ¶ 207.) Washington agreed to meet Cheatham, who met with her at UH's offices shortly thereafter. (*Id.*) Mr. Cheatham told Washington that UH needed

a deposit and she gave him a check for $2,000 payable to United Homes.  (*Id.*)  The sales price of the Dean Street property was $315,000.  (*Id.*)

United Homes also arranged for Washington to meet with a representative of Gateway Mortgage at UH's offices.  (*Id.* ¶ 211.)  Later, at church, Mr. Wright informed Ms. Washington that Gateway had not approved her for a mortgage and asked her to return to UH's offices to meet with other lenders.  (*Id.* ¶ 212.)  After she met with other lenders at UH's offices, Mr. Wright instructed Washington again to return to UH's offices and meet with Gateway's representative a second time.  (Id.)

Before Ms. Washington closed on the house, she returned to the property during daylight hours.  (*Id.* ¶ 213.)  The house appeared to be in good condition.  (*Id.*)

On January 13, 2003, Wright took Washington to UH's offices for the closing.  (*Id.* ¶ 214.)  Mr. Cheatham was also present and told her to sign the closing documents.  (*Id.*)  At the closing, Ms. Washington learned for the first time that she would have an adjustable-rate mortgage with Alliance.  (*Id.* ¶ 216.)  She did not fully understand the meaning of an adjustable-rate mortgage.  (*Id.*)  That day, Washington executed an adjustable-rate mortgage in the amount of $303,688 for the benefit of Alliance.  (*Id.* ¶ 217.)  Her initial monthly mortgage

payment was $1,755.76 and consumed over 70% of her net monthly income. (*See id.* ¶ 218.)

Shortly after the closing, Ms. Washington experienced problems with her new house. A problem with the chimney caused her furnace to shut down in the middle of the winter. (*Id.* ¶ 223.) After initially failing to repair the problem, United Homes eventually restored heat to the home. (*Id.*) Ms. Washington also discovered leaky basement walls and rodent infestation. (*See id.* ¶¶ 224, 226, 229.) Sometime in 2003, she discovered water damage in her kitchen and a leaking roof. (*Id.* ¶ 228.) Thereafter, in the fall of 2004, after pulling back the carpet on the second floor of her house, she noticed more than 20 holes in the flooring, some as large as her fist. (*Id.* ¶ 229.)

**f. Mary Lodge**

In 2002, plaintiff Mary Lodge, a retired African-American woman, began looking for a house. (*Id.* ¶¶ 78-79.) She had no experience with the home-buying process. (*Id.* ¶ 80.) After seeing an advertisement for United Homes, Lodge contacted UH and visited its Brooklyn offices. (*Id.* ¶ 81.) According to Lodge, a UH representative told her that all of UH's houses sell for $319,000 to $350,000 and that UH would help her get a mortgage. (*Id.* ¶ 82.)

Another UH representative, an African-American man named Chris Webb, then took Lodge and her daughter to view three houses. (*Id.* ¶ 84.) Lodge liked one located at 249 Halsey Street in Brooklyn (the "Lodge property") and thought it appeared to be in decent shape. (*Id.*) According to Lodge, Mr. Webb told her that she could rent out two of the three apartments in the house for $1,500 each to pay the mortgage. (*Id.* ¶ 85.) At the time, Ms. Lodge received approximately $400 per month in Social Security payments as well as temporary income from housing two foster children. (*See id.* ¶ 79.) Notwithstanding, based upon Mr. Webb's statements, Ms. Lodge believed that with rental income, she could afford the monthly mortgage payments on the house. (*Id.* ¶ 88.)

A week or two later, Ms. Lodge visited UH's offices after receiving a phone call requesting that she meet with UH as soon as possible. (*Id.* ¶ 86.) Although she felt pressured, the next day Ms. Lodge met with a United Homes salesperson about purchasing the Halsey Street house. (*Id.* ¶¶ 86-87.) When asked by the salesperson how much she could put down toward the purchase price, Ms. Lodge advised that she could pay between $30,000 to $35,000, and believed that by putting down a large sum, she would lower the amount of her mortgage loan. (*Id.* ¶ 89.) At that time, she was told that the house cost $419,000, significantly more than the previously quoted price range. (*Id.*

¶¶ 82, 90.)  Michael Gilbert, an appraiser retained in connection with the home sale, created an appraisal report dated January 16, 2003, which estimated the value of the property at $420,000.  (*Id.* ¶ 91.)  The following day, Ms. Lodge delivered a $35,000 check to United Homes.  (*Id.* ¶ 93.)

Thereafter, she met with attorney Michael Cheatham at UH's offices.  (*Id.* ¶ 93.)  According to Ms. Lodge, Cheatham told her that he worked for United Homes, but that he would represent her as a "favor."  (*Id.* ¶ 94.)  He also told her to return the next day with a check for an additional $5,000, which she did.  (*Id.*)

The closing took place at UH's offices on January 16, 2003.  (*Id.* ¶ 101.)  During the closing, Ms. Lodge found out for the first time that she would have two mortgages.  (*Id.* ¶ 102.)  Ms. Lodge was upset about this fact and told Cheatham that she was ready to terminate the closing.  (*Id.* ¶ 103.)  In response, Cheatham reassured Lodge that she would be able to rent two apartments for $1,500 each and cover the mortgage payments through rental income alone.  (*Id.* ¶ 104.)  Lodge relented and completed the closing.  (*Id.* ¶ 105.)

Lodge signed a contract to purchase 249 Halsey Street from United Homes for $419,000.  (ECF No. 454, Wachovia Defendants' Local Rule 56.1 Statement ("Wachovia Defs. 56.1 Stmt.") ¶ 1; ECF No. 456, Plaintiff Mary Lodge's Rule 56.1

Statement in Opposition to the Wachovia Defendants' Motion for Summary Judgment ("Lodge 56.1 Stmt.") ¶ 1; ECF No. 456, Declaration of Jean Constantine-Davis ("Constantine-Davis Decl."), Ex. L, Contract of Sale, Bates Nos. UHD 7-11.) She executed two mortgages with Olympia. The first is a 30-year 6.625% fixed-rate mortgage in the amount of $335,200 for the benefit of Olympia. The second is a 15-year balloon mortgage with monthly payments based on a 30-year amortization, fixed at 12.5% interest, in the amount of $41,900 for the benefit of Olympia. (Pls. 56.1 Stmt. ¶ 107.) Lodge was required to pay $2,897 each month in mortgages payments and related expenses. (*Id.* ¶ 111.)

After moving in, Lodge discovered that the house was in disrepair. (*See id.* ¶ 112.) Among other problems, much of the flooring was rotten and full of holes, the basement flooded whenever it rained, and the house was not insulated. (*Id.*)

### g. Facts Common to Plaintiffs

According to the plaintiffs, their interactions with United Homes followed a pattern. As previously mentioned, each plaintiff was an African-American, first-time homebuyer and each purchased their home from the UH Defendants within a four-month period from September 2002 to January 2003. (*Id.* ¶¶ 2-3, 22, 34, 64, 79-80, 106, 116-18, 136, 144-45, 183, 199-200, 215.) Each of the plaintiffs took title to their respective properties

from United Property Group, LLC via deed signed by defendant Hershco.  (*Id.* ¶¶ 18, 64, 106, 136, 183, 215.)

Several plaintiffs state that United Homes promised to provide them with a package of services, including an attorney, home appraisal and inspection and all mortgage arrangements. (*See, e.g.*, *id.* ¶¶ 6, 39-40, 46, 50, 82, 119, 134, 167-68, 211.) Moreover, some of the plaintiffs were discouraged from arranging for independent property inspections (*id.* ¶¶ 47, 99, 170) or obtaining independent legal advice (*id.* ¶¶ 14-15).  Further, several plaintiffs state that they had limited access to their houses and were forced to inspect properties with inadequate lighting, shortly before closing.  (*See id.* ¶¶ 60, 152, 206.)

The undisputed evidence also indicates that UH's agents and employees assured plaintiffs that United Homes would fully renovate their homes and repeatedly promised that all repairs would be completed before the closing.  (*Id.* ¶¶ 7, 48, 61, 99, 122, 154, 213.)  Each plaintiff's home was significantly in disrepair, with defects in many cases masked by cosmetic repairs.  (*Id.* ¶¶ 28, 72, 112, 140, 197, 225.)  By contrast, the UH Defendants contend, without citing any admissible evidence, that "no representations as to the value or the condition of the

properties were ever made . . . ."  (ECF No. 482, UH Defendants'
Memorandum of Law ("UH Defs. Mem.") at 3.)[4]

It is further undisputed that United Homes employees
referred plaintiffs to Olympia or Alliance to finance the
purchase of properties from United Homes.  (Faux Decl. Ex. 27,
Excerpts from the Deposition of Yariv Reznik ("Reznik Dep.") at
36-40, 43-45, 48-51.)  United Homes typically would negotiate a
monthly mortgage payment with the purchaser, and the lender was
required to confirm the loan to fit the negotiated payment.
(Pls. 56.1 Stmt. ¶ 235.)  Further, employees of Olympia and
Alliance took mortgage applications from UH's clients at United
Homes's offices.  (*Id.* ¶ 236, 241.)

Additionally, UH employees referred homebuyers to
attorneys.  (*Id.* ¶ 242.)  Attorneys Cheatham, Sfantos, and
Turner all received calls directly from United Homes employees
asking them to represent a UH purchaser.  (*Id.* ¶ 243.)  These
attorneys routinely met with clients referred by United Homes at
UH's offices.  (*Id.* ¶ 244.)

The undisputed evidence further establishes that
United Homes spent over $1.5 million on advertising in 2002 and
2003.  (*Id.* ¶ 252.)  These expenditures included newspaper,

---

[4] The UH Defendants' Memorandum of Law is not paginated, but the
court has paginated its copy of the Memorandum.  Page 1 of the
court's copy of the Memorandum begins on the page titled
"Preliminary Statement."

subway, and television advertisements. (*Id.*) Through their advertisements, UH promised "fully renov[ated]" and "[n]ewly renov[ated]" homes. (*Id.* ¶ 267; *see* Faux Decl., Ex. 11, at Bates Nos. CL-46, 50.) One newspaper advertisement states "Sit back & enjoy while our contractors are remodeling your dream home according to your needs[,]" while another claims "great for living or investm[en]t." (*Id.*, at Bates Nos. CL-56, 59.) Another advertisement promised that homes would be "Exquisitely Renovated (New Bathrooms, Kitchens, Appliances, Etc)" and "Quality Craftsmanship Throughout the Whole House[.]" (*Id.*, at Bates No. DCD-03.) United Homes's television commercial titled "One's Man's Ceiling" depicted an African-American family sitting in their apartment underneath a white man who is stomping on his floor, causing debris to fall from the ceiling onto the family. (*See* Pls. 56.1 Stmt. ¶ 268.)

Further, there is evidence that United Homes's clients predominantly were racial minorities. Specifically, Christopher Webb, a sales agent for United Homes, testified that the approximately "50 to 60 percent" of UH's customers were African American, "25 percen[t] Latino" and the "rest was [sic] European or Indian or whatever . . . ." (Faux Decl., Ex. 28, Excerpts from the Deposition of Christopher Webb ("Webb Dep.") at 244-45.)

**B. Wachovia Defendants' Summary Judgment Motion**

As previously mentioned, Ms. Lodge executed two mortgage loans with Olympia to finance the purchase of her home. (Wachovia Defs. 56.1 Stmt. ¶ 5; Constantine-Davis Decl., Exs. Q-R.) The first loan was secured by a note executed by Lodge in the total principal sum of $335,200 (the "First Note") for the benefit of Olympia. (Constantine-Davis Decl., Ex. Q; Wachovia Defs. 56.1 Stmt. ¶ 6.) The first loan was further secured by a first mortgage lien against the property (the "First Mortgage"). (Wachovia Defs. 56.1 Stmt. ¶ 6.) The second loan was secured by a note executed by Lodge in the total principal sum of $41,900. (Constantine-David Decl., Ex. R.) Because Lodge seeks through her action to bar enforcement of the First Mortgage, facts relevant only thereto are discussed herein.

The Wachovia Defendants assert that in or about June 2003, Olympia offered to sell Lodge's First Mortgage to Bayview Financial Trading Group, LP ("Bayview Financial"), a holding company of defendant Bayview. (ECF No. 455, Declaration of Robert Hodapp ("Hodapp Decl.") ¶ 6.) On or about June 25, 2003, Olympia and Bayview Financial entered into a Supplement to Loan Sale Agreement ("Agreement") memorializing Olympia's sale of 53 loans, including Lodge's First Note and First Mortgage, to Bayview Financial. (*Id.; see* Constantine-Davis Decl., Ex. X, Agreement.) Bayview Financial had previously purchased loans

from Olympia in April 2002. (Hodapp Decl., Ex. A, Deposition of Jack Silver ("Silver Dep.") at 16.) According to Jack Silver, Bayview's Vice President, the closing for the purchase of the 53 loans from Olympia, including Lodge's First Note and First Mortgage, took place on July 14, 2003. (*Id.* at 31.)

Bayview states that it paid "valuable consideration" for the First Note and First Mortgage. (ECF No. 454, Declaration of Jack Silver ("Silver Decl.") ¶ 6; Hodapp Decl. ¶ 10; *see also* Silver Dep. at 82.) Bayview paid the "total outstanding principal in addition to some interest due on the First Mortgage and First Note." (Silver Decl. ¶ 6.) Specifically, Bayview Financial paid $334,007.22 toward the outstanding principal balance on Ms. Lodge's First Mortgage, as well as $2,643.21 in accrued interest on the loan. (Silver Dep. at 82; *see also* Lodge 56.1 Stmt. ¶ 22.)

Both Jack Silver and Robert Hodapp, Bayview's Vice President and Corporate Counsel, state that when Bayview Financial purchased the First Note and First Mortgage from Olympia, it had "no notice of any defense or claim against it on the part of Lodge or any other person." (Hodapp Decl. ¶ 11; Silver Decl. ¶ 7.) Before the July 14, 2003 closing, however, Odyxa Bermudez, an in-house appraiser at Bayview Financial, emailed Mr. Silver to discuss concerns regarding the valuation of certain properties in Brooklyn. (*See* Silver Dep. at 46-50;

Constantine-Davis Decl., Ex. H, Email from Bermudez to Silver
dated 7/1/10, Bates No. Bayview 14.)  Bermudez reported to
Silver that she contacted an appraiser named Mr. Gilbert (who
had generated an appraisal for Olympia for the Lodge loan).
(Silver Dep. at 48-50.)  The email provides, in relevant part,
that

> We have contacted an agent in Brooklyn who
> alerted us to the flipping and inflating sales
> prices going on in Brooklyn in the recent months.
> He happened to have sold one of the properties in
> our deal.
>
> I got in touch with one of the appraisals [sic]
> that "supposedly" completed these appraisals and
> he informed us that not only had he not completed
> these appraisals but that there [sic] his name
> has been involved in several forged appraisals
> now in the hands of the attorney general.
>
> As you can see the appraisals on these Brooklyn
> properties cannot be given any credit.

(*Id.*)

In response to the email, Bayview Financial "closely
review[ed]" property valuations and was "very cautious with
respect to how [Bayview Financial] valued properties."  (Silver
Dep. at 51.)  Mr. Hodapp acknowledges that Bayview "was 'aware'
of appraisal and other 'issues' generally affecting the real
estate market as a whole in Brooklyn" but maintains that
"[n]either Bayview nor Wachovia were under notice of any claim
or defense."  (Hodapp Decl. ¶ 12.)

As part of Bayview Financial's due diligence, it commissioned a broker price opinion ("BPO") to value the Lodge property. A BPO dated July 10, 2003 indicates that the property was valued between $200,000 and $400,000, with a "[r]ecommended" list price of $369,900 and a "[p]robable" sales price of $360,000. (Constantine-Davis Decl., Ex. I, Bates No. Fillmore 10; *see also* Silver Dep. at 55.) An appraisal report dated November 20, 2002 issued by Michael Gilbert to Olympia concerning the property indicates that the "[l]isting price" is $449,000 and that the sales price is $419,000. (Constantine-Davis Decl., Ex. J, Bates No. OMC-L 0382.)

When Bayview Financial acquired Ms. Lodge's First Mortgage in July 2003, it was not concerned about borrowers' debt-to-income ratio on loans they reviewed for purchase. (Lodge 56.1 Stmt. ¶ 25.) Ms. Lodge's loan application does not indicate whether she had any income or assets. (Constantine-Davis Decl., Ex. U, Residential Loan Application dated 1/6/03, Bates Nos. OMC-L 0226-29.) Mr. Silver testified that, as a result of due diligence performed on Ms. Lodge's mortgages, he was aware that there was a second "piggyback" mortgage to the First Mortgage. (Silver Dep. at 57; *see* Lodge 56.1 Stmt. ¶ 18.)

After sale and assignment of the First Note and First Mortgage by Olympia to Bayview Financial, the First Note and First Mortgage were securitized. (Silver Decl. ¶ 5; Hodapp

Decl. ¶¶ 7-8.)  Wachovia served as the trustee of the securitization trust and Bayview serviced the trust, which included the First Mortgage.  (Silver Decl. ¶ 5.)  At some point thereafter, US Bank and Trust ("US Bank") purchased Wachovia's assets and thus succeeded Wachovia's rights as trustee.  (*See* Hodapp Decl. ¶ 8.)  Defendant Bayview, as servicer of the securitization trust which included the First Mortgage, "has continuously been in possession, custody and control of the original documents, including the First Note and First Mortgage."  (*Id.*)  According to Mr. Hodapp, "US Bank, as trustee, the successor to Wachovia as Trustee, is the holder of the First Note and First Mortgage. . . .  Wachovia . . . never had an ownership interest in the First Note and Mortgage aside from in its capacity as trustee."  (Hodapp Decl. ¶ 9.)

On January 13, 2005, Lodge filed this action (05-cv-187) naming, *inter alia*, Olympia and Wachovia.  (ECF No. 1, Complaint ¶ 11, 13.)  Bayview was added as a defendant in June 2005.  (ECF No. 32, Stipulation Substituting Parties.)  Thereafter, on December 8, 2005, Ms. Lodge filed the instant Amended Complaint which alleges, *inter alia*, that "[o]n information and belief, Wachovia is the trustee for a trust into which plaintiff's first mortgage was sold and, as such, is a necessary party pursuant to Federal Rule of Civil Procedure 19."  (Lodge Am. Compl. ¶ 17.)  Lodge further alleges in her Amended

Complaint that "Bayview is the servicer of plaintiff's first mortgage, and is thus a necessary party pursuant to Federal Rule of Civil Procedure 19." (*Id.* ¶ 18.) Wachovia and Bayview denied these allegations in their Answer. (ECF No. 237, Answer ¶¶ 17-18.)

### III. DISCUSSION

**A. Summary Judgment Standard**

A court may grant summary judgment only "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). The moving party carries the burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The court must construe the facts in the light most favorable to the nonmoving party and all reasonable inferences and ambiguities must be resolved against the moving party. *Flanigan v. General Elec. Co.*, 242 F.3d 78, 83 (2d Cir. 2001). Nevertheless, the nonmoving party may not "rely merely on allegations or denials" but must instead "set out specific facts showing there is a genuine issue for trial." Fed. R. Civ. P. 56(e)(2). Further, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v.*

*Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008) (citations omitted).

**B. The UH Defendants' Motion for Summary Judgment**

    **a. Compliance with Local Civil Rule 56.1**

Rule 83 of the Federal Rules of Civil Procedure ("Rule 83") authorizes the district court to adopt local rules governing practice. Fed. R. Civ. P. 83(a)(1). Rule 83 further provides that "[a] local rule imposing a requirement of form must not be enforced in a way that causes a party to lose any right because of a nonwillful failure to comply." Fed. R. Civ. P. 83(a)(2). Significantly, Rule 83(a)(2) does not "affect the court's power to enforce local rules that involve more than mere matters of form—for example, a local rule requiring parties to identify evidentiary matters relied upon to support or oppose motions for summary judgment." Fed. R. Civ. P. 83 advisory committee's notes (1995).

Pursuant to Rule 83's authority for district courts to adopt local rules, Local Civil Rule 56.1 requires a party moving for summary judgment to submit a "separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried[,]" together with citation to the admissible evidence of record supporting each such fact. Local Civil Rule 56.1(a), (d). "Failure to submit such a statement may constitute grounds

for denial of the motion" for summary judgment.  Local Civil Rule 56.1(a); *cf. T.Y. v. New York City Dep't of Educ.*, 584 F.3d 412, 417 (2d Cir. 2009) (while observing that Rule 56.1's requirement of a statement of undisputed facts "is strict[,]" the court held that in cases brought pursuant to the Individuals with Disabilities Education Improvement Act ("IDEA"), 20 U.S.C. §§ 1400-1482, Rule 56.1 statements are not strictly required because a summary judgment motion in an IDEA case "can serve as an aid to the court within the statutory scheme whose purpose is to ensure that children with disabilities receive the educational benefits to which they are entitled.").

Here, the UH Defendants have failed to file a Rule 56.1 Statement, despite receiving notice of their failure and an opportunity to correct the deficiency in their reply papers. (*See Barkley*, 04-cv-875, ECF No. 470, Plaintiffs' Memorandum of Law in Opposition to the UH Defendants' Motion for Summary Judgment ("Pl. Opp. to UH") at 4, 15-16) (pointing out the UH Defendants' failure to comply with Rule 56.1.)  *Cf. Tota v. Bentley*, No. 09-4566-cv, 2010 U.S. App. LEXIS 10717, at *2 (2d Cir. May 26, 2010) (finding that trial court did not abuse its discretion by permitting the summary judgment movants to file a Rule 56.1 statement of undisputed facts in their reply papers where the Rule 56.1 statement was based on affidavits submitted

with the movants' moving papers).  Nor have the UH Defendants explained their failure to comply with Rule 56.1.

Although Rule 56.1 permits—but does not require—the denial of a non-compliant motion for summary judgment, denial of the UH Defendants' motion for summary judgment in this case is appropriate because they have failed to identify undisputed material facts, supported by admissible evidence, which would permit the court to evaluate and provide the factual bases for their instant motion for summary judgment.  Instead, the UH Defendants have recycled many of their arguments in their previously denied Rule 12(b)(6) motion to dismiss and re-characterized it as a summary judgment motion.  Nor do the affidavits submitted by defendant Hershco in support of the UH Defendants' motions adequately identify and discuss the pleadings, discovery, disclosure materials or any other relevant admissible evidence, as prescribed by Fed. R. Civ. P. 56(c)(2), concerning plaintiffs' numerous causes of action or otherwise "assist the court in determining which facts are genuinely undisputed."  *See Madison Maidens, Inc. v. American Mfrs. Mut. Ins. Co.,* No. 05-cv-4585, 2006 U.S. Dist. LEXIS 39633, at *5 (S.D.N.Y. June 15, 2006).  Accordingly, the UH Defendants' motion may be denied for these reasons alone.  *See* Rule 56.1(d); *Felton v. King of Salsa, LLC*, No. 09-cv-7918, 2010 U.S. Dist. LEXIS 43443, at *4-*5 (S.D.N.Y. May 4, 2010) (denying summary

judgment based on the movant's failure to comply with Rule 56.1)
(citations omitted); *Searight v. Doherty Enters., Inc.*, No. 02-
cv-604, 2005 U.S. Dist. LEXIS 42681, at *3 (E.D.N.Y. Sept. 29,
2005) (denying summary judgment without prejudice based on
movant's failure to comply with Rule 56.1); *see also Tota*, 2010
U.S. App. LEXIS 10717, at *2 (observing that the court of
appeals accords "considerable deference" to the "the district
court's interpretation and application of its own local rule"
(quoting *LoSacco v. City of Middletown*, 71 F.3d 88, 92 (2d Cir.
1995))).

   By contrast, as discussed herein, plaintiffs'
extensive Rule 56.1 Statement and supporting declarations,
excerpted deposition testimony and exhibits raise issues of
material fact and preclude summary judgment on plaintiffs'
claims.[5]  Plaintiffs' claims are addressed in turn below.

---

[5] The UH Defendants did not object to or otherwise take issue
with plaintiffs' reliance on unsworn experts' reports which
summarize their findings and opinions about which they would
testify under oath at trial.  Although unsworn expert reports
generally do not satisfy the admissibility requirement of Rule
56(e), *see Fall v. New York State United Teachers*, 289 Fed.
Appx. 419, 421 n.3 (2d Cir. 2008); *Glowczenski v. Taser Int'l,
Inc.*, No. 04-cv-4052, 2010 U.S. Dist. LEXIS 47269, at *6
(E.D.N.Y. May 13, 2010); Fed. R. Civ. P. 56(e)(1)-(2); Local
Civil Rule 56.1(d), the court need not consider plaintiffs'
unsworn expert reports because of the UH Defendants' failure to
identify and adequately establish any undisputed material facts,
as required by Rule 56.1, and because of plaintiffs' extensive
showing of material facts in dispute.  *Cf. Capobianco v. City of
New York*, 422 F.3d 47, 55 (2d Cir. 2005) (holding that where the
defendants proffered and relied upon plaintiff's unsworn expert

### b. Claims under 42 U.S.C. §§ 1981 and 1982

Title 42 U.S.C. § 1981 ("Section 1981") and § 1982 ("Section 1982") "ban discrimination in various financial transactions, including making and enforcing contracts and purchasing real and personal property." *Barkley*, 2007 U.S. Dist LEXIS 61940, at *33-*34 (citing 42 U.S.C. §§ 1981, 1982). Specifically, Section 1981 provides, in pertinent part, that all persons "shall have the same right . . . to make and enforce contracts . . . ." 42 U.S.C. § 1981(a). Section 1982 provides, in relevant part, that "[a]ll citizens of the United States shall have the same right . . . as is enjoyed by white citizens . . . to . . . purchase, lease, sell, hold, and convey real . . . property." 42 U.S.C. § 1982. Sections 1981 and 1982 permit actions alleging discriminatory conduct against wholly private individuals and organizations. *See Runyon v. McCrary*, 427 U.S. 160, 179 (1976) (Section 1981); *Jones v. Mayer*, 392 U.S. 409, 438-39 (1968) (Section 1982).

---

report in support of their summary judgment motion, the district court erred by *sua sponte* excluding the unsworn report without providing the plaintiff notice and an opportunity to cure the defect by "obtain[ing] a sworn affidavit" from the expert, "which presumably would have merely reiterated" what was already stated in the report); *Cornell Research Found., Inc. v. Hewlett-Packard Co.*, No. 01-cv-1974, 2007 U.S. Dist. LEXIS 89637, at *60 (S.D.N.Y. Jan. 31, 2007) (observing that a defective unsworn expert report submitted in opposition to a summary judgment motion may be cured by "the submission of an affidavit or a declaration verifying the report's contents") (collecting cases).

To prevail under either Sections 1981 or 1982,

plaintiffs must establish that (1) they are members of a racial

minority; (2) the UH Defendants intended to discriminate against

them on the basis of their race; and (3) the discrimination

concerned one or more of the activities enumerated in Sections

1981 or Section 1982, such as the making or enforcement of

contracts or the purchase of real property. *See Puglisi v.

Underhill Park Taxpayer Assoc.*, 947 F. Supp. 673, 700 (S.D.N.Y.

1996), *aff'd*, 125 F.3d 844 (2d Cir. 1997); *Barkley*, 2007 U.S.

Dist LEXIS 61940, at *34. Although both parties' submissions

inadequately discuss the elements of plaintiffs' federal claims

against the UH Defendants, the parties fundamentally dispute

whether the UH Defendants intentionally discriminated against or

racially targeted the plaintiffs because of their African-

American race. (*See* Hershco Aff. ¶ 23; UH Defs. Mem. at Point

IV; Pls. Mem. at 28; ECF No. 471, UH Defendants' Reply

Memorandum of Law ("UH Defs. Reply Mem.") at 14.) Thus, in

opposing the UH Defendants' motion for summary judgment,

plaintiffs must proffer sufficient admissible evidence to raise

a genuine issue of material fact concerning the UH Defendants'

intent to discriminate against them. *See Okolie v. Paikoff*, 589

F. Supp. 2d 204, 217 (E.D.N.Y. 2008); *see also General Bldg.

Contractors Ass'n v. Pennsylvania*, 458 U.S. 375, 391 (1982)

(concluding that Section 1981 "can be violated only by

purposeful discrimination"); *Mian v. Donaldson, Lufkin &*

*Jenrette Sec. Corp.*, 7 F.3d 1085, 1087 (2d Cir. 1993); *Weser v.*

*Glen*, 190 F. Supp. 2d 384, 406 (E.D.N.Y. 2002) (observing that

to prevail under Section 1981 or 1982, the plaintiff must

establish discriminatory intent or motive).

The UH Defendants contend "plaintiffs' evidence of

targeting based on race is legally insufficient . . . ." (UH

Defs. Reply Mem. at 14; *see also* Hershco Aff. ¶ 23.)  The court

respectfully disagrees.

Plaintiffs have proffered sufficient admissible

evidence from which a jury could find intentional discrimination

by the UH Defendants.  Plaintiffs' admissible evidence includes

United Homes advertising featuring African-American and other

minority customers (Pls. 56.1 Stmt. ¶¶ 36, 119, 146, 203),

admissions by UH witnesses that UH sold properties mostly to

African-American and Latino buyers in neighborhoods comprised

predominantly of such racial and ethnic groups, and that UH

obtained and showed housing stock in predominantly minority

neighborhoods (*see id.* ¶¶ 7, 42, 84, 120, 149).[6]  Indeed, when

---

[6] The court properly may consider census tract maps compiled by
the United States Census Bureau for the year 2000, which reveal
that the neighborhoods in which plaintiffs were shown and
purchased homes were predominantly African American.  *See*
*Victoria Cruises, Inc. v. Yangtze Cruises, Inc.*, 630 F. Supp. 2d
255, 263 n.3 (noting that the court may take judicial notice of
government statistics, including census statistics); Fed. R.

the McDales inquired why they were being shown houses in the
East New York, East Flatbush, Bedford-Stuyvesant and Brownsville
sections of Brooklyn, a representative of UH, Gregory Copeland,
admitted "he believed United Homes was trying to sell the
McDales a home in certain neighborhoods." (Pls. 56.1 Stmt. ¶
150.) When the McDales asked about UH's customer base, the
United Homes representative responded that "it was Puerto Ricans
and African-Americans, mostly African-Americans."[7] (*Id.*)

Additionally, plaintiffs have presented evidence that
United Homes used "race-conscious outreach strategies." *See
Barkley*, 2007 U.S. Dist LEXIS 61940, at *36-37. Specifically,
the undisputed evidence establishes that when the Gibbonses
first visited United Homes's offices, they met with a Caucasian
manager who then paired them with an African-American salesman,

Evid. 202. Public census data is available at
http://factfinder.census.gov [last visited September 13, 2010].

[7] The statements of UH's representative are admissions. A
statement is not hearsay if it is offered against a party and
is, among other things, "a statement by the party's agent or
servant concerning a matter within the scope of the agency or
employment, made during the existence of the relationship."
Fed. R. Evid. 801(d)(2)(D); *see also Pappas v. Middle Earth
Condo. Ass'n*, 963 F.2d 534, 537 (2d Cir. 1992); *Arista Records
LLC v. Lime Group LLC*, No. 06-cv-5936, 2010 U.S. Dist. LEXIS
46638, at *39 (S.D.N.Y. May 11, 2010). Here, the undisputed
evidence indicates (i) the existence of an agency relationship
between United Homes and Mr. Copeland, who showed homes to the
McDales on behalf of United Homes; (ii) that Copeland's
statements were made during the course of the relationship; and
(iii) that his statements relate to a matter within the scope of
the agency relationship, namely, the showing of homes to the
McDales.

Barry Braxton.  (Pls. 56.1 Stmt. ¶ 37.)  According to the
Gibbonses, Mr. Braxton told the Gibbonses that he attended
church and that he "takes care of his own people[.]"  (*Id.* ¶ 38)
(quotation marks omitted).  Although it is unclear to whom the
phrase "own people" refers, a jury should be permitted to decide
whether the statement supports a finding of racial targeting.
Further, Christopher Webb, a sales agent for United Homes,
testified that approximately "50 to 60 percent" of UH's
customers were African American, "25 percen[t] Latino" and the
"rest was [sic] European or Indian or whatever . . . ."  (Webb
Dep. at 244-45.)

        Taken together, this evidence is sufficient to raise a
genuine issue of material fact as to whether the UH Defendants
targeted plaintiffs because of their race in order to lure them
into allegedly fraudulent real estate transactions.  As the
court previously observed, "evidence of [racial] targeting may
establish discriminatory intent in housing discrimination
cases."  *Barkley*, 2007 U.S. Dist LEXIS 61940, at *38 (collecting
cases).  Accordingly, the UH Defendants' motion for summary
judgment on plaintiffs' Section 1981 and Section 1982 claims is
denied.

### c. Claims under 42 U.S.C. § 1985(3)

The UH Defendants also seek summary judgment on plaintiffs' claims under 42 U.S.C. § 1985(3) ("Section 1985(3)").  Section 1985(3) provides, in relevant part, that

> If two or more persons . . . conspire . . . for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws . . . the party so injured or deprived may have an action for the recovery of damages, occasioned by such injury or deprivation, against any one or more of the conspirators.

42 U.S.C. § 1985(3).  Section 1985(3) does not create any "substantive rights" and therefore "rights, privileges, and immunities that § 1985(3) vindicates must be found elsewhere . . . ." *United Bhd. of Carpenters and Joiners of Am., Local 610 v. Scott*, 463 U.S. 825, 833 (1983) (citations omitted); *see Traggis v. St. Barbara's Greek Orthodox Church*, 851 F.2d 584, 587 (2d Cir. 1988) (observing that Section 1985(3) "itself provides no substantive rights; instead, it provides a remedy for violation of the rights it designates.  Determining which rights the statute designates, however, is not always a simple matter." (citations and internal quotation marks omitted)).

Here, plaintiffs base their Section 1985(3) claim on alleged violations of Sections 1981 and 1982.  (*See, e.g.*, 04-cv-875, ECF No. 78, Amended Complaint ("Barkley Am. Compl.").)  Although neither party has addressed whether Section 1985(3)

43

provides a remedy for violations of Sections 1981 or 1982, there is authority indicating that the plaintiffs may seek redress under Section 1985(3) for violations of Section 1981 where, as here, the Section 1981 claim is based on the right to make contracts free from racial discrimination. *See Rowe Entm't, Inc. v. William Morris Agency, Inc.*, 2000 U.S. Dist. LEXIS 9256, at *48 (S.D.N.Y. July 6, 2000); *cf. Great Am. Fed. Sav. and Loan v. Novotny*, 442 U.S. 366, 372, (1979) (holding that Section 1985(3) does not confer a separate right of action for injuries redressed by Title VII); *Jenkins v. Arcade Bldg. Maint.*, 44 F. Supp. 2d 524, 553 (S.D.N.Y. 1999) (holding that Section 1981's "prohibition against racial harassment relating to the conditions of employment . . . cannot form the substantive basis for a § 1985(3) conspiracy.")

"The four elements of a § 1985(3) claim are: (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of equal protection of the laws, or of equal privileges and immunities under the laws; (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right of a citizen of the United States." *Mian*, 7 F.3d at 1087 (citation omitted); *see Barkley*, 2007 U.S. Dist LEXIS 61940, at *35.

Additionally, "[a] conspiracy need not be shown by proof of an explicit agreement but can be established by showing that the parties have a tacit understanding to carry out the prohibited conduct." *Barkley*, 2007 U.S. Dist LEXIS 61940, at *35 (citations and internal quotation marks omitted); *see LeBlanc-Sternberg v. Fletcher*, 67 F.3d 412, 427 (2d Cir. 1995); *cf. Cine SK8, Inc. v. Town of Henrietta*, 507 F.3d 778, 792 (2d Cir. 2007) (holding that where there was sufficient evidence for a reasonable jury to find that a majority of the town board members, as individuals, were motivated by racial animus in amending the plaintiff's special use permit, the court could not "draw a reasonable inference from this evidence alone that the members . . . had even a tacit understanding" to amend the permit because of racial animus). "Furthermore, the conspiracy must also be motivated by some racial or perhaps otherwise class-based, invidious discriminatory animus behind the conspirators' action." *Mian*, 7 F.3d at 1087 (citation and internal quotation marks omitted).

Neither plaintiffs nor the UH Defendants have addressed Section 1985(3)'s four-element test and, instead, focus their arguments exclusively on whether there is sufficient evidence of discriminatory intent. As previously discussed, there is admissible evidence which, taken together, is sufficient to raise a genuine issue of material fact as to

whether the UH Defendants targeted plaintiffs based on their race.

Further, the undisputed evidence sufficiently raises a genuine issue of material fact regarding the existence of a conspiracy and whether certain acts of the defendants were taken in furtherance thereof. Among other things, the evidence demonstrates that each plaintiff was shown distressed and defective properties in predominantly minority sections of Brooklyn; were encouraged to and met with lenders and attorneys arranged for by United Homes at UH's offices, which attorneys purported to represent the purchasers; were subject to high-pressure tactics to close quickly on the deals; and were discouraged from obtaining independent advice about the terms of the transactions and from conducting thorough and independent inspections. The evidence further demonstrates that each plaintiff purchased homes with hidden defects, superficial repairs and unaffordable mortgages. Thus, when viewed in totality, the evidence indicates the existence of a conspiracy carried out by the UH Defendants, lawyers, real estate appraisers, and lenders, who all participated in a scheme to obfuscate the home-buying process for these first-time minority purchasers. Accordingly, the UH Defendants' motion for summary judgment on plaintiffs' Section 1985(3) claims is denied.

**d. Claims under the Fair Housing Act**

The UH Defendants also seek summary judgment dismissal of plaintiffs' claims under Fair Housing Act ("FHA"), 42 U.S.C. § 3604 ("Section 3604") and § 3605 ("Section 3605"). Among other things, Section 3604 prohibits discrimination "against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(b). Section 3605 prohibits anyone "whose business includes engaging in residential real estate-related transactions to discriminate against any person in making available such a transaction, or in the terms or conditions of such a transaction, because of race, color, religion, sex, handicap, familial status, or national origin." 42 U.S.C. § 3605(a).

Disparate treatment claims under the FHA are analyzed under the burden-shifting analysis prescribed by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Boykin v. KeyCorp*, 521 F.3d 202, 213 (2d Cir. 2008) (citing *Mitchell v. Shane*, 350 F.3d 39, 47 (2d Cir. 2003)); *Barkley*, 2007 U.S. Dist LEXIS 61940, at *42 (citations omitted). Under the burden-shifting framework, plaintiffs must establish a *prima facie* case of discrimination, the elements of which the court will discuss below. If plaintiffs establish a *prima facie* case of

discrimination, the UH Defendants must proffer a legitimate,

nondiscriminatory reason for their conduct.  If the UH

Defendants make such a showing, the burden shifts back to the

plaintiffs to demonstrate that discrimination was the "real

reason" for the UH Defendants' action.  *Mitchell*, 350 F.3d at

47.

Each plaintiff herein claims that the UH Defendants

violated the FHA by "targeting" them "for a predatory home sale

and financing transaction" that constituted "reverse redlining."

(*See, e.g.*, Barkley Am. Compl. ¶ 221.)  "'Reverse redlining' is

the situation in which a lender unlawfully discriminates by

extending credit to a neighborhood or class of people (typically

living in the same neighborhood) on terms less favorable than

would have been extended to people outside the particular class

at issue."  *Williams v. 2000 Homes Inc.*, No. 09-cv-16, 2009 U.S.

Dist. LEXIS 65433, at *11 (E.D.N.Y. July 29, 2009) (citation

omitted).  Although the Second Circuit has not yet addressed

whether reverse redlining violates the FHA, the court in this

action previously held that this type of predatory lending

connected to the purchase of a home can form the basis of a

claim under either § 3604(b) or § 3605(a).  *See Barkley*, 2007

U.S. Dist. LEXIS 61940, at *43-*47.

The court observed in its August 2007 Order that the

elements necessary to establish a *prima facie* case of

discrimination based on reverse redlining are as follows: (1)
plaintiffs are members of a protected class, an element which
the parties do not dispute is satisfied; (2) plaintiffs applied
for and were qualified for loans; (3) the loans were made on
grossly unfavorable terms; and (4) the transactions were
discriminatory. *Barkley*, 2007 U.S. Dist. LEXIS 61940, at *44-
*45 (citations omitted); *see Williams*, 2009 U.S. Dist. LEXIS
65433, at *12. The court previously held that the fourth
element may be established "with evidence of intentional
targeting" of a protected class. *See Barkley*, 2007 U.S. Dist.
LEXIS 61940, at *47. For the reasons previously discussed
herein, plaintiffs have raised a genuine issue of material fact
as to whether the UH Defendants intentionally targeted them
based on their African-American race, thus satisfying the fourth
element of the *prima facie* analysis and requiring denial of
summary judgment on plaintiffs' FHA claims.[8] Further, the same
evidence of racial targeting rebuts any legitimate, non-
discriminatory reason for the UH Defendants' actions and
provides a basis upon which a jury may find that discrimination
was the "real reason" for the UH Defendants' action. *See*

---

[8] Based upon the UH Defendants' failure to offer any evidence
that there are undisputed facts relevant to the second and third
elements, or even to discuss these elements in their Memorandum
of Law, the court declines to address the same and will not for
purposes of this motion find that plaintiffs have failed to
satisfy the second and third elements of the *prima facie*
analysis.

*Mitchell*, 350 F.3d at 47. Accordingly, the UH Defendants'
motion for summary judgment on plaintiffs' FHA claims is denied
because a reasonable jury could find that the UH Defendants'
actions were motivated by discrimination. *Cf. id.* ("summary
judgment is appropriate if no reasonable jury could find that
the defendant's actions were motivated by discrimination."
(citation omitted)).

### e. Claims under State and Local Anti-Discrimination Laws

The UH Defendants seek summary judgment dismissal of
plaintiffs' claims under the NYHRL and NYCHRL "for the same
reasons" that they contend warrant dismissal of plaintiffs'
federal law claims. (UH Defs. Mem. at 7.) Alternatively,
without citing any legal authority or providing any reasoning,
the UH Defendants seek severance of these claims "so that [sic]
can be brought in State Court." (*Id.*)

Because the standards relevant to NYHRL and NYCHRL
claims "parallel those applicable under the Fair Housing Act,"
the court denies the UH Defendants' summary judgment motion
dismissing such claims. *See Barkley*, 2007 U.S. Dist. LEXIS
61940, at *56-*57 (citing *Lynn v. Village of Pomona*, 212 Fed.
Appx. 38, 2007 U.S. App. LEXIS 610, at *3 n.2 (2d Cir. Jan. 9,
2007)). Moreover, the court declines to sever plaintiffs' NYHRL
and NYCHRL claims based on the UH Defendants' failure to explain
the basis for the requested relief and because such relief is

not warranted. *See Atlantic Specialty Ins. v. AE Outfitters Retail Co.*, No. 07-cv-8508, 2009 U.S. Dist. LEXIS 101802, at *4 (S.D.N.Y. Oct. 30, 2009) (the "decision whether to grant a severance motion is committed to the sound discretion of the trial court" (citations and internal quotation marks omitted)).

### f. Claims under New York General Business Law § 349

The UH Defendants contend that plaintiffs' claims under New York General Business Law § 349 ("Section 349") should be dismissed. The UH Defendants maintain that "the statute does not apply here because the Complaints are limited to disputes between the plaintiffs and the defendants arising out of a relationship, which is essentially contractual in nature." (UH Defs. Mem. at 1.) The UH Defendants further contend that Section 349 "does not apply to a breach of a private contract . . . because that conduct is not an act or practice affecting the public interest." (*Id.*)

The court has previously considered this argument and observed that "Section 349 reaches real estate transactions consisting of a 'package of consumer services.'" *Barkley*, 2007 U.S. Dist. LEXIS 61940, at *58 (citing *Polonetsky v. Better Homes Depot, Inc.,* 760 N.E.2d 1274, 1277 (N.Y. 2001)). Based upon plaintiffs' allegations that "defendants orchestrated all-inclusive home sales and steered plaintiffs to participating lawyers, lenders, and mortgage brokers[,]" the court previously

51

held that plaintiffs adequately alleged "consumer-oriented" conduct for purposes of Section 349.  *Id.* at *59.

The elements of a Section 349 claim are "(1) the defendant's challenged acts or practices must have been directed at consumers, (2) the acts or practices must have been misleading in a material way, and (3) the plaintiff must have sustained injury as a result."  *Cohen v. JP Morgan & Chase Co.*, 498 F.3d 111, 126 (2d Cir. 2007) (citations omitted).

As to the first element, plaintiffs must demonstrate that the UH Defendants' alleged acts or practices have a "broa[d] impact on consumers at large."  *See Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 647 N.E.2d 741, 744 (N.Y. 1995); *Sheehy v. New Century Mortg. Corp.*, 690 F. Supp. 2d 51, 74 (E.D.N.Y. 2010).  "Thus, when courts have found § 349 applicable in the context of real estate transactions, they have usually done so where defendant published advertisements or otherwise solicited the general public."  *Sheehy*, 690 F. Supp. at 74 (collecting cases).

Here, the undisputed evidence establishes that the UH Defendants advertised their services on billboards, in subways, in newspapers, on television, through a website and with flyers. (UH Defs. Interrogatory Responses at 6-7.)  Accordingly, the first element of a Section 349 claim is satisfied.

As to the second and third elements, plaintiffs have proffered evidence that would enable a reasonable fact finder to conclude that the UH Defendants engaged in practices that are "objectively" misleading in a material way that damaged the plaintiffs. *See Oswego,* 647 N.E.2d at 744 (deceptive or misleading representations or omissions are defined objectively as those "likely to mislead a reasonable consumer acting reasonably under the circumstances"). Most significantly, as discussed above, each plaintiff states that despite United Homes's repeated representations that their homes would be renovated and repaired, each home was significantly in disrepair, in many cases with myriad defects masked by cosmetic repairs, which defects caused plaintiffs to incur substantial repair costs. By contrast, it is undisputed that United Homes advertised "fully renov[ated]" and "[n]ewly renov[ated]" homes. (Faux Decl., Ex. 11, at Bates Nos. CL-46, 50.) One advertisement promised that homes would be "Exquisitely Renovated (New Bathrooms, Kitchens, Appliances, Etc)" and "Quality Craftsmanship Throughout the Whole House[.]" (*Id.*, at Bates No. DCD-03.) Thus, at a minimum, there is a triable issue of fact as to whether United Homes's advertisements were objectively misleading. Thus, summary judgment as to plaintiffs' Section 349 claims is denied.

### g. Fraud Claims

To state a claim for fraud in New York, a plaintiff must allege "(1) a material misrepresentation or omission of fact, (2) made with knowledge of its falsity, (3) with an intent to defraud, and (4) reasonable reliance on the part of the plaintiff, (5) that causes damage to the plaintiff." *Haggerty v. Ciarelli & Dempsey*, No. 09-2135-cv, 2010 U.S. App. LEXIS 6128, at *4 (2d Cir. Mar. 25, 2010) (citations omitted); *see Barkley*, 2007 U.S. Dist. LEXIS 61940, at *59 (citations omitted). The court has previously held that plaintiffs have adequately alleged fraud claims against each of the UH Defendants. *See id.*, at *62-*66.

The UH Defendants seek summary judgment dismissal of plaintiffs' fraud claims on substantially the same grounds that this court previously rejected in the context of the UH Defendants' Rule 12(b)(6) motion to dismiss. The UH Defendants contend that plaintiffs cannot identify any misrepresentations or omissions of material fact which were known to be false and that the doctrine of *caveat emptor* defeats plaintiffs' fraud claims insofar as the "properties were made fully available for inspection . . . without restriction . . . ." (UH Defs. Mem. at 2, 4.) The UH Defendants further contend that plaintiffs' fraud claims "arise out of contracts" and therefore "no independent

fraud claim can be sustained or maintained." (*Id.* at 4.) The court disagrees.

With respect to the first three elements required to state a fraud claim, as explained in Section II(A)(g), *supra*, plaintiffs proffer undisputed admissible evidence of the UH Defendants' material factual misrepresentations and omissions throughout plaintiffs' home-buying processes. (*See also* Pls. Mem. at 7-10.) The evidence indicates, among other things, that the UH Defendants, with the assistance of complicit lawyers, lenders and real estate appraisers, concealed facts and misled the plaintiffs about the condition and true value of the properties that unquestionably would be material to any reasonable purchaser. Consequently, the evidence raises questions of material fact as to whether the UH Defendants intended to defraud plaintiffs.

As to the fourth element, the court rejects the UH Defendants' contention that plaintiffs have failed to establish reasonable reliance upon the UH Defendants' alleged misrepresentations and omissions. The UH Defendants argue that the doctrine of *caveat emptor* required plaintiffs to exercise "ordinary intelligence" to ascertain the "truth or the real quality of the properties." (UH Defs. Mem. at 4.) This argument was rejected in the court's August 2007 Order because the *caveat emptor* doctrine does not apply where, as here, there

is evidence that the seller "concealed facts or induced buyers to refrain from making independent inquiries into the terms of a real estate deal." *See Barkley*, 2007 U.S. Dist. LEXIS 61940, at *60 (citations omitted). Further, the *caveat emptor* doctrine is inapplicable to bar fraud claims where, as here, there is a material factual dispute as to whether the UH Defendants "deliberately steered plaintiffs" to other members of the alleged conspiracy "to prevent their discovery of the true value of the properties at issue." *Id.*, at *61. As discussed in Section II(A)(g), *supra*, plaintiffs have proffered admissible evidence that the UH Defendants steered them to other parties complicit in the alleged fraud, and pressured them to sign closing documents, "thereby discouraging them from obtaining independent advice about the terms of the transactions." *See id.*, at *61-*62; *see also M&T Mortg. Corp. v. White*, No. 04-CV-4775, 2010 U.S. Dist. LEXIS 89008, at *48-*49 (E.D.N.Y. Mar. 18, 2010) (concluding that the *caveat emptor* doctrine was inapplicable where a jury could find that the plaintiffs' failure to perform or procure independent property inspections resulted from the defendant home seller's referral of plaintiffs to appraisers and attorneys who allegedly deprived the plaintiffs of independent advice), *aff'd*, 2010 U.S. Dist. LEXIS 88944 (August 26, 2010).

As to the fifth element, the UH Defendants do not genuinely dispute that plaintiffs have proffered admissible evidence of damages. By contrast, as previously explained, each plaintiff's home was significantly in disrepair, with latent defects in many cases concealed by cosmetic repairs. (*See* Pls. 56.1 Stmt. ¶¶ 28, 72, 112, 140, 197, 225.)

Finally, the court rejects the UH Defendants' contention that plaintiffs' fraud claims do not lie because they arise out of an alleged breach of contract. (*See* UH Defs. Mem. at 4.) Generally, "a fraud claim may not be used as a means of restating what is, in substance, a claim for breach of contract." *Wall v. CSX Transp., Inc.*, 471 F.3d 410, 416 (2d Cir. 2006) (quotation marks omitted); *see also id.* (observing that a cause of action for fraud cannot exist when a fraud claim arises out of the same facts as a breach of contract claim where the sole additional allegation is that the "defendant entered into a contract while lacking the intent to perform" contractual obligations (citation omitted)). Notwithstanding, "New York law specifically recognizes causes of action for fraud in the inducement [of a contract] when the misrepresentation is collateral to the contract it induced." *Id.* (citations omitted).

Here, as previously discussed, plaintiffs have proffered admissible evidence of alleged material

misrepresentations and omissions that are collateral to any contracts between plaintiffs and the UH Defendants. Specifically, the undisputed evidence demonstrates that United Homes advertised "renovated" homes that were "great for living or investm[en]t." (*See* Faux Decl., Ex. 11, at Bates Nos. CL-46, 50, 56, 59.) Further, the UH Defendants' employees or agents assured plaintiffs that United Homes would fully renovate their homes and repeatedly promised that all repairs would be completed before the closing and that United Homes would assist them in securing tenants for rental units. (Pls. 56.1 Stmt. ¶¶ 7, 10, 44, 46, 48, 59, 61, 65, 85, 99, 104, 122, 154, 156, 213.) Additionally, there is substantial admissible evidence indicating that the UH Defendants affirmatively took steps to conceal defects in plaintiffs' homes by, *inter alia*, concealing rotten flooring; leaking roofs, walls and windows; debris; electrical and plumbing problems; and water damage. (*Id.* ¶¶ 28, 112, 140, 190, 224.) Accordingly, the court concludes that the UH Defendants' representations are sufficiently collateral to their agreements with the plaintiffs as to sustain a claim for fraud in the inducement under New York law. Thus, summary judgment on plaintiffs' fraud claims is denied.

### h. Civil Conspiracy Claims

The UH Defendants seek summary judgment dismissal of plaintiffs' civil conspiracy claims on the mistaken grounds that

"New York does not recognize a cause of action for civil conspiracy." (UH Defs. Mem. at 5) (citing *Hebrew Inst. for the Deaf & Exceptional Children v. Kahana*, 870 N.Y.S.2d 85 (N.Y. App. Div. 2008); *Crispino v. Greenpoint Mortg. Corp.*, 769 N.Y.S.2d 553 (N.Y. App. Div. 2003).) The cited cases, however, recognize that a claim of civil conspiracy is not an independent cause of action but is predicated upon the tortious conduct of a defendant. *See Kahana*, 870 N.Y.S.2d at 86 ("New York does not recognize civil conspiracy to commit a tort as an independent cause of action; rather, such a claim stands or falls with the underlying tort") (citations omitted); *Crispino*, 769 N.Y.S.2d at 556 ("a mere conspiracy to commit a fraud is never of itself a cause of action" (citation and internal quotation marks omitted)). Here, plaintiffs' civil conspiracy claims are derivative of their underlying claims for fraud, which survive summary judgment.

To establish a claim of civil conspiracy, plaintiffs must demonstrate the underlying tort, plus the following four elements: (1) an agreement between two or more parties; (2) an overt act in furtherance of the agreement; (3) the parties' intentional participation in the furtherance of a plan or purpose; and (4) resulting damage or injury. *Meisel v. Grunberg*, 651 F. Supp. 2d 98, 119 (S.D.N.Y. 2009).

The court has discussed each of the above four factors
in the context of other causes of action and will briefly
summarize the evidence as it applies to plaintiffs' civil
conspiracy claims.  As to the first element, the undisputed
evidence indicates the existence of an agreement between the UH
Defendants, lawyers, appraisers and lenders to sell distressed
and defective properties to the plaintiffs.  As to the second
and third elements, the UH Defendants, *inter alia*, arranged for
plaintiffs to meet with lawyers and lenders in their offices,
performed cosmetic repairs on plaintiffs' homes, pressured
plaintiffs to close quickly on the transactions, and discouraged
the plaintiffs from obtaining independent advice about the terms
of the transactions and from conducting thorough and independent
inspections.  Finally, plaintiffs were unquestionably damaged as
a result of the conspiracy by purchasing homes with hidden
defects, superficial repairs and unaffordable mortgages.  Thus,
summary judgment on plaintiffs' civil conspiracy claims is
denied.

### C. Wachovia Defendants' Motion for Summary Judgment

The Wachovia Defendants move for summary judgment on
plaintiff Mary Lodge's claims against the enforceability of the
First Mortgage, based upon the affirmative defense that Wachovia
is a holder in due course of Lodge's First Note and First
Mortgage.  The parties agree that the New York Uniform

Commercial Code ("NYUCC") establishes the rights of a holder in due course and the defenses that may be asserted by the maker, such as Lodge, of a negotiable instrument such as the First Note. (*See* ECF No. 454, Wachovia Defendants' Memorandum of Law ("Wachovia Defs. Mem.") at 4;[9] ECF No. 456, Plaintiff Lodge's Memorandum of Law ("Lodge Mem.") at 8 and nn.6-7; ECF No. 455, Wachovia Defendants' Reply Memorandum of Law ("Wachovia Defs. Reply Mem.") at 2.) The provision dictates that, except in certain situations, a holder in due course takes an instrument free from "all claims to it on the part of any person . . . ." NYUCC § 3-305.[10]

---

[9] The Wachovia Defendants' Memorandum of Law is not paginated, but the court has paginated its copy of the Memorandum. Page 1 of the court's copy of the Memorandum begins on the page titled "Preliminary Statement."

[10] NYUCC § 3-305, governing the "[r]ights of a Holder in Due Course" provides:

> To the extent that a holder is a holder in due course he takes the instrument free from
>
> (1) all claims to it on the part of any person; and
>
> (2) all defenses of any party to the instrument with whom the holder has not dealt except
>> (a) infancy, to the extent that it is a defense to a simple contract; and
>> (b) such other incapacity, or duress, or illegality of the transaction, as renders the obligation of the party a nullity; and
>> (c) such misrepresentation as has induced the party to sign the instrument with neither knowledge nor reasonable opportunity to obtain knowledge of its character or its essential terms; and

"Under UCC Article 3, '[a] holder in due course is defined as a (1) holder (2) of a negotiable instrument (3) who took it for value, (4) in good faith, and (5) without notice that it is overdue or has been dishonored or of any defense against or claim to it on the part of another.'" *Provident Bank v. Cmty. Home Mortg. Corp.*, 498 F. Supp. 2d 558, 572 (E.D.N.Y. 2007); *see* NYUCC § 3-302; *see also A.I. Trade Fin., Inc. v. Laminaciones de Lesaca, S.A.*, 41 F.3d 830, 836-37 (2d Cir. 1994) (citation omitted); *Hartford Accident & Indem. Co. v. American Express Co.*, 74 N.Y.2d 153, 159 (1989).  The parties do not dispute the second element, that the subject note is a negotiable instrument.  (Lodge Mem. at 8 n.7.)

Instead, Lodge contends that there is a genuine factual dispute as to whether (i) Wachovia is a holder[11] of the First Note and First Mortgage; (ii) Wachovia took the subject

---

(d) discharge in insolvency proceedings; and
(e) any other discharge of which the holder has notice when he takes the instrument.

[11] Under the NYUCC, a "holder" is defined as "a person who is in possession of . . . an instrument . . ., issued or indorsed to him or to his order or to bearer or in blank."  NYUCC § 1-201(20).  The "indorsement must be written by or on behalf of the holder and on the instrument or on a paper so firmly affixed thereto as to become a part thereof."  *Id.* § 3-202(2).  "Thus, although a party may be a transferee of an instrument, it does not follow that such party must also be a holder within the meaning of UCC Article 3."  *Provident Bank*, 498 F. Supp. 2d at 573 (quoting *Hauser v. W. Group Nurseries, Inc.*, 767 F. Supp. 475, 486 (S.D.N.Y. 1991)).

note and mortgage for value; and (iii) Wachovia and Bayview took the note and mortgage in bad faith, with notice of claims or defenses. (*See* Lodge Mem. at 7-8.) The Wachovia Defendants contend that Wachovia was a holder in due course when the First Note was assigned to it as trustee and at the time this lawsuit was commenced. (*See* Wachovia Defs. Reply Mem. at 1-2.) The Wachovia Defendants further contend that they took the First Note and First Mortgage in good faith, for value, and that they had no actual notice of any claims or defenses. (*Id.*)

Even assuming for purposes of their motion only that the Wachovia Defendants both are holders of the First Note and First Mortgage or were holders at the time they were joined as Rule 19 parties,[12] and that they took the instruments for value, there is a material factual dispute as to whether the Wachovia Defendants took the instruments in good faith and without notice of claims or defenses.

---

[12] The Wachovia Defendants' submissions are seemingly contradictory and inconsistent regarding the "holder" issue. Although the Wachovia Defendants claim that "Wachovia as Trustee is the holder of the First Note, and in fact, is in possession of the First Note and First Mortgage" (Wachovia Defs. Reply Mem. at 2), Mr. Hodapp states that Bayview "has continuously been in possession, custody and control of the original documents, including the First Note and First Mortgage." (Hodapp Decl. ¶ 8.) Mr. Hodapp further states that "Wachovia as Trustee . . . became the owner and holder of the First Note and First Mortgage" (*id.* ¶ 7), and that Wachovia "never had an ownership interest in the First Note and Mortgage aside from in its capacity as trustee." (*Id.* ¶ 9.)

The NYUCC defines "good faith" as "honesty in fact in the conduct or transaction concerned." NYUCC § 1-201(19). Under the NYUCC, good faith "requires honesty only. It does not require the exercise of due care." *In re Apponline.com, Inc.*, 285 B.R. 805, 819 (E.D.N.Y. 2002) (citation omitted); *Provident Bank*, 498 F. Supp. 2d at 573.

"Similarly, '[t]o constitute notice of a claim or defense, the purchaser must have notice of the claim or defense or knowledge of such facts that his action in taking an instrument amounts to bad faith.'" *Provident Bank*, 498 F. Supp. 2d at 573 (quoting NYUCC § 3-304(7)). In determining whether a party had notice of a claim or defense to a negotiable instrument, courts apply a "subjective test of actual knowledge rather than an objective test which might involve constructive knowledge." *See A.I. Trade*, 41 F.3d at 837 (citing *Carrefour U.S.A. Properties Inc. v. 110 Sand Co.*, 918 F.2d 345, 347 (2d Cir. 1990); *Hartford Accident*, 74 N.Y.2d at 162) (internal quotation marks omitted).

"The same facts that call a party's 'good faith' into question may also give that party 'notice' that the instrument has one of the problems listed in section 3-302" (*e.g.* the instrument is subject to a claim or defense). 2 James J. White & Robert S. Summers, Uniform Commercial Code § 17-7 (5th ed. 2008). "The holder's initial burden on the issues of notice and

good faith . . . is 'a slight one' that may be satisfied by his affidavit disclaiming any knowledge of the maker's defense when the notes were negotiated." *A.I. Trade*, 41 F.3d at 836 (citing *First Int'l Bank, Ltd. v. L. Blankstein & Son, Inc.*, 59 N.Y.2d 436, 444 (1983)). "Such an affidavit, 'while necessarily conclusory in form,' may nevertheless be enough to place on the maker the burden of coming forward with evidence sufficient to raise a genuine issue as to the holder's notice of defenses. *Id.* at 837 (quoting *First Int'l Bank*, 59 N.Y.2d at 444).

Here, the Wachovia Defendants have proffered a declaration indicating that neither Bayview nor Wachovia had notice of any claim or defense against the First Note or First Mortgage. (*See* Hodapp Decl. ¶¶ 11-12.) They have thus satisfied their "slight" initial burden to establish a lack of knowledge of any claim or defense to the instruments. *See A.I. Trade*, 41 F.3d at 836.

Consistent with her obligations under Fed. R. Civ. P. 56(e), Lodge must proffer admissible evidence from which a reasonable jury could find notice and bad faith. *See Citibank, N.A. v. Trump Taj Mahal Assocs.*, No. 95-cv-4327, 1996 U.S. Dist. LEXIS 16480, at *10 (S.D.N.Y. Nov. 6, 1996) ("Plaintiff need not . . . show 'actual notice' to defeat a motion for summary judgment; plaintiff need only show there is a genuine issue of fact from which a reasonable jury could infer notice and bad

faith." (citations omitted)).  Lodge contends that there is sufficient evidence to defeat summary judgment and from which a jury could infer that the Wachovia Defendants acquired the First Note and First Mortgage with knowledge of Lodge's claim that the appraisal on which the property value was based was questionable, or even forged, and/or that Lodge had no realistic possibility to repay the loan.  The court agrees.

There is evidence that the Bayview entities were aware of property flipping and inflated or fraudulent appraisals in Brooklyn at the time Lodge purchased her home and obtained financing from Olympia.  (*See* Silver Dep. at 48-49.)  As previously mentioned, a July 1, 2003 email from Odyxa Bermudez, an in-house appraiser at Bayview Financial, to Jack Silver, advises of property flipping and sales price inflation "going on in Brooklyn in the recent months" and that one of the properties involved "in our deal" with Olympia was implicated. (Constantine-Davis Decl., Ex. H, Email from Bermudez to Silver dated 7/1/10, Bates No. Bayview 14.)  The email also indicates that some appraisals had been forged and that "appraisals on these Brooklyn properties cannot be given any credit."  (*Id.*) The evidence further establishes that Mr. Gilbert, who appraised the Lodge property for Olympia, was contacted by Ms. Bermudez, who confirmed that flipping and inflated appraisals were

occurring in Brooklyn regarding Lodge's and other loans that Bayview purchased from Olympia. (Silver Dep. at 48-50.)

Further, the undisputed evidence indicates that before purchasing the First Note and First Mortgage, Bayview performed "independent due diligence" (Hodapp Decl. ¶ 10) and ordered broker price opinions ("BPO") to determine "accurate" property values. (*See* Wachovia Defs. Reply Mem. at 6; Constantine-Davis Decl., Ex. I, Lodge BPO dated July 10, 2003, Bates No. Fillmore-10.) In contrast to the $419,000 sales price of Lodge's home, the BPO recommended that the property be valued at $369,000 and estimated a $360,000 sales price, which suggests that Lodge's property was over appraised.

Bayview was also aware that Ms. Lodge had not listed any assets or income on her loan application and that she had undertaken a second "piggyback" loan at the time she purchased her home. (*See* Silver Dep. at 57; Lodge 56.1 Stmt. ¶ 18; Constantine-Davis Decl., Ex. U, Residential Loan Application dated 1/6/03, Bates Nos. OMC-L 0226-29.) Although the Wachovia Defendants were not concerned about borrowers' debt-to-income ratio on loans they reviewed for purchase, (Lodge 56.1 Stmt. ¶ 25), at a minimum, Lodge's lack of income or assets and substantial debt raise concerns about her ability to repay the loan.

When viewed in totality, the evidence is sufficient to raise material factual questions as to whether the Wachovia Defendants acted in good faith when they acquired the First Note and First Mortgage and whether they actually were aware of defenses to the loan.  Accordingly, the Wachovia Defendants' motion for summary judgment is denied.

**D. Plaintiffs' Motion to Consolidate**

Plaintiffs move to consolidate the above-captioned actions for trial pursuant to Federal Rule of Civil Procedure Rule 42(a).  (*Barkley*, 04-cv-875, ECF No. 467, Notice of Motion and Memorandum of Law ("Pls. Consolidation Mem.").)  The UH Defendants and the Wachovia Defendants oppose consolidation and seek separate trials.  (*Barkley*, 04-cv-875, ECF No. 468, UH Defendants' Memorandum of Law ("UH Defs. Consolidation Mem."); *Lodge*, 05-cv-187, ECF No. 452, Wachovia Defendants' Memorandum of Law ("Wachovia Defs. Consolidation Mem.").)  Olympia also opposes consolidation and "joins in opposing" the motion "for the reasons set forth in the submissions of the other Defendants."  (*Barkley*, 04-cv-875, ECF No. 466, Olympia's Memorandum of Law.)

Pursuant to Fed. R. Civ. P. Rule 42, "[i]f actions before the court involve a common question of law or fact, the court may: (1) join for hearing or trial any or all matters at issue in the actions; (2) consolidate the actions; or (3) issue

any other orders to avoid unnecessary cost or delay." Fed. R. Civ. P. 42(a). "The trial court has broad discretion to determine whether consolidation is appropriate." *Johnson v. Celotex Corp.*, 899 F.2d 1281, 1284 (2d Cir. 1990) (citations omitted); *see Gorbaty v. Wells Fargo Bank, N.A.*, Nos. 10-CV-3291, 10-CV-3354, 2010 U.S. Dist. LEXIS 77289, at *1 (E.D.N.Y. July 27, 2010) (citation omitted). A party moving for consolidation bears the burden of showing the commonality of factual and legal issues in the actions it seeks to consolidate. *DeBruyne v. National Semiconductor Corp.*, 11 F.3d 368, 373 (2d Cir. 1993).

"Consolidation is appropriate in order to serve the interests of judicial economy." *Capp v. New York State Dep't of Transp.*, Nos. 10-cv-679, 10-cv-681, 10-cv-682, 2010 U.S. Dist. LEXIS 66068, at *3 (E.D.N.Y. June 22, 2010) (citation omitted); *see Johnson*, 899 F.2d at 1285. "Specifically, consolidation of cases with common questions of law or fact is favored to avoid unnecessary costs or delay, and to expedite trial and eliminate unnecessary repetition and confusion." *Capp*, 2010 U.S. Dist. LEXIS 66068, at *3 (citing *Johnson*, 899 F.2d at 1284; *Devlin v. Trans. Comm'cns Int'l Union*, 175 F.3d 121, 130 (2d Cir. 1999)) (internal quotation marks omitted). "Cases may be consolidated even where, as here, certain defendants are named in only one of the complaints." *Id.* (citation omitted). Considerations of

convenience and economy, however, "must yield to a paramount concern for a fair and impartial trial." *Johnson*, 899 F.2d at 1285 (citation omitted).

In determining whether consolidation is appropriate, the court must consider the following factors:

> Whether the specific risks of prejudice and possible confusion [are] overborne by the risk of inconsistent adjudications of common factual and legal issues, the burden on parties, witnesses, and available judicial resources posed by multiple lawsuits, the length of time required to conclude multiple suits as against a single one, and the relative expense to all concerned of the single-trial, multiple-trial alternatives.

*Id.* (citation omitted) (alteration in original). "One of the primary objectives of consolidation is to prevent separate actions from producing conflicting results." *Bank of Montreal v. Eagle Assocs.*, 117 F.R.D. 530, 533 (S.D.N.Y. 1987) (citation omitted).

Plaintiffs have satisfied their burden of demonstrating the existence of common factual and legal questions in the six actions sought to be consolidated. The complaints in each action contain virtually identical factual allegations, claiming that the UH Defendants, among others, "targeted persons of limited financial means and savvy who had never before purchased homes." *See Barkley*, 2007 U.S. Dist. LEXIS 61940, at *11. Plaintiffs allege that United Homes operated a "one-stop shop" through which it directed plaintiffs

to "cooperating" lenders, appraisers and attorneys "who rushed the transactions to completion at breakneck speed so that plaintiffs had little time to seek independent advice." *See id.* The plaintiffs further allege that "defendants exploited New York City's racially segregated housing market and engaged in 'reverse redlining,' the practice of intentionally extending credit to members of minority communities on unfair terms." *See id.* Plaintiffs contend that they were targeted based on their race through the use of advertisements that featured minority homebuyers and selectively running these ads in minority communities. *See id.* Many of the plaintiffs allegedly received unaffordable mortgages based on inadequate verification of income or assets, and inflated property values that were significantly over-appraised. Each plaintiff further alleges that despite United Homes's repeated representations that their homes would be renovated and repaired, each home was significantly in disrepair, with latent defects in many cases masked by cosmetic repairs. The UH Defendants, who are defendants in all six actions, "recognize that there are certain facts that overlap each of these six actions, and that to a certain degree, some common questions of law and fact are presented." (UH Defs. Consolidation Mem. at 3.)

Further, requiring separate trial in each of the six actions will result in a significant burden on the parties and

witnesses and will needlessly consume the parties' and the
court's limited resources. Each of the eight plaintiffs, who
are represented by the same counsel, have indicated that they
will testify in support of their Fair Housing Act claims and
that they have designated seven expert witnesses for trial.
(Pls. Consolidation Mem. at 5, 8.) If separate trials are held,
each of the plaintiffs and the parties' fact and expert
witnesses would testify at each of the trials. Further, the UH
Defendants and some of the other defendants would have to appear
and defend separate trials. Consolidation would thus minimize
duplicative testimony by the parties and their witnesses, and
thus further the interests of judicial economy.

Relying upon three New York State cases, the UH
Defendants contend that consolidation is inappropriate because
"each case involves a separate parcel of realty and separate
defects or repairs . . . ." (UH Defs. Consolidation Mem. at 5-
6) (citing *Stephens v. Allstate Ins. Co.*, 586 N.Y.S.2d 305 (N.Y.
App. Div. 1992); *H. H. Robertson Co. v. New York Convention
Center Dev. Corp.*, 554 N.Y.S.2d 175 (N.Y. App. Div. 1990); *Dean
Witter Reynolds, Inc. v. Greene*, 452 N.Y.S.2d 404 (N.Y. App.
Div. 1981).) The UH Defendants' reliance on these cases is
misplaced. *Stephens* does not concern real property. There, the
appellate court affirmed the denial of a motion to consolidate
where it found that the plaintiff chiropractors' claims against

an insurance company arose out of "separate incidents and separate claims . . . ." 586 N.Y.S.2d at 305. Here, as noted above, the factual patterns and claims are common to all actions. Also inapposite is *H. H. Robertson*, where the appellate court affirmed the denial of a motion to consolidate two separate actions brought by different contractors against the same real estate developer arising out of different contracts with the developer. Although the parties' claims involved the same construction site, the court concluded that the two actions, *inter alia*, involved "different parties" and "different factual issues[.]" 554 N.Y.S.2d at 176. In *Dean Witter Reynolds*, the appellate court found that consolidation of actions concerning share prices for a real estate investment trust was not warranted where actions were commenced by different parties to enforce distinct insurance policies. 452 N.Y.S.2d at 405.

By contrast, plaintiffs' reliance on *Hargraves v. Capital City Mortg. Corp.*, 140 F. Supp. 2d 7 (D.D.C. 2000) is persuasive. The *Hargraves* court denied the motion of a lending company and its president for separate trials where the court found that proof of the plaintiffs' claims of racially discriminatory lending practices "will be interwoven, particularly as to the expert witness testimony regarding patterns of racially discriminatory lending." 140 F. Supp. 2d

at 28.  The court observed that there "are distinct advantages
in having the claims tried together, including the minimization
of expense and delay, and the convenience of the parties and the
Court."  *Id.* at 29.

Although the instant actions involve different parcels
of real property, as discussed above, the alleged fact patterns
and law in each case are substantially the same and will require
similar and overlapping fact and expert testimony and evidence.
Thus, considerations of judicial efficiency strongly favor
consolidation of the six above-captioned actions because they
involve essentially the same legal theories, questions of law
and fact, many of the same remaining defendants, and will
require much of the same evidence.

Based upon the existence of many common factual and
legal issues, and the overlapping nature of the evidence
expected to be presented at trial, the court further finds that
the risk of inconsistent verdicts here is significant, which
factor further favors consolidation.  Where the individual
plaintiffs expect to rely on the same factual and expert
evidence to establish their claims, they should not be required
to try their claims in separate trials and risk being subject to
inconsistent verdicts.

The UH Defendants contend that they will be "severely
prejudiced" by a joint trial.  (UH Defs. Consolidation Mem. at

6.)  The contend that if the plaintiffs present their claims in
one trial, the "jury will of necessity gather the preconceived
notion that some conspiracy must have existed to bring all these
people together against the defendants." (*Id.* at 4.)  They
contend that plaintiffs' "common ancestry, background, and
appearance . . . will cause any reasonable juror to believe that
perhaps something is wrong, because otherwise how did all these
people of like background come together." (*Id.*)  They further
contend that the "respective sales in each of the actions are so
dissimilar and the trial may prove so unwieldy, that . . . a
joint trial will result in jury confusion . . . ." (*Id.* at 6.)

Similarly, the Wachovia Defendants, as Rule 19
parties, contend that plaintiffs' "attempts to show a 'pattern
and practice' will undoubtedly result in an inference by the
jury that all of the defendants (including Wachovia and Bayview)
were involved in the same pattern and practice." (Wachovia
Defs. Consolidation Mem. at 5.)[13]  The Wachovia Defendants
request that the court order separate trials pursuant to Rule
42(b)[14] on their defenses because "Bayview is nothing more than a

---

[13] The Wachovia Defendants' Memorandum of Law is not paginated,
but the court has paginated its copy of the Memorandum.  Page 1
of the court's copy of the Memorandum begins on the
"Introduction" page.

[14] Rule 42(b) provides, in relevant part, that "[f]or
convenience, to avoid prejudice, or to expedite and economize,
the court may order a separate trial of one or more separate

servicer and Wachovia is a holder in due course of its mortgage." (*Id.* at 6.)  The Wachovia Defendants are concerned that evidence of alleged fraud and property flipping "will result in sympathetic jurors more concerned with compensating Lodge than whether or not Bayview or Wachovia had actual knowledge or Lodge's claim." (*Id.* at 7.)

The UH Defendants' concerns regarding prejudice or confusion arising out of "pattern and practice" evidence do not outweigh the significant benefits of consolidation.  Indeed, courts routinely consolidate cases involving allegedly discriminatory or unlawful practices or policies. *See EEOC v. HBE Corp.*, 135 F.3d 543, 551 (8th Cir. 1998) (affirming the district court's Rule 42(a) consolidation of claims of two plaintiffs alleging employment discrimination as (1) the cases had common questions of law and fact; (2) both plaintiffs sought to present similar evidence about a climate of racial hostility; (3) the same evidence was relevant to both plaintiffs in establishing why one was fired and why the other perceived a climate of racial discrimination); *Caronia v. Hustedt Chevrolet*, Nos. 05-cv-3526, 05-cv-4148, 05-cv-4149, 05-cv-4230, 2009 U.S. Dist. LEXIS 120971, at *10-*13 (E.D.N.Y. Dec. 29, 2009) (despite differences in various plaintiffs' causes of action for sexual

issues, claims, crossclaims, counterclaims, or third-party claims."

discrimination and retaliation, the court ordered consolidation for trial due to a "substantial overlap" in the factual and legal issues); *BD v. DeBuono*, 193 F.R.D. 117, 141-43 (S.D.N.Y. 2000) (consolidation under Rule 42(a) of actions where plaintiffs' claims that defendants maintained an unconstitutional practice or policy limiting a particular therapy for the treatment of autism); *LeGrand v. New York City Transit Auth.*, No. 95-cv-333, 1999 U.S. Dist. LEXIS 8020, at *23 (E.D.N.Y. May 26, 1999) (consolidation under Rule 42(a) of pregnancy discrimination suits warranted given common legal issue of existence of same unlawful discriminatory practice or policy of defendant); *cf. Alaniz v. Zamora-Quezada*, 591 F.3d 761, 774 (5th Cir. 2009) (affirming denial of a Rule 42(b) motion for separate trials where the plaintiffs each alleged "continuous sex discrimination involving the same *modus operandi*" and were "based on a similar series of transactions that were committed by the same defendant over a relatively short time span"); *Alexander v. Fulton County*, 207 F.3d 1303, 1324-25 (11th Cir. 2000) (affirming the district court's refusal to order separate trials under Rule 42(b) where 18 plaintiffs alleged a systematic pattern of racial discrimination by one particular supervisor, even though the plaintiffs complained of different adverse employment decisions and had different work histories), *overruled on other grounds by Manders v. Lee*, 338

F.3d 1304 (11th Cir. 2003); *Hargraves*, 140 F. Supp. 2d at 28

(denying motion Rule 42(b) motion to sever, discussed above).

Similarly, consolidation will not prejudice Bayview or

Wachovia's defenses. Plaintiffs correctly point out that, as

"holders" of a negotiable instrument, the Wachovia Defendants'

liability is limited to the instrument. (*See* Pls. Consolidation

Mem. at 6.) *See Primavera Familienstiftung v. Askin*, 173 F.R.D.

115, 130 (S.D.N.Y. 1997) ("Consolidation 'does not merge the

suits into a single cause, or change the rights of the parties,

or make those who are parties in one suit parties in another.'"

(quoting *Johnson v. Manhattan Ry. Co.*, 289 U.S. 479, 496-97

(1933))). Further, the Wachovia Defendants' concerns that the

jury will compensate Lodge out of sympathy are merely

speculative and insufficient to overcome the benefits of a joint

trial.

Finally, any risk of confusion or prejudice at trial

can be mitigated with jury instructions and verdict sheets. The

Second Circuit has observed that "the risks of prejudice and

confusion may be reduced by the use of cautionary instructions

to the jury and verdict sheets outlining the claims of each

plaintiff." *Johnson*, 899 F.2d at 1285 (citation omitted); *see*

*Consorti v. Armstrong World Indus., Inc.*, 72 F.3d 1003, 1008 (2d

Cir. 1995) (risk of confusion or prejudice avoided in

consolidated action where district court used "intelligent

management devices" such as "special verdict forms to help the jury approach deliberations in a well-organized fashion"), *vacated on other grounds sub nom. Consorti v. Owens-Corning Fiberglas Corp.*, 518 U.S. 1031 (1996); *Caronia*, 2009 U.S. Dist. LEXIS 120971, at *13 (finding that the defendants' "concerns regarding prejudice and juror confusion can be adequately addressed through the use of cautionary instructions to the jury and carefully crafted verdict sheets"); *Franco v. Ideal Mortg. Bankers, Ltd.*, No. 07-cv-3956, 2009 U.S. Dist. LEXIS 91570, at *19 (E.D.N.Y. Sept. 28, 2009), *aff'd*, 2009 U.S. Dist. LEXIS 104550 (E.D.N.Y. Nov. 3, 2009). Indeed, the court will order the parties to submit proposed jury instructions and verdict sheets prior to trial.

Accordingly, the court, in its discretion, grants plaintiffs' motion to consolidate the above-captioned six actions for trial. The Wachovia Defendants' request for a separate trial is denied.

## IV. CONCLUSION

For the foregoing reasons, the defendants' motions for summary judgment are denied and plaintiffs' motion to consolidate is granted. The parties shall confer about the length of the trial and dates of their availability for trial after December 10, 2010, and shall jointly advise the court of the same, in writing, by September 16, 2010.

SO ORDERED.

Dated: Brooklyn, New York
       September 13, 2010

                                                  /s/
                                        KIYO A. MATSUMOTO
                                        United States District Judge
                                        Eastern District of New York