UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------X
SANDRA C. BARKLEY,

                    Plaintiff,

        -against-                                   04-cv-875 (KAM) (RLM)

UNITED HOMES, LLC, UNITED PROPERTY GROUP,
LLC, YARON HERSHCO, GALIT NETWORK, LLC,
OLYMPIA MORTGAGE CORP., and BENJAMIN
TURNER,

                    Defendants.
----------------------------------------X
MARY LODGE,

                    Plaintiff,

        -against-                                   05-cv-187 (KAM) (RLM)

UNITED HOMES, LLC, UNITED PROPERTY GROUP,
LLC, YARON HERSHCO, GALIT NETWORK, LLC,
OLYMPIA MORTGAGE CORP., BAYVIEW LOAN
SERVICING, LLC, BAYVIEW ASSET MANAGEMENT,
LLC, U.S. BANK, N.A., AS TRUSTEE FOR
BAYVIEW ASSET-BACKED SECURITIES TRUST
SERIES 2007-30, and BAYVIEW FINANCIAL
MANAGEMENT CORP.,

                    Defendants.
----------------------------------------X
DEWITT MATHIS,

                    Plaintiff,

        -against-                                   05-cv-4386 (KAM) (RLM)

UNITED HOMES, LLC, UNITED PROPERTY GROUP,
LLC, YARON HERSHCO, GALIT NETWORK, LLC,
and ALLIANCE MORTGAGE BANKING CORP.,

                    Defendants.
----------------------------------------X

```
------------------------------------------X
```
SYLVIA GIBBONS and SYLVIA GIBBONS, AS
ADMINISTRATOR OF THE ESTATE OF RODNEY
GIBBONS,

        Plaintiffs,

    -against-                   05-cv-5302 (KAM) (RLM)

UNITED HOMES, LLC, UNITED PROPERTY GROUP,
LLC, YARON HERSHCO, GALIT NETWORK, LLC,
and OLYMPIA MORTGAGE CORP.,

        Defendants.
```
------------------------------------------X
```
MILES MCDALE and LISA MCDALE,

        Plaintiffs,

    -against-                   05-cv-5362 (KAM) (RLM)

UNITED HOMES, LLC, UNITED PROPERTY GROUP,
LLC, YARON HERSHCO, GALIT NETWORK, LLC,
ALLIANCE MORTGAGE BANKING, CORP., and
BENJAMIN TURNER,

        Defendants.
```
------------------------------------------X
```
CHARLENE WASHINGTON,

        Plaintiff,

    -against-                   05-cv-5679 (KAM) (RLM)

UNITED HOMES, LLC, UNITED PROPERTY GROUP,
LLC, YARON HERSHCO, GALIT NETWORK, LLC,
and ALLIANCE MORTGAGE BANKING CORP.,

        Defendants.
```
-------------------------------------X
```

<u>**MEMORANDUM AND ORDER**</u>

**MATSUMOTO, United States District Judge:**

        Plaintiffs Sandra Barkley, Mary Lodge, Dewitt Mathis, Sylvia Gibbons, Sylvia Gibbons as the Administrator of the Estate of Rodney Gibbons, Lisa McDale, Miles McDale, and Charlene Washington (collectively "plaintiffs") commenced this action against United Homes, LLC; United Property Group, LLC; Galit Network, LLC (the "UH Defendants"); Yaron Hershco ("Hershco"); Olympia Mortgage Corp. ("Olympia")[1] (collectively "defendants"); and others, alleging that defendants engaged in a fraudulent property-flipping scheme wherein the UH Defendants acquired distressed, damaged, and defective properties in predominantly minority neighborhoods, made substandard and superficial repairs, and used racially targeted marketing strategies to sell the properties as "newly renovated" at substantially inflated prices, primarily to members of racial and ethnic minorities with little or no experience with homeownership and minimal financial acumen.  Plaintiffs further alleged that the UH Defendants conspired with appraisers, attorneys, and mortgage lenders--including Olympia--in order to perpetrate the fraudulent scheme.  Pursuant to Federal Rule of Civil Procedure 19, plaintiff Mary Lodge also named as necessary

---

[1] Olympia is named as a defendant in the actions brought by plaintiffs Sandra Barkley, Mary Lodge, and Sylvia Gibbons, and the Estate of Rodney Gibbons.

parties the servicer and holder of her First Note and Mortgage,
Bayview Loan Servicing, LLC; Bayview Asset Management, LLC; U.S.
Bank, N.A. as Trustee for Bayview Asset-Backed Securities Trust
Series 2007-30; Bayview Financial, L.P.; and Bayview Financial
Management Corp. (collectively, the "Bayview Defendants").

On May 9, 2011, jury selection and trial commenced in
these actions. (ECF[2] Minute Entry dated 5/9/2011.) Prior to
submitting the cases to the jury, the court granted plaintiffs'
motion pursuant to Federal Rule of Civil Procedure 50(b) for
judgment as a matter of law with regard to the Bayview
Defendants' holder-in-due-course defense. (Tr. XV at 133.)
After three weeks of trial, on June 1, 2011, the jury found the
UH Defendants, Hershco, and Olympia liable for engaging in
deceptive practices in violation of Section 349 of New York
General Business Law, fraud, and conspiracy to commit fraud, and
awarded compensatory and punitive damages. (ECF Minute Entry
dated 6/1/2011; ECF No. 566, Jury Verdict ("Verdict").) The
jury found the UH Defendants, Hershco, and Olympia not liable on
plaintiffs' discrimination claims. (Verdict.)

Presently before the court are five post-trial motions
by the parties. The court considers each motion separately.
For the reasons set forth below, the court: (1) denies

---

[2] Unless otherwise indicated, all Electronic Case Filing system ("ECF")
citations are to docket number 04-cv-875.

defendants' motions regarding interpretation of the jury verdict; (2) grants in part and denies in part defendants' motions for set-offs; (3) grants plaintiffs' motion for an award of interest; (4) grants plaintiffs' motion for a permanent injunction; and (5) denies plaintiff Mary Lodge's motion for injunctive relief to void her mortgage.

**DISCUSSION**

## I.   Defendants' Motions Regarding Interpretation of the Jury Verdict

*A. Duplication of Damages*

The UH Defendants and Hershco contend that "the verdict sheet's egregious inconsistencies and fundamental errors warrant correction before the Court reduces the verdict to judgment." (ECF No. 575, UH Defendants and Hershco Post-Verdict Motion #1 ("UH Jury Int. Mot.") at 1.) These defendants argue that because "[t]he verdict sheet shows that the jury awarded the same compensatory damages under both the fraud and civil conspiracy causes of action . . . [and] the plaintiffs introduced only one measure for damages for both counts . . . each plaintiff should be entitled to only one recovery." (*Id.* at 2.) Specifically, the UH Defendants and Hershco argue that "a plaintiff seeking compensation for the same injury under different legal theories is . . . entitled to only one recovery." (*Id.* (internal quotations and citation omitted).)

5

Moreover, these defendants contend that "the civil conspiracy count is nothing more than an element of the fraud count and therefore cannot support an independent damage award." (*Id.* at 3.) The UH Defendants and Hershco rely on a recent decision by the New York Appellate Division, *Hoeffner v. Orrick, Herrington & Sutcliffe LLP*, 924 N.Y.S.2d 376 (N.Y. App. Div. 2011), to support their argument that the conspiracy-to-defraud claim cannot sustain an independent measure of damages. (*Id.*) Finally, the UH Defendants and Hershco argue that "defendants have raised this issue well before the jury considered it, both in its summary judgment motion and pre-trial memorandum, and during the trial." (*Id.*)

Olympia contends that the jury correctly placed "the same figure in the verdict sheet under both . . . fraud and conspiracy to defraud . . . because the amount of damages caused by a conspiracy to defraud are necessarily the same amount as caused by the underlying fraud." (ECF No. 576-2, Olympia Memorandum of Law Concerning Interpretation of Jury Verdict ("Olympia Jury Int. Mem.") at 1.) Additionally, Olympia argues that "the conspiracy to defraud claim exists, and can only exist, because of the underlying fraud claim," and thus "for the jury to have found that the conspiracy to defraud caused monetary damages that were not caused by the fraud would be illogical and completely contrary to the law." (*Id.* at 2-3.)

Plaintiffs oppose the motions concerning the interpretation of the jury verdict, arguing that defendants have failed to meet their burden to show that the jury has, in fact, duplicated damages. (ECF No. 585, Plaintiffs' Opposition to UH Jury Int. Mot. and Olympia Jury Int. Mot. ("Pl. Jury Int. Opp'n") at 2.) Specifically, plaintiffs contend that it is not enough for defendants to simply assert "that [the jury] allocated the damages under two different causes of action" and that "[t]he mere possibility of non-duplicative awards is enough to sustain the jury verdict." (*Id.* at 2-3 (internal quotations and citation omitted).) Plaintiffs assert that "in light of the various sources of plaintiffs' damages and the increased severity of those damages because of the conspiracy, the jury correctly determined that the plaintiffs suffered damages for fraud and conspiracy to defraud." (*Id.* at 4.) Moreover, plaintiffs argue, "[e]ven if a jury could not award additional damages for conspiracy . . . it is reasonable to assume that the jury simply divided the damages for fraud between the two lines provided them on the verdict form." (*Id.*) Finally, plaintiffs argue that "defendants' failure to object to the verdict form, or to ask that the jury be polled to clarify any perceived duplication of damages, is fatal to their current arguments" because such failure "waived their right to raise" the issue. (*Id.* at 5, 8.)

The UH Defendants and Hershco reply that the cases upon which plaintiffs rely in their opposition "do not support their argument that the jury's duplicate awards under fraud and civil conspiracy theories should be allowed." (ECF No. 581, UH Defendants and Hershco Reply on Motion Concerning Verdict Sheet ("UH Reply") at 1.) Specifically, the UH Defendants and Hershco contend that in each of the cases cited by plaintiffs, "the jury was either explicitly instructed not to award duplicative damages or was polled afterwards to determine intent," and thus those cases are inapplicable here. (*Id.* at 4.) Further, these defendants argue that plaintiffs "continue to conflate theories of liabilities with damage," noting that although "plaintiffs contend they established a 'variety' of damages . . . they only established one injury." (*Id.*) Finally, in response to the argument that defendants waived their objection to the verdict sheet or polling of the jury, the UH Defendants and Hershco argue that "all of the defendants consistently and repeatedly objected to the plaintiff's civil conspiracy claim, which did not present a separate claim under New York law," and that "even a waived objection to a verdict sheet will not justify sustaining an obviously erroneous verdict." (*Id.* at 5.)

Olympia similarly replies that "[n]one of the cases cited [in plaintiffs' opposition] address [the] issue that a conspiracy to defraud cannot sustain an independent award of

damages." (ECF No. 587, Olympia Reply Memorandum of Law Concerning Interpretation of the Jury Verdict ("Olympia Reply") at 2.) Olympia further argues that "there is no possibility of non-duplicative damages because, as a matter of law, New York simply does not permit additional damages to be awarded on a conspiracy to defraud claim." (*Id.*) Olympia contends that although plaintiffs originally claimed that the conspiracy-to-defraud claim "was *not* an independent claim but instead was merely an adjunct to their fraud cause of action . . . they [now] claim, the conspiracy to defraud claim can sustain its own damages separately from the fraud claim." (*Id.* at 3.) In response to the argument that defendants waived their objection to any duplicative damages, Olympia argues that "[p]laintiffs completely overlook the principal point made by Olympia" in that "[w]hat Olympia objects to on this motion is not the verdict sheet but rather to the manner in which Plaintiffs seek to interpret the jury's verdict." (*Id.*) Olympia contends that it did not need to poll the jury because "there was nothing to ask the jury about because the jury correctly interpreted the law: it held that the damages caused by the conspiracy to defraud were the same damages caused by the fraud." (*Id.*) However, Olympia asserts, even if an objection was necessary, it effectively objected by "repeatedly ask[ing] this Court to dismiss the conspiracy to defraud claim." (*Id.* at 5.)

9

1. <u>Defendants Waived Any Objection to Duplicative Damages</u>

Despite defendants' contentions, it is not clear from the verdict sheet that the jury awarded duplicative damages, and as set forth below, it is doubtful that the jury did so.  Even assuming, but not finding, that the jury awarded duplicative damages, the court agrees with plaintiffs that defendants waived their objection to any duplicative damages by failing to offer a jury instruction that they now claim should have been given, failing to object to the jury instructions or the verdict sheet, and failing to request that the jury be polled on the issue prior to discharging the jury.  "The Second Circuit has frequently addressed waiver in cases involving challenges based on some logical inconsistency within a verdict," and although not directly on point to the issue of whether defendants waived an objection to duplicative damages, "the court finds this line of precedent useful in so far as it elucidates the general principles underlying the doctrine of waiver." *Bseirani v. Mahshie*, 881 F. Supp. 778, 784 (N.D.N.Y. 1995), *aff'd*, Nos. 95-9109, 95-9145, 1997 WL 3632 (2d Cir. Jan. 3, 1997).

"It is well established that a party waives its objection to any inconsistency in a jury verdict if it fails to object to the verdict prior to the excusing of the jury." *Kosmynka v. Polaris Indus., Inc.*, 462 F.3d 74, 83 (2d Cir. 2006); *see also Lavoie v. Pac. Press & Shear Co.*, 975 F.2d 48,

55 (2d Cir. 1992) ("Failure to object to a jury instruction or
the form of an interrogatory prior to the jury retiring results
in a waiver of that objection."); *Jarvis v. Ford Motor Co.*, 283
F.3d 33, 56-57 (2d Cir. 2002) (quoting *Lavoie*, 975 F.2d at 55).
"The requirement of a timely exception is not merely a
technicality.  Its function is to give the court and the
opposing party the opportunity to correct an error in the
conduct of the trial."  *Kosmynka*, 462 F.3d at 83 (internal
quotations and citations omitted); *see also Bseirani*, 881 F.
Supp. at 784 ("Waiver is particularly appropriate where counsel
is or should be aware of the inconsistency in the verdict, and
where resubmission to the jury would resolve the ambiguity,
because the purpose of waiver is to promote the efficiency of
trials by allowing the original deliberating body to reconcile
inconsistencies without resort to the presentation of evidence
to a different body." (internal quotations and citations
omitted)).

          The Second Circuit has applied these same principles,
which govern objections to inconsistencies in jury verdicts, to
cases that address the waiver of duplicative damages objections.
For example, in *Metron Tech. Distrib. Corp. v. Discreet Indust.
Corp.*, the Second Circuit held:

               As to whether the jury awarded duplicative
               damages, defendants have waived any argument
               regarding the jury instruction or verdict

11

> sheet given their failure to raise this
> issue in their request to charge or at the
> charging conference, or to lodge a timely
> objection, or to request that the court poll
> the jury.

189 F. App'x 3, 4 (2d Cir. 2006). In *Bseirani*, the Second
Circuit, citing *Lavoie*, held that because the defendant "did not
object to the instruction on duplication grounds" or "seek
clarification from the jury," his argument that the damages
awarded by the jury were duplicative was waived. 1997 WL 3632,
at *1-2. These cases, though unpublished, provide guidance in
applying the doctrine of waiver to duplicative damages
objections.

Here, defendants raise the duplicative damages issue
for the first time in their post-trial motions. All parties had
multiple opportunities to submit proposed jury instructions and
proposed verdict sheets prior to trial and prior to charging the
jury. Yet the UH Defendants, Hershco, and Olympia all failed to
request a jury instruction that specifically addressed the risk
that the jury might award duplicative damages for fraud and
conspiracy to defraud. The court notes that although the UH
Defendants and Hershco originally requested a general
instruction concerning duplicative damages, they withdrew the
request in their amended proposed jury charges and did not raise
the issue at the charging conference or with respect to the
proposed verdict sheets. (*Compare* ECF No. 540, Proposed Jury

12

Instructions by UH Defendants and Hershco, *with* ECF No. 543,
Amended Proposed Jury Instructions by UH Defendants and
Hershco.)  Olympia completely failed to submit any requests for
jury charges or a proposed verdict sheet prior to trial, as
ordered.  Indeed, Olympia submitted no requests until the last
week of the three-week trial, and on May 26, 2011, requested
only one instruction relating to the knowledge element of the
conspiracy-to-defraud charge.  (*See* Tr. XIV at 34-38, 92-98; ECF
No. 565, Plaintiffs' and Defendants' Supplemental Proposed Jury
Charges.)  Moreover, that same day, the court held a charging
conference during which all parties had yet another opportunity
to request changes to the proposed jury charges and verdict
sheet.  (*See* Tr. XIV.)  In fact, the court provided the parties
with three different versions of the jury charges in an attempt
to incorporate the parties' requests.  (*See* ECF Nos. 562, 563,
Draft Jury Instructions; ECF No. 564, Jury Instructions.)
Although defendants requested a number of other changes to the
charges, they failed to request an instruction on duplicative
damages for the fraud and conspiracy-to-defraud charges or
object to its omission.

Defendants also had ample opportunity to submit
proposed verdict sheets and object to plaintiffs' proposed
verdict sheets, but again failed to do so until now.  On
April 4, 2011, prior to the commencement of this three-week

trial, plaintiffs submitted their proposed verdict sheets, which
contained a separate line for each award of damages for fraud
and conspiracy to defraud. (ECF No. 536, Plaintiffs' Proposed
Verdict Sheet.)  No defendant submitted proposed verdict sheets,
although they had been ordered to do so. (*See* ECF No. 495,
Pretrial Scheduling Order ¶ 6(v).)  After the final pretrial
conference, the court directed the parties to meet and confer in
an attempt to resolve any disputes regarding pretrial
submissions--including jury instructions--and to agree on
proposed verdict sheets. (*See* Minute Order dated 4/11/2011.)
On April 15, 2011, plaintiffs filed a joint status report,
noting that after conferring with counsel for the UH Defendants
and Hershco, the verdict sheets had been modified, but that the
UH Defendants and Hershco continued to object to the
instructions regarding piercing the corporate veil. (ECF No.
544, Status Report dated 4/15/2011, at 3.)  Olympia filed a
letter on May 3, 2011, informing the court that it had no
submissions regarding the jury instructions or verdict sheets,
but it joined in the objections already made by the UH
Defendants and Hershco. (ECF No. 550, Letter dated 5/3/2011.)
Moreover, at trial, the parties again discussed changes to the
proposed verdict sheets and submitted revised versions for the
jury. (*See* Tr. XIV.)  At no point did the UH Defendants,

14

Hershco, or Olympia object to the separate damages lines for fraud and conspiracy to defraud on the verdict sheets.

Finally, after the verdicts were published by the court and before the jury was discharged, defendants had the opportunity to request clarification from the jury regarding what they now claim is a duplication of damages. In fact, at the request of the UH Defendants, the jurors were polled after the verdicts were published, but no request was made for clarification. (Tr. XVII at 4, 51.) Before the jurors were discharged, Hershco requested only that the jurors receive an instruction regarding communications with counsel. (*Id.* at 52.) After the jurors were discharged, defendants raised several matters to be addressed through post-trial motions. (*Id.* at 53-56.) At no point did the UH Defendants, Hershco, or Olympia mention the duplicative damages issue they now raise in the instant motions.

The court is unconvinced by defendants' arguments that no objection was necessary or, in the alternative, that the issue was preserved by moving to dismiss or moving for summary judgment on the conspiracy-to-defraud count. None of the defendants ever objected specifically to the charge regarding conspiracy to defraud; at most, all the parties discussed appropriate language for the charge with respect to the form of agreement among co-conspirators, and Olympia belatedly objected

15

only to language regarding the extent of the knowledge element for fraud.  (*See, e.g.*, Tr. XIV 11-14; *id.* at 34-37 ("I didn't make a submission with respect to the charge . . . ."  Mr. Grannis, counsel for Olympia, asked for "an instruction to the jury that says Olympia has to know [that statements] are fraudulent just like a direct participant.").)

Moreover, the issue raised in the instant motions is not whether the conspiracy-to-defraud charge should have been submitted to the jury.  As the parties point out, the UH Defendants and Hershco sought dismissal and summary judgment on the conspiracy-to-defraud claim, which the court denied in the Memorandum and Order denying defendants' motions for summary judgment.  (*See* ECF No. 485, Memorandum and Order dated 9/13/2010.)  The court also acknowledges that in the Joint Pretrial Order, defendants raised the defense that there is no separate cause of action for conspiracy to defraud (*see* ECF No. 537, Joint Pretrial Order at 12, 14, 16), and the court agrees. The issue presented in the defendants' post-verdict motions, however, is separate and distinct:  here, defendants question whether the award of damages for fraud and conspiracy to defraud was duplicative.  Indeed, Olympia acknowledges that "[t]he question now before the Court is not whether conspiracy to defraud should have gone before the jury as a separate claim but how the jury verdict should be interpreted as written."

16

(Olympia Jury Int. Mem. at 3-4.)  As participants in the
drafting of the jury instructions and verdict sheets, defendants
were on notice of the possibility that the jury would render its
verdict as it did.  Had defendants raised the question regarding
duplicative damages before the jury was discharged, the matter
could have been resolved.  The issue, therefore, should have
been raised before the jury was charged and the verdict sheets
were presented or, at the very latest, after the jury returned
with the award.

Defendants' "failure to raise a timely objection
deprived the court and the parties of their most effective and
efficient means of resolving the issue of whether their award
was duplicative."  *Bseirani*, 881 F. Supp. at 784-85.  As such,
the court finds that defendants waived any objection to the jury
award as duplicative.  *See id.; Bseirani*, 1997 WL 3632, at *2
(holding that defendant "had either to seek clarification from
the jury or be held to have waived the argument that the damages
are duplicative"); *Metron*, 189 F. App'x at 4 (holding that
defendants waived any objection to duplicative damages by
failing "to raise this issue in their request to charge or at
the charging conference, or to lodge a timely objection, or to
request that the court poll the jury").

17

2. Defendants Have Not Shown Duplicative Damages

Even in the absence of a waiver, the defendants have not shown that the damages are duplicative.  It is well settled that "when a plaintiff seeks compensation for the same damages under different legal theories of wrongdoing, the plaintiff should receive compensation for an item of damages only once." *Gentile v. Cnty. of Suffolk*, 926 F.2d 142, 153 (2d Cir. 1991); *Conway v. Icahn & Co.*, 16 F.3d 504, 511 (2d Cir. 1994).  The court agrees with defendants that the conspiracy-to-defraud count "cannot have its own independent measure of damages." *Hoeffner*, 924 N.Y.S.2d at 377-78.  "However, a jury may assess one amount of damages and divide that amount between two applicable counts."  *Galazo v. Pieksza*, No. 3:01-CV-01589, 2005 WL 3312765, at *2 (D. Conn. Dec. 6, 2005); *see also Gentile*, 926 F.2d at 154; *Bseirani*, 881 F. Supp. at 786.  "Where the jury has divided damages between two theories of liability[,] the awards are not duplicative."  *Galazo*, 2005 WL 3312765, at *2.

In *Gentile*, for example, the Second Circuit found that defendants had not shown with "any degree of certainty" that damages awarded under both state and federal causes of actions were duplicative where "plaintiffs presented substantial evidence indicating that they suffered from multiple injuries." 926 F.2d at 153-54.  The court noted that "defendants do not demonstrate that a jury's award is duplicative merely by noting

18

that it allocated the damages under two different causes of action." *Id.* at 154.  Although defendants argued that "the fact that the jury divided their award for each plaintiff into two equal parts . . . indicate[d] that the jury impermissibly compensated each plaintiff twice for identical injuries," the Second Circuit found that "it [was] equally conceivable that the jury . . . merely split the total amount equally between the state and federal causes of action in announcing their award to the court on the form submitted to it." *Id.* at 153-54.  The Court, therefore, denied the defendants' motion to set aside that portion of the jury verdict as duplicative. *Id.* at 154 ("Under all the circumstances, we simply do not think that we would be justified in upsetting the jury's award in whole or in part.").

There are instances in which an award of damages may result in a finding of duplicative damages.  In *Conway*, for example, the court found duplicate damages where the "theories of recovery were based on a single set of facts, . . . the economic loss sustained was predicated on those unitary facts" and "[t]here was but one injury suffered by [the plaintiff] and that injury gave rise to a single item of damages." 16 F.3d at 511-12.  Similarly, in *Bender v. City of New York*, the Second Circuit observed that "[i]n some cases, seemingly duplicative damages made separately for overlapping causes of action or

19

against different defendants have been sustained where it appeared that the jury intended to award the aggregate sum," but that "[t]here [was] no such indication in [the *Bender*] case" because the court determined that the aggregate award was "excessive."  78 F.3d 787, 794 (2d Cir. 1996).

The instant cases, however, are distinguishable. Here, as in *Gentile*, plaintiffs submitted "substantial evidence indicating that they suffered from multiple injuries."  926 F.2d at 153.  Specifically, plaintiffs presented substantial evidence of the following injuries: (1) damages suffered due to the over-appraisal of properties; (2) damages suffered due to abusive financing and lending practices; (3) excess closing costs; (4) past cost of repairs; and (5) future cost of repairs.  (*See generally* Tr. XIII at 77-100 (presenting a summary of damages evidence at trial).)  Unlike *Conway*, therefore, this is not a case in which plaintiffs suffered "but one injury."  *See Conway*, 16 F.3d at 512.

Nor does the court find that the aggregate damages award for the fraud claims is excessive, as the Second Circuit did in *Bender*.  *See* 78 F.3d at 794.  Plaintiffs presented the testimony of appraisal expert Dominick Pompeo, who testified that plaintiffs' homes had been over-appraised at the time of closing.  (*See generally* Tr. VII.)  Specifically, Mr. Pompeo testified that, based on his retrospective appraisals of the

plaintiffs' properties, the properties were over-appraised as follows: (1) 21 Marconi Place, Dewitt Mathis' home, was over-appraised by $133,000 (*id.* at 43-44); (2) 2126 Union Street, Miles and Lisa McDale's home, was over-appraised by $150,000 (*id.* at 49-50); (3) 2422 Dean Street, Charlene Washington's home, was over-appraised by $157,000 (*id.* at 51-52); (4) 249 Halsey Street, Mary Lodge's home, was over-appraised by $185,000 (*id.* at 56-57); (5) 557 Hancock Street, Sandra Barkley's home, was over-appraised by $124,000 (*id.* at 57-58); and (6) 1148 Halsey Street, Sylvia and Rodney Gibbons' home, was over-appraised by $114,000 (*id.* at 59-60).

In addition, at trial, all plaintiffs testified and presented photographs of the numerous problems they experienced with their properties.  Miles and Lisa McDale had a flood in their basement, resulting in the loss of important papers, clothing, and other personal belongings; leaking radiators; cement crashing down from the ceiling above their entryway; water leaking from the upstairs bathroom into a light fixture; dangerous electrical wiring; clogged drainage pipes resulting in a raw sewage backup in the house; and a gap in the floor of their daughter's bedroom through which the light from the boiler room below could be seen.  (Tr. II at 18-27; Pl. Ex. 2637.) Mary Lodge had water leaking into the house; holes in the floors and rotten wood floors hidden under the carpet; poor heating in

the winter; cracked cement on the stoop; pipe bursts in the wintertime; improperly installed broken kitchen tiles; and rodent infestation. (Tr. III 58-65; Pl. Ex. 2637.) Sylvia and Rodney Gibbons had uneven and bumpy floors, later discovered to be due to drywall, cardboard, and other trash left underneath the carpets; leaning and leaky sinks; water leaking from the stoop and roof; drafty windows without appropriate screens; flooding in the backyard; rotted wood on the floors; improperly installed broken kitchen tiles; and raw sewage coming into the basement due to an old, backed-up sewage pipe. (Tr. IV 131-33, 144-456; Pl. Ex. 323; Pl. Ex. 2637.) Dewitt Mathis had water leaking into the basement; uneven and tilted stairs; raw sewage backing up into the trap door underneath the floor; problems with the electrical system; inadequate heating; and over 150 bags worth of trash and construction debris discovered underneath a layer of tightly packed dirt in his backyard. (Tr. IX at 183-196; Pl. Ex. 623.) Sandra Barkley had water collecting on the stoop of her house, which caused flooding underneath the stoop and rusting of the entrance door; rotted wood tiles falling from the top of the house; leaking radiators; inadequate heat; water leaking into the basement, which caused damage to valuables, clothing, and papers; water leaking into an electrical fixture; improperly installed broken kitchen tiles; leaking under the kitchen sink; and creaky, uneven floors, later

22

discovered to be due to inadequate materials and faulty installation of the floors. (Tr. X 181-95; Pl. Ex. 2637; Pl. Ex. 89.)  Finally, Charlene Washington had no heat in her apartment for approximately three weeks during the winter, during which she slept on the floor of her kitchen with the oven on and the oven door open; ceiling leaks; raw sewage in the basement, about three inches thick, which caused damage to clothes and papers; gas leakage; and approximately twenty holes in the wood of the floor, filled with debris. (Tr. XII at 56-68.)

Further, plaintiffs presented the testimony of construction expert Sirivishnu Khalsa, who testified about the estimated cost of repairing plaintiffs' properties using basic quality materials. (*See generally* Tr. VI.)  According to his unrebutted testimony, the cost of repairs would be as follows: (1) $72,005.50 for 1148 Halsey Street, Sylvia and Rodney Gibbons' home (*id.* at 105); (2) $57,214.75 for 21 Marconi Place, Dewitt Mathis' home (*id.* at 112); (3) $29,288.50 for 2422 Dean Street, Charlene Washington's home (*id.* at 117); (4) $52,120.00 for 2126 Union Street, Miles and Lisa McDale's home (*id.* at 120); (5) $49,583.00 for 557 Hancock Street, Sandra Barkley's home (*id.* at 124); and (6) $82,689.00 for 249 Halsey Street, Mary Lodge's home (*id.* at 129).

In light of this and other abundant evidence presented at the trial, the aggregate damages award to each of the plaintiffs was adequate, but not excessive.  These cases, therefore, are distinguishable from *Bender* in that the court does not find the aggregate damages figure to be excessive and therefore duplicative.

Defendants "point[] to no evidence, other than the award itself, to support [their] claim of double recovery.  By merely asking the court to draw from the jury award an inference of duplic[ation] the defendant[s] ha[ve] failed to sustain [their] burden."  *Galazo*, 2005 WL 3312765, at *3 (citing *Gentile*, 926 F.2d at 154).  The Second Circuit held that "defendants do not demonstrate that a jury's award is duplicative merely by noting that it allocated the damages under two different causes of action."  *Gentile*, 926 F.2d at 154.  But that is all the UH Defendants, Hershco, and Olympia have done here.  Consequently, defendants have failed to show "with any degree of certainty" that the jury awards are duplicative.  *See id*. at 153-54; *see also Aldrich v. Thomson McKinnon Secs., Inc.*, 756 F.2d 243 (2d Cir. 1985) (finding that the jury meant to award the aggregate amount of damages); *Galazo*, 2005 WL 3312765, at *3 (finding that "the defendant has not supported his double recovery argument with any evidence," and therefore "the probabilities are balanced between the possibility that the jury

24

duplicated awards or whether they merely split one award between two applicable claims" and "the court will draw an inference in favor of the jury verdict and the non-moving party" and find no duplication); *Bseirani*, 881 F. Supp. at 786-87 (denying motion for new trial or judgment as a matter of law where the "defendant has failed to establish with any degree of certainty that the instant jury awards were duplicative"); *Bseirani*, 1997 WL 3632, at *2 (affirming district court finding that defendants had not shown duplicative damages and noting that the mere "possibility of non-duplicative awards is enough to sustain the jury verdict").

The UH Defendants and Hershco argue that *Gentile* and other cases finding that a damages award was not duplicative are distinguishable because "[i]n each of those cases, the jury was either explicitly instructed not to award duplicative damages or was polled afterwards to determine intent" and "[h]ere, no such instruction was given, and no such poll was taken." (UH Reply at 4.)  Defendants, however, should not now be heard to complain that a jury instruction regarding duplicative damages should have been given, or that the jury should have been polled to determine intent, when defendants failed to propose such an instruction despite numerous opportunities to do so before and during the three-week trial, and failed to request that the jury

be polled to clarify what defendants now claim is a duplicative
damages award.

Further, although an instruction explicitly addressing
duplicative damages was not read to the jury, the charges
clearly instructed the jury on the measure of damages to be
assessed as to the fraud claims together, instead of providing
separate instructions for individual measures of damages for
fraud and conspiracy to defraud. (*See* ECF No. 564, Jury
Instructions at 40.)  Even now, defendants cannot establish that
the damages awarded were duplicative rather than allocated among
the multiple injuries presented by plaintiffs at trial.  *See
Martinez v. Port Auth. of New York and New Jersey*, 445 F.3d 158,
161 (2d Cir. 2006) ("Although it would have been preferable had
the District Court specifically instructed the jury to avoid
duplicative damage awards in this case, defendants have failed
to establish 'with any degree of certainty' that such double-
counting actually or likely occurred in this particular case."
(quoting *Gentile*, 926 F.2d at 154) (footnote omitted)).

For the foregoing reasons, defendants' motions for
interpretation of the jury verdict as awarding duplicative
damages are denied.

B. *Incorrect Entities on Verdict Sheets*

The UH Defendants and Hershco also assert that "the
wrong entities were placed on the verdict sheet." (UH Jury Int.

26

Mot. at 4.)  Specifically, the UH Defendants and Hershco argue that "all three 'United Homes' entities . . . for all six plaintiffs" were included on the verdict sheets even though "each transaction involved one or two of the entities, but in no case all three."  (*Id.*)  Accordingly, these defendants contend that "the uninvolved entity should not have been on the verdict sheet for that plaintiff."  (*Id.*)

Plaintiffs oppose the "belated" motion concerning the entities on the verdict sheets, arguing that "[t]he jury found that all of the defendants engaged in a conspiracy to defraud each one of the individual plaintiffs."  (Pl. Jury Int. Opp'n at 8.)  Further, plaintiffs argue that "'United Homes' was the trade name for [all] companies," and that there was "ample evidence to support the jury's finding that all the defendant companies were utilized by Yaron Hershco as a single entity to perpetrate his fraudulent property-flipping scheme . . . ." (*Id.* at 9.)  Therefore, plaintiffs argue, "there is a factual basis to hold each company liable for participation in the conspiracy to defraud every plaintiff and to award punitive damages against each company for each plaintiff."  (*Id.*)

In response, the UH Defendants and Hershco argue that "[t]he verdict's special interrogatories concerning the pierce-the-veil claims cannot reasonably be read to support a judgment against an entity that was not involved in a particular

27

transaction." (UH Reply at 6.) The UH Defendants and Hershco argue that the piercing-the-corporate-veil questions were directed at determining the liability of Hershco, and that "[n]othing in these special interrogatories can be read as suggesting the jury made any finding about the entities' activities, that it found that any one company was separately liable for a transaction it was not involved in, or that any one company dominated another." (*Id.* at 7.)

      1. <u>Defendants Waived Any Objection to the Entities Listed</u>

For the same reasons outlined above, the court finds that the UH Defendants and Hershco waived any objection to the entities listed on the verdict sheets. The UH Defendants and Hershco failed to object to any of the multiple versions of the jury charges or verdict sheets prior to submitting the cases to the jury. Moreover, these defendants failed to object after the jury returned a verdict against all United Homes entities in all six actions. Having failed to raise the objection in a timely manner, the court finds that the UH Defendants and Hershco have waived any objection to the entities listed on the verdict sheets. *See, e.g.*, *Kosmynka*, 462 F.3d at 83; *Jarvis*, 283 F.3d at 56-57; *Lavoie*, 975 F.2d at 55.

      2. <u>Evidence Supports Liability of All Entities</u>

Even in the absence of a waiver of the objection, the court would still find that the evidence was sufficient to

support a finding of liability as to all United Homes entities.
The court agrees with the UH Defendants and Hershco that not all
United Homes entities were *directly* involved in the sales
transactions with all the plaintiffs.  For example, in the Joint
Pretrial Order, the parties stipulated that United Property
Group, LLC was the only entity directly involved in the sale
transaction for the home of plaintiff Sandra Barkley.  (*See* ECF
No. 537-2, Joint Pretrial Order, Ex. A, Stipulated Facts ¶¶ 1-
4.)

          The evidence, however, was sufficient to establish
that all entities participated in the conspiracy to perpetrate
the fraudulent property-flipping schemes.  Plaintiffs presented
evidence that United Homes, LLC; United Property Group, LLC; and
Galit Network, LLC failed to observe corporate formalities, such
that one or more entities financed the operations of the other
entities.  (*See generally* Tr. XI at 96-173.)  Expert witness
Alan Blass testified that Hershco used the United Homes entities
"as a man with 21 pockets in his coat constantly moving cash
from one pocket to another as he needed it, whether it was for
cash flow purposes or for lending purposes or for some other
unknown purposes."  (*Id.* at 108; *see also id.* at 76-95
(deposition testimony of Boaz Smorlarchik, United Homes
representative, regarding entities' practices).)  Mr. Blass
testified that "all of the corporate lines were totally blurred"

among the United Homes entities, such that it could not be determined "where [a particular company] was operating," "who was working for" that company, which company was borrowing money from others, or "where each of the loans stood." (Tr. XI at 121.)  Moreover, all three United Homes entities were involved in the advertising of the United Homes services. (*See, e.g.* Pl. Exs. 2716, 2719, 2720, 2726, 2727, 2755, 2756, 2759, 2760.) Finally, United Homes, LLC is the trade name used for all the United Homes entities. (*See* Tr. XI at 92; Tr. X at 135.)

The UH Defendants and Hershco argue that the pierce-the-corporate veil finding against Hershco cannot be interpreted as a finding of liability against the individual companies. (UH Reply at 6-7.)  Nonetheless, it is not just the jury's corporate veil-piercing finding that is relevant, but also the facts supporting that finding.  The same facts that support piercing the corporate veil--the failure to observe corporate formalities and treatment of each United Homes entity as an extension of the others--also support a finding of liability for each entity (United Homes, LLC; United Property Group, LLC; and Galit Network, LLC) for having participated, directly or indirectly, in the fraudulent property-flipping scheme affecting plaintiffs. Consequently, the UH Defendants' and Hershco's motion concerning the interpretation of the jury verdict with respect to the entities listed on the verdict sheets is denied.

## II.  __Defendants' Motions for Set-Offs__

The UH Defendants and Hershco argue that under New York General Obligations Law Section 15-108 ("Section 15-108") they are "entitled to an offset equal to the compensation the [plaintiffs] received from all the settling defendants for the same injury." (ECF No. 577, UH Defendants and Hershco Post-Verdict Motion #2 ("UH Set-Off Mot.") at 2.) These defendants contend that "the requirement for applying section 15-108 is whether the settlement payment represented compensation for the same injuries as the verdict's compensatory award." (*Id.* at 3.) Thus, because "plaintiffs' position here was that all of the defendants, whether settling or non-settling, contributed to the same injuries, *to wit*, the so called inflated values of the subject homes and financing to purchase such homes," the UH Defendants and Hershco argue that they are entitled to a set-off equal to the amount of any settlement. (*Id.* at 4.)

Olympia likewise argues that "[t]he settlements in this action were clearly for the 'same injury'" as required for application of Section 15-108. (ECF No. 578-3, Olympia Memorandum of Law in Support of Reduction of Jury Verdict by Amount of Settlements ("Olympia Set-Off Mem.") at 1.) Olympia contends that "[t]he [settling defendants] were all sued as joint tortfeasors along with Olympia," and that these defendants "were given general releases of all claims including the fraud

and conspiracy to defraud claims for which Olympia was found liable." (*Id.*)  Therefore, Olympia argues, "[t]he verdict against Olympia is . . . plainly subject to reduction in the amount of the settlements." (*Id.*)[3]

Plaintiffs concede that "[t]he settlements reached with some of the settling defendants present no difficulty for the application of Section 15-108." (ECF No. 590, Plaintiffs' Opposition to UH Set-Off Mot. and Olympia Set-Off Mem. ("Pl. Set-Off Opp'n") at 7.)  Plaintiffs, however, argue that some of the settlements "do not lend themselves to set-off under Section 15-108." (*Id.*)  First, plaintiffs argue that "[a]ny settlement with a Rule 19 party against whom no claims have been alleged is, by definition, not subject to set-off under Section 15-108, which applies only to 'tortfeasors.'" (*Id.* (quoting Section 15-108).)  Second, plaintiffs argue that "[g]iven the scope of the claims settled, . . . a dollar-for-dollar set-off is not called for under section 15-108." (*Id.* at 9.)  Specifically, plaintiffs contend that settlement amounts covered "*all* claims asserted against" the settling defendants, which "included the claims as to which the jury found the non-settling defendants

---

[3] Olympia also moves to amend its Answers to the Complaints to assert its right to a set-off.  (Olympia Set-Off Mem. at 2.)  Because plaintiffs did not oppose Olympia's motion to amend, and because there is no prejudice in allowing the amendment, the court grants Olympia's motion to amend its Answers to the Complaint to assert its right to set-offs from settling defendants.  *See Whalen v. Kawasaki Motors Corp., U.S.A.*, 703 N.E.2d 246, 249 (N.Y. 1998).

liable . . . as well as the claims for which the jury found no liability . . . ." (*Id.* at 9-10.) Plaintiffs argue that they "sought different kinds of damages under different causes of action based on different kinds of harm--economic as well as non-economic--that they suffered." (*Id.* at 11.) Therefore, plaintiffs assert that by settling all claims, the settling defendants "agreed to pay certain amounts in exchange for receiving a release from possible liability for economic and non-economic damages, as well as for punitive damages." (*Id.*) The non-settling defendants, on the other hand, are only liable "for economic and punitive damages." (*Id.*) "The settlement and judgment therefore do not represent 'common damages.'" (*Id.*) Third, plaintiffs argue that modifications and satisfactions of certain mortgages on plaintiffs' homes should not be used to reduce the jury verdict because, in addition to having been made by Rule 19 parties, these modifications and satisfactions "are not 'monetary consideration greater than one dollar' as required under Section 15-108(d)," because "the defendants have already obtained the benefits of those modifications and satisfactions" when plaintiffs presented their calculation of damages to the jury, and because "the value of these modifications and satisfactions is neither the amount asserted by defendants, nor quantifiable for purposes of set-off." (*Id.* at 12.)

33

The UH Defendants and Hershco reply that "[g]iven the Plaintiffs' refusal to provide an alternate calculation [of set-offs] or disclose information that would allow for such a calculation, the defendants' offset calculation should be accepted and applied." (ECF No. 588, UH Defendants and Hershco Reply on Motion for Offset ("UH Set-Off Reply") at 2.) The UH Defendants and Hershco argue that plaintiffs "cannot now escape the effect of section 15-108 by suggesting the settling defendants resolved federal claims along with state claims" and that "it is the resulting proven injury, not the theory for recovery[,] that determines whether an offset is proper." (*Id.* at 5.) The UH Defendants and Hershco further contend that the mortgage restructurings and satisfactions "must be considered in the analysis" because they "resulted in forgiveness of debt, measurable in dollars" and because "the evidence Plaintiffs point to does not support their contention that the damage evidence reflected the settlements." (*Id.* at 9-10.) Finally, the UH Defendants and Hershco argue that because "[t]he whole point of bringing in a 'required' party under Rule 19 is to protect the defendant from paying double damages," "[t]he settling defendants' status as 'required' under Rule 19 only buttresses the defendants['] claim for offsets." (*Id.* at 10.)

Olympia replies, first, that "[t]here is simply no reason to exempt payments received from Rule 19 parties from

setoff" because "Section 15-108 stems from the fundamental
common law rule that prohibits plaintiffs from obtaining a
double recovery and is applicable irrespective of whether the
person providing the compensation is in fact legally liable for
the injury." (ECF No. 589, Olympia Reply on Motion for Set-Offs
("Olympia Set-Offs Reply") at 1-2.) Moreover, Olympia argues
that it is not even clear "that in fact the settlements were
funded solely by the Rule 19 defendants," and that "the Court
should permit Defendants to obtain discovery from [settling
defendants, specifically] to find out whether and how much they
contributed in cash to finance the loan modifications" if the
court finds that settlements with Rule 19 parties are not
subject to set-off. (*Id.* at 2-3.) Olympia further argues that
"there was a very large overlap" in the damages asserted under
the claims for which the jury found liability and the claims for
which the jury found no liability, "with the only difference
being that with respect to [the latter claims], the Plaintiffs
could seek emotional damages as well as the economic damages
that are common to both claims." (*Id.* at 4.) However, Olympia
argues, "the allocation of the settlement must be premised on
what actually happened at trial" and "[i]n this case, nothing
was awarded for emotional damages because there was no finding
of liability with respect to the discrimination claims." (*Id.*
at 5.) Therefore, "the Court [] should not allocate any of the

35

settlement to non-existent discrimination claims." (*Id.*)
Finally, Olympia contends that the loan modifications and
satisfactions are subject to set-off, arguing that "loan
forgiveness is plainly 'monetary consideration'" because "it
relates to the obligation to repay money" and "it is something
of value to the recipient"; that "[t]he write off of principal
in no way entered into the information that the jury was given
to calculate damages since they were not aware of these
settlements" and therefore were not taken into account in
calculating damages; that the fact that plaintiffs paid money to
receive the modifications is irrelevant; and that the value of
the modifications and satisfactions can be determined as being
"quite simply the amount of the loan that was written off."
(*Id.* at 6-8.)

A. *New York General Obligations Law Section 15-108*

Section 15-108 of New York General Obligations Law
provides that non-settling defendants are entitled to a monetary
offset against the amount of a compensatory damages verdict.
Specifically, the statute provides that,

> When a release or a covenant not to sue or
> not to enforce a judgment is given to one of
> two or more persons liable or claimed to be
> liable in tort for the same injury, or the
> same wrongful death, it does not discharge
> any of the other tortfeasors from liability
> for the injury or wrongful death unless its
> terms expressly so provide, but it reduces
> the claim of the releasor against the other

36

> tortfeasors to the extent of any amount
> stipulated by the release or the covenant,
> or in the amount of the consideration paid
> for it, or in the amount of the released
> tortfeasor's equitable share of the damages
> under article fourteen of the civil practice
> law and rules, whichever is the greatest.

N.Y. Gen. Oblig. Law § 15-108(a) (McKinney 2007).  Under Section 15-108, the permitted reduction is the greatest of the amount stipulated as consideration for the release, the amount actually paid for the release, or the settling tortfeasor's equitable share of the damages.  *Id.; see also Whalen*, 703 N.E.2d at 248; *Chubb & Son Inc. v. Kelleher*, No. 92-CV-4484, 2006 WL 2728636, at *5 (E.D.N.Y. Mar. 30, 2006); *Nu-Chem Labs., Inc. v. Dynamic Labs., Inc.*, No. 96-CV-5886, 2001 WL 35981560, at *23 (E.D.N.Y. Mar,. 30, 2001).  In the absence of any finding regarding the settling of defendants' equitable share of plaintiffs' damages, the appropriate measure is either the actual amount paid for each release, or the amount stipulated as consideration for the release.  *See Whalen*, 703 N.E.2d at 248.

### 1. No Set-Offs for Settlements With Rule 19 Parties

The court agrees with plaintiffs that defendants are not entitled to set-offs for settlements reached with defendants sued as necessary parties pursuant to Federal Rule of Civil Procedure 19.  By its terms, Section 15-108 covers settlements with "one of two or more persons *liable or claimed to be liable in tort* for the same injury."  N.Y. Gen. Oblig. Law § 15-108(a)

37

(emphasis added).  The case law is replete with references to the fact that "[t]he section *only* applies where *tortfeasors* are 'liable in tort for the same injury.'"  *Ackerman v. Price Waterhouse*, 683 N.Y.S.2d 179, 196 (N.Y. App. Div. 1998) (emphasis added) (internal citations omitted); *see also Scotts Co. v. Pac. Emp'rs Ins. Co.*, 875 N.Y.S.2d 891, 892 (N.Y. App. Div. 2009) ("Moreover, § 15-108 applies only to joint tortfeasors, not to co-insurers."); *Pro Bono Inv., Inc. v. Gerry*, No. 03 Civ. 4347, 2008 WL 4755760, at *20 (S.D.N.Y. Oct. 29, 2008) (noting that "the statute applies only to joint tortfeasors"); *Hyosung Am., Inc. v. Sumagh Textile Co., Ltd.*, 25 F. Supp. 2d 376, 387 (S.D.N.Y. 1998), *aff'd*, 189 F.3d 461 (2d Cir. 1999) (holding that because the defendant "has not proven that [the settling defendant] was also involved [in the fraud] . . . [plaintiff's] settlement with [the settling defendant] does not reduce plaintiff's recovery against [the defendant] in this action").

        One court in this Circuit has analyzed specifically whether Section 15-108 is applicable to parties not liable in tort.  *See Halpern v. Rosenbloom*, 459 F. Supp. 1346 (S.D.N.Y. 1978).  The *Halpern* court concluded, after reviewing the legislative history and statutory structure of Section 15-108, that "[t]he necessary inference is that when the legislature, in a title that otherwise deals with obligors, used 'tortfeasor' in

38

§ 15-108, their intention was to restrict the application of §
15-108 to tortfeasors in the traditional sense of the word" and
that "[j]udicial expansion of the term to include 'obligors'
would be unwarranted." *Id.* at 1353.

    Although *Halpern* was decided in 1978, the court has
not found, nor do defendants point to, any cases correcting or
overruling its holding.  Finding the analysis in *Halpern*
persuasive, the court holds that Section 15-108 applies only to
"tortfeasors in the traditional sense of the word." *Id.*  The
statute, therefore, does not apply to Rule 19 defendants sued by
plaintiffs as necessary parties.  The Rule 19 defendants were
not sued as joint tortfeasors, and plaintiffs did not claim that
these defendants were liable in tort.  Rather, the Rule 19
defendants were sued because of their interest or potential
interest in the plaintiffs' mortgages as either holders or
servicers of the loans.  Because the Rule 19 defendants are not
"tortfeasors in the traditional sense of the word," *Id*. at 1354,
the UH Defendants, Hershco, and Olympia are not entitled to set-
offs based on plaintiffs' settlements with these defendants.
Acknowledging that the New York Court of Appeals has held, in
the context of Section 15-108, that "the possibility of double
recovery should be avoided," *Whalen*, 703 N.E.2d at 248, this
court notes that the *Whalen* case did not specifically address
the issue of settlement with necessary parties, as opposed to

tortfeasors.  Because the Rule 19 defendants are not tortfeasors with the trial defendants, any settlement would not result in a double recovery.[4]

   2. *Pro Tanto* Reduction of Damages Not Appropriate

        The court also agrees with plaintiffs that a *pro tanto* reduction of damages is not appropriate in this case.  The language of Section 15-108 clearly establishes that a non-settling defendant is entitled to a set-off only when an agreement with a settling defendant is for "the same injury" alleged against the non-settling defendant.  N.Y. Gen. Oblig. Law § 15-108(a).  "For General Obligations Law § 15-108(a) to apply . . . the defendant and joint tortfeasor must have caused *the same injury* to the plaintiff."  *In re CBI Holding Co.*, 419 B.R. 553, 575 (S.D.N.Y. 2009) (citing *Ackerman*, 683 N.Y.S.2d at 196) (emphasis added).  "Where payments made by a settling defendant are not for the same injury as that allegedly caused by a non-settling defendant, § 15-108 has no office to perform

---

[4] Olympia has requested further discovery, if the court rules that Rule 19 parties are not covered by Section 15-108, to allow Olympia to determine how much Credit Suisse contributed to certain mortgage modifications.  Although defendants had already been granted generous briefing schedules and one extra week to seek more information from the settling defendants, the court granted the parties yet another opportunity to obtain additional discovery on November 28, 2011.  (*See* Order dated 11/28/2011.)  The parties' subsequent submissions contained irreconcilable information that was unsupported by documentary evidence regarding the amounts, if any, that Credit Suisse contributed, credited or accepted in relation to certain mortgage modifications.  (*See* ECF Nos. 599, 600, 601.)  Because the parties have failed to submit further useful and admissible information to the court despite ample opportunity to do so, the court in its discretion is unable to further consider the parties' positions, and proceeds as set forth in this Memorandum and Order.

and the settling defendant, once liability is established and quantified, is not entitled to an offset." *Hulko v. Connell*, No. 83 CIV. 7760, 1990 WL 139022, at *3 (S.D.N.Y. Sept. 18, 1990) (citing *Getty Petroleum Corp. v. Island Transp. Corp.*, 862 F.2d 10, 15–16 (2d Cir. 1988); *Whitney v. Citibank, N.A.*, 782 F.2d 1106, 1118 (2d Cir. 1986)).

Here, the scope of the settlements with some of the defendants is broader than the damages for which the jury found the non-settling defendants liable.  In particular, some settlements covered release of federal and state discrimination claims, for which plaintiffs claimed substantial non-economic damages, in addition to economic harms.  (*See* Tr. XV at 78 (asking the jury to award $200,000 to each plaintiff for emotional damages).)  The fraud, conspiracy-to-defraud, and deceptive practices claims, for which the defendants were found liable at trial, allowed plaintiffs to recover damages only for economic harms.  Some of the settlements, therefore, were not entirely for the "same injury," as required for application of Section 15-108.

Olympia concedes that some of the settlements that cover non-economic harms are not for the "same injury" as that for which Olympia was found liable for at trial.  (*See* Olympia Set-Offs Reply at 4.)  Olympia argues, however, that plaintiffs' argument against a *pro tanto* reduction has been rejected by the

41

Second Circuit in *Singer v. Olympia Brewing Co.*, 878 F.2d 596 (2d Cir. 1989). The court notes, as an initial matter, that *Singer* relied on federal common law, and not Section 15-108. *Singer*, 878 F.2d at 600. More importantly, the argument advanced by the plaintiff in *Singer* was not that the settlement with another defendant related to a different injury than that for which the non-settling defendant had been found liable at trial. Rather, the plaintiff argued that because a particular claim against the settling defendant exposed that defendant to treble damages, the set-off calculation should be made from the highest amount of "provable damages." *Id.* The argument advanced by plaintiffs here--that the scope of the settlements with some defendants is broader than the jury verdict--was not addressed by the Second Circuit in *Singer*.

Similarly, the other case cited by Olympia, *Casey v. New York*, 507 N.Y.S.2d 159 (N.Y. App. Div. 1986), did not address the question at issue here. In *Casey*, the New York Appellate Division addressed "the proper forum and manner for the apportionment of the proceeds of settlements entered into prior to trial involving the wrongful death and pain and suffering causes of action." *Id.* at 162. The Appellate Division held that "self-created apportionment proffered by the claimants is not binding on the trial court." *Id.* at 163. *Casey* did not address the issue in the instant case--namely, the

42

proper set-off amount for a settlement that is broader in scope than the injury for which defendants were found liable at trial.

Although some of the settlements were not entirely for the "same injury" for which defendants were found liable at trial, the court agrees with Olympia that there is a degree of overlap. These settlements were broader in scope only in that the settlements covered the non-economic harms alleged by plaintiffs under the discrimination claims. The economic harms, however, were identical. Therefore, although a dollar-for-dollar reduction is not appropriate, the compensatory damages awarded to plaintiffs at trial must be set off to some extent to reflect these settlements. Having reviewed the pleadings, the record, and the parties' submissions, the court finds that defendants are entitled to a set-off equal to fifty-eight percent of the settlement amounts. This is, on average, the percentage of the total damages proven by plaintiffs corresponding to economic harms.

Because the terms of the settlement agreements at issue are confidential, the court will enter a separate order, filed under seal, setting forth the set-off calculations. Based on its calculations, the court grants in part and denies in part defendants' motions for set-offs and reduces the compensatory damages awards to plaintiffs as follows: (1) Sandra Barkley, from $91,000 to $83,460; (2) Sylvia and Rodney Gibbons, from

43

$116,000 to $10,490; (3) Mary Lodge, from $101,000 to $58,100; (4) Dewitt Mathis, from $131,000 to $106,640; (5) Miles and Lisa McDale, from $151,000 to $127,800; and (6) Charlene Washington, from $51,000 to $24,900.

## III. <u>Plaintiffs' Motion for Pre- and Post-Judgment Interest</u>

### A. *Pre-Judgment Interest*

Plaintiffs argue that they are entitled to an award of pre-judgment interest on the verdicts entered by the jury against the UH Defendants, Hershco, and Olympia.  (ECF No. 592, Plaintiffs' Cross-Motion for an Award of Interest ("Pl. Int. Mot.") at 5.[5])  Plaintiffs contend that "pre-judgment interest on the compensatory damages the jury awarded . . . [should] begin accruing as of the date of each plaintiff's home purchase transaction."  (*Id.* at 6.)

Plaintiffs note that "[f]ederal courts determining state law claims are mandated to apply state laws to computations of interest," so "it is mandatory to apply New York State laws to the computation of interest in this matter."  (*Id.* at 6-7.)  Plaintiffs point to New York Civil Practice Law and Rules ("C.P.L.R.") §§ 5001-04 for the proposition that pre-judgment interest "is recoverable as a matter of right," where "an act or omission depriving or otherwise interfering with

---

[5] As the plaintiffs' motion for an award of interest is not paginated, the court refers to the page numbers assigned by the ECF System.

title to, or possession or enjoyment of, property has occurred,"
such as in the instant cases. (*Id.* at 7 (quoting C.P.L.R.
§ 5001(a)).) Plaintiffs further contend that, because § 5001(b)
provides that "interest shall be computed from the earliest
ascertainable date the cause of action existed," pre-judgment
interest should be computed from "the date of closing on each of
the properties in question." (*Id.* at 8 (quoting § 5001(b)).)

The UH Defendants and Hershco oppose plaintiffs'
cross-motion for an award of interest. (*See* ECF No. 596, UH
Defendants and Hershco Opposition to Plaintiffs' Motion for
Interest ("UH Int. Opp'n").) The UH Defendants and Hershco
contend that, "[c]ontrary to the Plaintiffs' contention,
determining whether to award pre-judgment interest always rests
within the Court's discretion." (*Id.* at 2.) The UH Defendants
and Hershco acknowledge that C.P.L.R. § 5001(a) states that
"interest *shall* be recovered," but argue that "in actual
practice the award is discretionary." (*Id.* (quoting C.P.L.R.
§ 5001(a)) (emphasis in original).)

Arguing that the court should, in its discretion,
refuse to award plaintiffs' pre-judgment interest here, the UH
Defendants and Hershco contend that "[p]laintiffs are already
receiving enhanced compensation in the form of punitive damages,
. . . so additional interest is not necessary to compensate
them." (*Id.* at 3.) Further, they argue that because "[t]he

45

compensatory damages in this case reflected the differences between the houses' inflated prices and their actual values" and plaintiffs "funded those [inflated] payments with borrowed funds from the mortgage lenders, not with out-of-pocket payments . . . [p]laintiffs cannot be said to have lost the use of that [borrowed] money." (*Id.* at 3-4.)   The UH Defendants and Hershco also argue that, because "the jury did not itemize its verdict to specify how much of its award represented the borrowed funds and how much (if any) might have represented out-of-pocket payments . . . [t]here is no basis to parse the verdict to determine which part might actually constitute out-of-pocket payments." (*Id.* at 4.)

        The UH Defendants and Hershco contend that, if pre-judgment interest is to be awarded, then pursuant to New York General Business Law § 349, "pre-judgment interest should run from the date of verdict, not from some earlier date." (*Id.* at 5.)   Alternatively, the UH Defendants and Hershco argue that "interest should not run from before the date the complaint was filed," since, under C.P.L.R. § 5001, "the verdict does not specify when the jury found the cause of action existed . . . [and] it cannot be determined when . . . various mortgage interest payments might have been made." (*Id.* at 6.)

        Olympia also opposes plaintiffs' cross-motion for an award of interest, arguing that "[p]laintiffs have already

obtained their interest from the jury." (ECF No. 597, Olympia
Memorandum of Law in Opposition to an Award of Interest
("Olympia Int. Opp'n") at 2.)  Olympia contends that, since
"[p]laintiffs sought from the jury interest on the money that
they had to pay for borrowing the funds to buy these
properties," they "may not seek yet additional interest." (*Id.*)
Olympia argues that it would be a "windfall" to give plaintiffs
additional interest and "would put [plaintiffs] not simply in
the same position [they were] in prior to the fraud but in a
better position." (*Id.*)  Olympia further notes that inflation
through 2009 was built into the repair estimates provided at
trial, so "it would be improper to award interest on top of
that." (*Id.* at 3.)

  Plaintiffs reply that "New York law mandates an award
of prejudgment interest on compensatory damages awarded for
fraud." (ECF No. 595, Plaintiffs' Reply Memorandum of Law in
Further Support of Cross-Motion for an Award of Interest ("Pl.
Int. Reply") at 2.)  Plaintiffs note that the cases cited by the
UH Defendants and Hershco for their contention that pre-judgment
interest is awarded at the court's discretion, "when read in
full, simply hold that, in the *absence* of an explicit state or
federal law directing or prohibiting prejudgment interest
awards, federal judges have the discretion to order prejudgment
interest." (*Id.* at 3 (emphasis in original).)  Plaintiffs argue

47

that, since New York does have a statute mandating an award of pre-judgment interest, and because "none of the cases United Homes cites involves a finding of fraud under New York law," "these cases are inapposite." (*Id.* at 3-4.)

In their reply, plaintiffs also contend that, "[w]ithout a specific explanation from the jury, and in light of the discrepancy between Plaintiffs' requested compensatory damages and those awarded, no evidence of the jury's intent exists and any statement purporting to explain its intent is pure speculation." (*Id.* at 5.)  Thus, plaintiffs contend that defendants' assertion that the jury considered or awarded pre-judgment interest in its verdict "is completely unfounded." (*Id.*)  Furthermore, plaintiffs note that, "[e]ven if it were somehow possible to determine that *all* of the jury's compensatory damage awards were intended to compensate Plaintiffs for their payments of excess interest, Plaintiffs would still be entitled to prejudgment interest," because "excess interest" and "prejudgment interest" are distinct.  (*Id.* at 6 (emphasis in original).)

Plaintiffs take further issue with defendants' contention that an award of interest would be unwarranted because plaintiffs borrowed the money to pay the inflated prices on their respective homes.  Plaintiffs argue that, when plaintiffs closed on their mortgages, "the money [then] belonged

48

to Plaintiffs, and they were obligated to repay it." (*Id.* at
7.)  Plaintiffs also state that "each Plaintiff made significant
payments on their mortgages" and paid "vastly inflated prices
for their shoddily-renovated houses which . . . resulted in
Plaintiffs losing further money in various fees, refinance
charges, and, in [one plaintiff's] case, outright loss of her
home." (*Id.* at 7-8.)  Finally, plaintiffs contend that, under
C.P.L.R. § 5001(b), "the earliest ascertainable date
[plaintiffs'] cause of action existed" was the date on which
each plaintiff closed on his or home, respectively, because,
"[a]t that moment, plaintiffs paid too much for their houses,
took title to houses that were not newly renovated as advertised
and had hidden defects and decisively fell prey to the concerted
action of United Homes." (*Id.* at 8.)  Plaintiffs conclude that,
"[g]iven the voluminous evidence in this case, and its lengthy
journey to trial, the Court is uniquely qualified to" fix the
date from which pre-judgment interest is to be computed. (*Id.*
at 9.)

     1. Plaintiffs Are Entitled to Pre-Judgment Interest

     Plaintiffs are entitled to an award of pre-judgment
interest under New York law.  Section 5001 of the C.P.L.R.
provides that

> Interest shall be recovered upon a sum
> awarded because of a breach of performance
> of a contract, or because of an act or

> omission depriving or otherwise interfering
> with title to, or possession or enjoyment
> of, property, except that in an action of an
> equitable nature, interest and the rate and
> date from which it shall be computed shall
> be in the court's discretion.

N.Y. C.P.L.R. § 5001(a).  "Under New York law, awarding pre-judgment interest on damages awarded for fraud is mandatory." *In re Crazy Eddie Secs. Litig.*, 948 F.Supp. 1154, 1166 (E.D.N.Y. 1996); *see also Huang v. Sy*, 878 N.Y.S.2d 398, 400 (N.Y. App. Div. 2009) ("The Supreme Court properly awarded pre-verdict interest as a matter of right pursuant to CPLR 5001(a) upon the principal sum awarded in connection with the plaintiffs' causes of action to recover damages for fraud and breach of fiduciary duty.").

The court is unconvinced by defendants' argument that plaintiffs are not entitled to an award of pre-judgment interest because they financed the purchase of their homes with loans and therefore cannot be said to have lost the use of borrowed money. Plaintiffs are correct that, once plaintiffs closed on the properties, the loan proceeds became their property.  Plaintiffs have a continuing obligation to repay the loans, and are entitled to interest for the loss of enjoyment of that property as a result of the fraud.  *Cf. Mallis v. Bankers Trust Co.*, 717 F.2d 683, 695 (2d Cir. 1983) ("We conclude, therefore, that [defendant's] tortious actions resulting in the loss of

plaintiffs' loan proceeds were 'act[s] or omission[s] depriving or otherwise interfering with title to, or possession or enjoyment of, property' under § 5001(a).  Accordingly, we hold that plaintiffs are entitled to prejudgment interest as a matter of right." (quoting § 5001(a))).

Nor does the court find defendants' remaining contentions persuasive.  The awards of punitive damages are unrelated to an award of pre-judgment interest.  Punitive damages are intended to punish defendants for willful and knowing violations of the law and morally repugnant conduct. Pre-judgment interest, on the other hand, is intended to reward plaintiffs for the loss of enjoyment of property as a result of the fraud.  Nor are damages for excess interest paid on predatory loans the equivalent of pre-judgment interest.  The excess interest measures the loss plaintiffs suffered as a result of the fraud, whereas the pre-judgment interest award compensates plaintiffs for the deprivation of property due to that loss.  Finally, although it is true that repair costs were adjusted in plaintiffs' damages presentation, the prices were adjusted downward to reflect lower prices in the market.  Such adjustment is not the equivalent of an award of pre-judgment interest.

Consequently, the court finds that plaintiffs are entitled to an award of pre-judgment interest at nine percent,

per annum, the rate prescribed by New York law.  N.Y. C.P.L.R. §
5004 ("Interest shall be at the rate of nine per centum per
annum, except where otherwise provided by statute.").[6]

      2. <u>Pre-Judgment Interest Accrues From Intermediate Date</u>

        The court finds that pre-judgment interest on
plaintiffs' awards accrues from an intermediate date, falling
somewhere between the date of closing on the plaintiffs'
properties and the last date damages accrued.  Section 5001 of
the C.P.L.R. provides that

> Interest shall be computed from the earliest
> ascertainable date the cause of action
> existed, except that interest upon damages
> incurred thereafter shall be computed from
> the date incurred.  Where such damages were
> incurred at various times, interest shall be
> computed upon each item from the date it was
> incurred or upon all of the damages from a
> single reasonable intermediate date.

N.Y. C.P.L.R. § 5001(b).  Although plaintiffs are correct that
the "earliest ascertainable date the cause of action existed" is
the date of the closing on plaintiffs' properties, some of the
damages--namely, the excess interest paid on the predatory
mortgages and repair costs incurred by the plaintiffs--were
incurred at later dates.  Section 5001 of the C.P.L.R. clearly
provides that "interest upon damages incurred" after the date
the cause of action existed "shall be computed from the date

---

[6] Even if the award of pre-judgment interest were not mandatory pursuant to
Section 5001 of the C.P.L.R., the court would still award pre-judgment
interest in the exercise of its discretion.

incurred." *Id.* Because the damages here were incurred at various times, under the statute interest must be calculated individually for each item of damages from the date it was incurred or "from a single reasonable intermediate date." *Id.* Here, because the jury did not award damages by item but rather awarded one aggregate sum for all items of damages, it is not feasible to compute interest for each item of damages from the date it was incurred. Therefore, the interest shall be computed from a single reasonable intermediate date.

The dates on which plaintiffs closed on their properties is undisputed: (1) Sandra Barkley closed on her house on January 14, 2003; (2) Sylvia and Rodney Gibbons closed on their house on November 12, 2002; (3) Mary Lodge closed on her house on January 16, 2003; (4) Dewitt Mathis closed on his house on September 17, 2002; (5) Miles and Lisa McDale closed on their house on November 15, 2002; and (6) Charlene Washington closed on her house on January 13, 2003. The dates when damages were last incurred, however, is not clear from the record. For instance, although the evidence presented a trial showed that plaintiffs incurred expenses in repairs for their properties, the last date on which plaintiffs incurred such expenses is unknown to the court. Moreover, it is unclear how these dates compare to the last date on which plaintiffs made payments on their mortgages, thereby incurring damages for excess interest.

By February 7, 2012, plaintiffs shall submit a calculation of pre-judgment interest for each plaintiff, computed at nine percent per annum and accruing from a reasonable intermediate date, and submit documentation in support of the calculation of such reasonable intermediate date.

### B. Post-Verdict and Post-Judgment Interest

Plaintiffs also argue that, pursuant to Section 5002 of the C.P.L.R., "plaintiffs are . . . entitled to an award of interest from the date the verdict was rendered to the date of entry of the final judgment." (Pl. Int. Mot. at 8.) Plaintiffs further argue that, "pursuant to both New York State and federal law, the plaintiffs are also entitled to an award of post-judgment interest upon entry of judgment." (*Id.*) Plaintiffs note that, under 28 U.S.C. § 1961, "an award of post-judgment interest is mandatory in any civil case where money damages are recovered." (*Id.* at 9.)

The UH Defendants and Hershco contend that "there is no need, basis, or ability to compute post judgment interest at this time," but "concede that once judgment is entered, interest will accrue at the federal rate under 28 U.S.C. § 1961." (UH Int. Opp'n 1.) Olympia did not address the issue of post-judgment interest. (*See generally* Olympia Int. Opp'n.)

Defendants do not dispute that plaintiffs are entitled to recover post-judgment interest pursuant to 28 U.S.C. § 1961

once judgment is entered.  Nor does the court find any reason why such award of interest is not warranted.

Consequently, plaintiffs are entitled to recover post-judgment interest at the rate prescribed by law.

## IV.  <u>Plaintiffs' Motion for Permanent Injunction</u>

Plaintiffs move for a permanent injunction against the UH Defendants and Hershco, enjoining these defendants "from engaging in deceptive acts and practices in the conduct of their business." (ECF No. 582-2, Plaintiffs' Motion for Injunctive Relief ("Pl. Inj. Mot.") at 5.)  Specifically, plaintiffs seek a permanent injunction pursuant to New York General Business Law ("G.B.L.") § 349, arguing that the statute "clearly affords authority for the injunctive relief sought." (Pl. Inj. Mot. at 6.)  Plaintiffs seek an injunction to bar the UH Defendants and Hershco from:

1. Engaging in fraudulent property-flipping activities;
2. Misrepresenting the condition of any homes they seek to sell;
3. Misrepresenting the extent or quality of repairs or renovations performed on a home prior to selling it to a potential buyer;
4. Misrepresenting the value of a residential property; and
5. Misrepresenting the affordability of financing available to potential homeowners;
6. Referring potential homeowners to lawyers;
7. Allowing lawyers and mortgage brokers to meet with potential homebuyers in their

           offices (or, in Mr. Hershco's case, the
           offices of his businesses);
    8. Working in concert with mortgage lenders,
       appraisers, contractors, or homebuyers'
       closing lawyers when selling homes; and
    9. Steering homeowners from independent
       mortgage lenders, contractors or
       attorneys.

(*Id.* at 7.)

      The UH Defendants and Hershco oppose plaintiffs'

motion for a permanent injunction. (ECF No. 583, UH Defendants

and Hershco Opposition to Plaintiffs' Motion for Injunctive

Relief ("UH Inj. Opp'n").) These defendants argue that "[i]t is

well established that the right to injunctive relief depends on

a finding of irreparable harm" and that "given the jury's

verdict awarding sufficient monetary damages to compensate the

plaintiffs, injunctive relief is not available." (*Id.* at 2-3.)

The UH Defendants and Hershco also argue that "plaintiffs do not

demonstrate any current or ongoing activities, on either side,

that would warrant prospective injunctive relief," and further

argue that the cases cited by the plaintiffs' do not support

injunctive relief here because those cases involved

"governmental actions." (*Id.* at 3-4.) Further, the UH

Defendants and Hershco argue that "injunctive relief would be

inappropriate here because nothing in the record establishes

that the UH Defendants harmed any other consumer or potential

consumer other than the plaintiffs' themselves, and each

plaintiff based his or her claim on the sale of a specific, unique home, not on common conduct that affected consumers at large." (*Id.* at 8.)  The UH Defendants and Hershco argue that plaintiffs failed to demonstrate that they are entitled to the relief requested, and that "the injunctive relief they are seeking is improperly overbroad and vague." (*Id.* at 9.)

Plaintiffs reply by arguing that these defendants erroneously rely on the federal standard for granting a permanent injunction, when the relief requested is governed instead by G.B.L. § 349. (ECF No. 584, Plaintiffs' Reply Memorandum of Law in Support of Motion for Injunctive Relief ("Pl. Inj. Reply") at 3-4.)  When "the injunctive relief sought is statutory," plaintiffs argue, the traditional equity grounds for injunctive relief do not apply. (*Id.*)  Further, plaintiffs argue that, contrary to the defendants' contention, "New York courts extend injunctive relief even when the complained-of conduct was voluntarily discontinued." (*Id.* at 5.)  According to plaintiffs, nothing in the statute, case law, or legislative history supports the distinction between actions brought by individuals and actions brought by government entities. (*Id.* at 6-7.)  Finally, plaintiffs argue that the requested relief is not overbroad and is "entirely consistent with the jury's findings" and "narrowly tailored and manifestly intended to

address the specific conduct that led to the jury's finding that Defendants engaged in deceptive practices." (*Id.* at 7.)

    *A. New York General Business Law § 349*

Section 349 of the General Business Law makes it unlawful to engage in "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service" in New York State. N.Y. Gen. Bus. Law § 349(a). The statute allows the attorney general of New York to enjoin deceptive acts or practices and seek restitution on behalf of the people of New York. *Id.* § 349(b). Further, the statute provides that

> In addition to the right of action granted
> to the attorney general pursuant to this
> section, any person who has been injured by
> reason of any violation of this section may
> bring an action in his own name to enjoin
> such unlawful act or practice, an action to
> recover his actual damages or fifty dollars,
> whichever is greater, or both such actions.
> . . .

*Id.* § 349(h). "Although originally written to enable the state attorney general to file suit, the statute was amended in 1980 to include a private right of action, 'to afford additional protection for consumers, allowing them to bring suit on their own behalf without relying on the attorney general for enforcement.'" *City of New York v. Cyco.Net, Inc.*, 383 F. Supp. 2d 526, 561 (S.D.N.Y. 2005) (quoting *Blue Cross and Blue Shield*

*of New Jersey, Inc. v. Philip Morris USA Inc.*, 818 N.E.2d 1140 (2004)).

     1. <u>Plaintiffs Are Entitled to a Permanent Injunction</u>

     Plaintiffs are entitled to an injunction barring the UH Defendants and Hershco from engaging in deceptive acts and practices.  To obtain an injunction under G.B.L. § 349, plaintiffs need only show that the defendants engaged in "deceptive acts or practices," as defined under the statute. "When an injunction is expressly authorized by statute, the standard preliminary injunction test is not applied.  Instead, the Court must look to the 'statutory conditions for injunctive relief,' and may issue a preliminary injunction if those conditions are met." *United States v. Broccolo*, No. 06-CV-2812, 2006 WL 3690648, at *1 (S.D.N.Y. Dec. 13, 2006) (quoting *SEC v. Mgmt. Dynamics, Inc.*, 515 F.2d 801, 808 (2d Cir. 1975)).  *Cf. People ex rel. Spitzer v. Applied Card Sys., Inc.*, 805 N.Y.S.2d 175, 177 (N.Y. App. Div. 2005) (noting that in claim for injunction "[a]s to the claims alleging deceptive business practices . . . under General Business Law §[] 349 [], the Attorney General was required to establish that respondents engaged 'in an act or practice that is deceptive or misleading in a material way and that [the consumer] has been injured by reason thereof'" (quoting *Small v. Lorillard Tobacco Co.*, 698 N.Y.S.2d 615 (N.Y. 1999) (internal citations omitted); *People ex*

*rel. Spitzer v. Gen. Elec. Co., Inc.*, 756 N.Y.S.2d 520, 523
(N.Y. App. Div. 2003) (noting that in action for injunction
"under General Business Law § 349, the plaintiff must prove that
the challenged act or practice was misleading in a material
way, and the deceptive practice must be likely to mislead a
reasonable consumer acting reasonably under the circumstances"
(internal quotations and citation omitted)).

Therefore, "[t]he contention that [] plaintiff[s]
failed to prove the existence of the usual equitable grounds for
relief, such as irreparable damage, is plainly irrelevant.
Where an injunction is authorized by statute it is enough if the
statutory conditions are satisfied." *Henderson v. Burd*, 133
F.2d 515, 517 (2d Cir. 1943).  Nor is it relevant that
plaintiffs have not shown that the deceptive acts or practices
are ongoing.  As an initial matter, the fact that deceptive acts
or practices with respect to the sale of properties to these
plaintiffs has ended does not necessarily mean that the
deceptive acts or practices are not ongoing as to other
consumers.  More importantly, "[t]o the extent that [the UH
Defendants and Hershco] voluntarily discontinued [the fraudulent
property-flipping scheme], such voluntary discontinuance of
fraudulent or deceptive practices will not bar the issuance of
an injunction to prevent future practices." *Applied Card Sys.,
Inc.*, 805 N.Y.S.2d at 179; *Gen. Elec.Co.*, 756 N.Y.S.2d at 524

60

("Even though GE voluntarily ceased its deceptive practices, the IAS court in the context of this consumer protection proceeding nonetheless retained the power to grant injunctive relief.").

Here, plaintiffs have already established at trial that the UH Defendants and Hershco engaged in deceptive acts or practices with respect to the sales of properties, in violation of G.B.L. § 349.  The jury found each of the UH Defendants and Hershco guilty of violating the statute.  (*See* Verdict.)  Having satisfied the "'statutory conditions for injunctive relief,'" the court may issue the injunction against defendants. *Broccolo*, 2006 WL 3690648, at *1 (quoting *SEC v. Mgmt. Dynamics*, 515 F.2d at 808).

The fact that individual plaintiffs, and not a government entity, are seeking the injunction is irrelevant. The clear language of the statute provides that "*any person* who has been injured by reason of any violation of this section may bring an action in his own name to enjoin such unlawful act or practice."  N.Y. Gen. Bus. Law § 349(h) (emphasis added).  In fact, the statute was amended in 1980 precisely "to include a private right of action, 'to afford additional protection for consumers, allowing them to bring suit on their own behalf without relying on the attorney general for enforcement.'" *Cyco.Net, Inc.*, 383 F. Supp. 2d at 561-62 (quoting *Blue Cross*, 818 N.E.2d at 1143).  Nor is it relevant that plaintiffs sought

61

and recovered damages at trial, since the statute allows a
plaintiff to "bring an action in his own name to enjoin such
unlawful act or practice, an action to recover his actual
damages or fifty dollars, whichever is greater, *or both such
actions*." *Id.* (emphasis added).

    Consequently, the court finds that plaintiffs are
entitled to a permanent injunction under G.B.L. § 349 barring
the UH Defendants and Hershco from engaging in deceptive acts or
practices.  Accordingly, the court permanently enjoins the UH
Defendants and Hershco from:

>    1. Engaging in fraudulent property-flipping
>       activities;
>    2. Misrepresenting the condition of any
>       homes they seek to sell;
>    3. Misrepresenting the extent or quality of
>       repairs or renovations performed on a
>       home prior to selling it to a potential
>       buyer;
>    4. Misrepresenting the value of a
>       residential property; and
>    5. Misrepresenting the affordability of
>       financing available to potential
>       homeowners.

In addition, the court grants a permanent injunction directing
the UH Defendants and Hershco to advise potential homeowners to
seek independent appraisers, mortgage lenders, inspectors,
contractors and attorneys.

## V.   **Plaintiff Mary Lodge's Motion to Void Mortgage**

    Plaintiff Mary Lodge ("Lodge") moves for injunctive
relief, asking the court "to invoke its equitable power to void

the first mortgage on her home." (ECF[7] No. 626, Plaintiff Mary Lodge Motion for Injunctive Relief ("Lodge Mot.") at 3.) Lodge argues that "[a]greements procured by fraud are voidable" and because "the jury unanimously found that Ms. Lodge's mortgage was procured by fraud," the court should invoke its equitable powers and declare the mortgage void. (*Id.* at 3-4.)

The Bayview Defendants and Olympia oppose Lodge's motion to void her mortgage. The Bayview Defendants first contend that "[a] contract that was fraudulently induced is voidable, and therefore gives rise to the defrauded party's right to request rescission" but that such a contract is not "void." (ECF[8] No. 633, Bayview Defendants Opposition to Plaintiff's Motion for Injunctive and Other Relief ("Bayview Opp'n") at 2-3.) The Bayview Defendants argue that "[a]lthough Plaintiff styles her motion as one seeking an order 'cancelling' or 'voiding' the mortgage, there is simply no such relief in the form she requests" and that Lodge "fails to cite even one case in which any court, presented with facts similar to those presented here, cancelled and voided a mortgage without ordering any sort of restitution." (*Id.* at 3, 6.) Further, the Bayview Defendants argue that rescission of the mortgage is an extraordinary remedy, that courts have "a duty to place the

---

[7] This citation is to docket number 05-cv-187.

[8] This citation is to docket number 05-cv-187.

parties where they were before the contract was made," and that "while Plaintiff may seek both monetary damages and rescission in a single action, she must eventually elect her remedy." (*Id.* at 6-7.) Because "the status quo cannot be restored," the Bayview Defendants argue that rescission is inappropriate in this case. (*Id.* at 8.) In addition, the Bayview Defendants argue that Lodge is not entitled to rescission because the monetary damages awarded by the jury were adequate, she unreasonably delayed in commencing this action, and she is estopped from seeking rescission "by virtue of the equitable defenses of estoppel and ratification." (*Id.* at 9-14.) Olympia joins in all the arguments advanced by the Bayview Defendants. (ECF[9] No. 631, Olympia Memorandum of Law in Opposition to Motion for Injunctive Relief.)

Lodge replies that "[r]estitution and restoration to the status quo is irrelevant where, as here, there has been a finding of fraud." (ECF[10] No. 629, Lodge Reply in Support of Motion for Injunctive Relief ("Lodge Reply") at 2.) Lodge distinguishes the cases upon which the Bayview Defendants rely on the basis that none involved a finding of fraud in the inducement, as is the case here. (*Id.* at 2-3.) Lodge argues that because "[t]his Court has already ruled that the Bayview

---

[9] This citation is to docket number 05-cv-187.

[10] This citation is to docket number 05-cv-187.

Defendants may not take shelter behind the holder-in-due-course defense," the Bayview Defendants cannot argue that an innocent party will be injured if the mortgage is voided. (*Id.* at 3-4.) Moreover, Lodge argues that "in light of the amount of money that [she] will have to expend on an ongoing basis to correct the defective conditions in her home, defendants' attempt to portray the Court's equitable voiding of this fraudulently obtained mortgage as a windfall . . . is audacious." (*Id.* at 4.) Lodge also argues that the monetary damages and injunctive relief are not duplicative because she "was not fully compensated for her loss by the jury" and therefore she is not bound by the law of election of remedies. (*Id.* at 5-6.) Finally, Lodge argues that the doctrines of estoppel and ratification do not apply where the party seeking to invoke the doctrines as a defense has benefited from the fraud, and that she did not unreasonably delay in seeking the injunctive relief because the finding of fraud by the jury was a necessary precursor to the relief sought. (*Id.* at 6-8.)

    *A. Rescission of Contract Induced By Fraud*

      "A contract induced by fraud . . . is subject to rescission, rendering it unenforceable by the culpable party." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Wise Metals Group, LLC*, 798 N.Y.S.2d 14, 16 (N.Y. App. Div. 2005). The extraordinary remedy of rescission is an equitable remedy and it

is "to be invoked only when there is lacking [a] complete and adequate remedy at law and where the status quo may be substantially restored." *Rudman v. Cowles Commc'ns*, 280 N.E.2d 867, 874 (N.Y. 1972). When a contract is rescinded, its "effect is to declare the contract void from its inception and to . . . restore the parties to status quo." *Symphony Space v. Pergola Props.*, 631 N.Y.S.2d 136, 144 (N.Y. App. Div. 1995) (internal quotation marks and citation omitted).

In a reversal of the traditional "election of remedies" doctrine, which precluded a plaintiff from obtaining both damages from a fraudulently induced contract and rescission of that same contract, New York law now provides that,

> A claim for damages sustained as a result of fraud or misrepresentation in the inducement of a contract or other transaction, shall not be deemed inconsistent with a claim for rescission or based upon rescission. In an action for rescission or based upon rescission the aggrieved party shall be allowed to obtain complete relief in one action, including rescission, restitution of the benefits, if any, conferred by him as a result of the transaction, and damages to which he is entitled because of such fraud or misrepresentation; but such complete relief shall not include duplication of items of recovery.

N.Y. C.P.L.R. § 3002(e); *see also Spainerman Gallery, Profit Sharing Plan v. Merritt*, No. 00 Civ. 5712, 2003 WL 289704, at *6-7 (S.D.N.Y. Feb. 6, 2003) (noting change from "election of

66

remedies" doctrine to C.P.L.R. § 3002(e) allowing plaintiff to recover damages and obtain rescission).

      1. <u>Lodge is Not Entitled to Rescission of Her Mortgage</u>

The court recognizes that under C.P.L.R. § 3002(e), Lodge is not barred from seeking rescission of her mortgage merely because the jury has awarded monetary damages. *See* N.Y. C.P.L.R. § 3002(e). Under New York law, Lodge is "allowed to obtain complete relief" in this action, including rescission of her mortgage. *Id.*

Still, although the "election of remedies" doctrine no longer bars a plaintiff from obtaining both damages and rescission, the "effect [of rescission] is to declare the contract void from its inception and to . . . restore the parties to status quo." *Symphony Space*, 631 N.Y.S.2d at 144 (internal quotation marks and citation omitted). "Rescission is not appropriate where . . . the status quo cannot be substantially restored." *Singh v. Carrington*, 796 N.Y.S.2d 668, 669 (N.Y. App. Div. 2005) (internal quotations and citations omitted). "The rescission theory of damages . . . cannot restore a plaintiff to a better position than he would have been in if the fraud had not occurred." *Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38, 49 n.22 (2d Cir. 1978), *amended sub nom.*, *Rolf v. Blyth Eastman Dillon & Co.*, No. 77-7104, 1978 WL 4098 (2d Cir. May 22, 1978); *Smith v. Fahnestock & Co.*, 00 CIV.

9691, 2002 WL 334511 (S.D.N.Y. Mar. 1, 2002) (citing *Rolf*, 570 F.2d at 49).

In the instant action, Lodge does not seek to restore the status quo. Instead, Lodge asks for monetary damages and cancellation of her mortgage so she will no longer have an obligation to pay the Bayview Defendants, all while keeping her house. This does not return Lodge and the Bayview Defendants to the respective positions they were in before the mortgage was entered into; rather, this leaves Lodge in a better position than that in which she would have been had the fraud not occurred.

It is true that the mortgage payments are based on the over-appraised value of the house and abusive financing, and that the poor condition of the house will require Lodge to invest in repairs in the future. In awarding Lodge $101,000 in compensatory damages, the jury took into consideration the evidence of over-appraised value, abusive financing, and need for future repairs. (*See* Tr. XIII at 94-97 (presentation of monetary damages to the jury, including damages due to over-appraisal, damages relating to financing, and damages due to the poor condition of the house).) Lodge cannot present evidence of these items of damages to the jury and request a monetary award based on such evidence, receive such award, and then claim that the mere possibility that the jury did not award damages fully

68

compensating Lodge for these losses warrants the extraordinary remedy of rescission.

"Rescission is not appropriate where, as here, the status quo cannot be substantially restored." *Singh*, 796 N.Y.S.2d at 669 (internal quotations and citation omitted). The court has not found, nor does Lodge cite, a single case holding that this basic rule is inapplicable in cases involving fraud in the inducement. Nor can the court conceive of any reason why returning the parties to the status quo is not applicable in such cases.

Consequently, Lodge's motion for injunctive relief rescinding her first mortgage is denied.[11]

/

/

/

/

/

/

/

/

/

/

---

[11] Because the court denies Lodge's motion for rescission in this case, the court need not address the additional defenses raised in Bayview Defendants' opposition.

**CONCLUSION**

For the foregoing reasons, the court: (1) denies defendants' motions regarding interpretation of the jury verdict; (2) grants in part and denies in part defendants' motions for set-offs; (3) grants plaintiffs' motion for an award of interest; (4) grants plaintiffs' motion for a permanent injunction; and (5) denies plaintiff Mary Lodge's motion for injunctive relief voiding her mortgage.

**SO ORDERED.**

Dated:     January 27, 2011
           Brooklyn, New York

                                   _____/s/_____
                                   **KIYO A. MATSUMOTO**
                                   United States District Court
                                   Eastern District of New York