UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------X
SANDRA C. BARKLEY,

             Plaintiff,

    -against-                   04-cv-875 (KAM)(RLM)

UNITED HOMES, LLC, UNITED PROPERTY GROUP,
LLC, YARON HERSHCO, GALIT NETWORK, LLC,
OLYMPIA MORTGAGE CORP., and BENJAMIN
TURNER,

             Defendants.
-----------------------------------------X
MARY LODGE,

             Plaintiff,

    -against-                   05-cv-187 (KAM)(RLM)

UNITED HOMES, LLC, UNITED PROPERTY GROUP,
LLC, YARON HERSHCO, GALIT NETWORK, LLC,
OLYMPIA MORTGAGE CORP., BAYVIEW LOAN
SERVICING, LLC, BAYVIEW ASSET MANAGEMENT,
LLC, U.S. BANK, N.A., AS TRUSTEE FOR
BAYVIEW ASSET-BACKED SECURITIES TRUST
SERIES 2007-30, and BAYVIEW FINANCIAL
MANAGEMENT CORP.,

             Defendants.
-----------------------------------------X
DEWITT MATHIS,

             Plaintiff,

    -against-                05-cv-4386 (KAM)(RLM)

UNITED HOMES, LLC, UNITED PROPERTY GROUP,
LLC, YARON HERSHCO, GALIT NETWORK, LLC,
and ALLIANCE MORTGAGE BANKING CORP.,

             Defendants.
-----------------------------------------X

```
-----------------------------------------X
```
SYLVIA GIBBONS and SYLVIA GIBBONS, AS
ADMINISTRATOR OF THE ESTATE OF RODNEY
GIBBONS,

        Plaintiffs,

    -against-                05-cv-5302 (KAM) (RLM)

UNITED HOMES, LLC, UNITED PROPERTY GROUP,
LLC, YARON HERSHCO, GALIT NETWORK, LLC,
and OLYMPIA MORTGAGE CORP.,

        Defendants.
```
-----------------------------------------X
```
MILES MCDALE and LISA MCDALE,

        Plaintiffs,

    -against-                05-cv-5362 (KAM) (RLM)

UNITED HOMES, LLC, UNITED PROPERTY GROUP,
LLC, YARON HERSHCO, GALIT NETWORK, LLC,
ALLIANCE MORTGAGE BANKING, CORP., and
BENJAMIN TURNER,

        Defendants.
```
-----------------------------------------X
```
CHARLENE WASHINGTON,

        Plaintiff,

    -against-                05-cv-5679 (KAM) (RLM)

UNITED HOMES, LLC, UNITED PROPERTY GROUP,
LLC, YARON HERSHCO, GALIT NETWORK, LLC,
and ALLIANCE MORTGAGE BANKING CORP.,

        Defendants.
```
------------------------------------X
```

<u>**MEMORANDUM AND ORDER**</u>

**MATSUMOTO, United States District Judge:**

Plaintiffs Sandra Barkley, Mary Lodge, Dewitt Mathis, Lisa McDale, Miles McDale, Charlene Washington, and Sylvia Gibbons in her individual capacity and as the Administrator of the Estate of Rodney Gibbons (collectively "plaintiffs") each commenced six separate actions against United Homes, LLC; United Property Group, LLC; Galit Network, LLC (collectively, the "UH Defendants"); Yaron Hershco, the owner and principal of the UH Defendants; Olympia Mortgage Corp. ("Olympia")[1] (collectively "defendants"); and others, alleging that defendants engaged in a fraudulent property-flipping scheme wherein the UH Defendants acquired distressed, damaged, and defective properties in predominantly minority neighborhoods, made substandard and superficial repairs, and used racially targeted marketing strategies to sell the properties as "newly renovated" at substantially inflated prices, primarily to members of racial and ethnic minorities with little or no experience with homeownership and minimal financial acumen.  Plaintiffs further alleged that the UH Defendants conspired with appraisers, attorneys, and mortgage lenders in order to perpetrate the fraudulent scheme.

---

[1] Olympia is named as a defendant in the actions brought by plaintiffs Sandra Barkley, Mary Lodge, and Sylvia Gibbons, and the Estate of Rodney Gibbons.

On May 9, 2011, jury selection and trial commenced in these actions. (ECF[2] Minute Entry dated 5/9/2011.)  Prior to submitting the cases to the jury, the court denied defendants' motions for judgment as a matter of law, made pursuant to Federal Rule of Civil Procedure 50(a) ("Rule 50(a)") with regard to plaintiffs' claims and the extent to which the corporate veil could be pierced to impose individual liability on Mr. Hershco. (Trial Transcript ("Tr.") XIII at 268-91.)  Following a three-week trial, on June 1, 2011, the jury found the UH Defendants, Mr. Hershco, and Olympia liable for engaging in deceptive business practices in violation of Section 349 of New York General Business Law ("GBL § 349"), fraud, and conspiracy to commit fraud, and awarded compensatory and punitive damages. (ECF Minute Entry dated 6/1/2011; ECF No. 566, Jury Verdict ("Verdict").)  The jury found the UH Defendants, Mr. Hershco, and Olympia not liable on plaintiffs' discrimination claims. (Verdict.)

Presently before the court are (1) renewed motions for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b) ("Rule 50(b)"), and (2) in the alternative, motions for a new trial pursuant to Federal Rule of Civil Procedure 59 ("Rule 59") by the UH Defendants and Mr. Hershco

---

[2] Unless otherwise indicated, all Electronic Case Filing system ("ECF") citations are to docket number 04-cv-875.

(the "moving defendants").[3]  (ECF No. 618, Memorandum of Law in Support of Hershco's Motion for Judgment as a Matter of Law, or in the Alternative, a New Trial ("Hershco Mem."); ECF No. 620, Memorandum of Law in Support of the UH Defendants' and Yaron Hershco's Motion for Judgment as a Matter of Law, or in the Alternative, a New Trial ("Defs.' Mem."); ECF No. 649, Defendants' Memorandum of Law in Reply ("Defs.' Reply").) Plaintiffs oppose the moving defendants' motions.  (ECF No. 643, Plaintiffs' Memorandum of Law in Opposition (Pls.' Opp'n").)

For the reasons set forth below, the court denies the moving defendants' Rule 50(b) and 59 motions.

**BACKGROUND**

I.   **The Verdict**

**A. The Jury's Findings**

After a three-week jury trial, the jury found by a preponderance of the evidence that defendants engaged in unfair and deceptive practices in violation of GBL § 349 by inducing plaintiffs to enter into their respective home purchase and financing transactions by misrepresenting the appraised value of the properties, the condition of the properties, and/or the terms and affordability of their respective mortgages.

---

[3] The court notes that, inexplicably and without leave of the court to file two motions, Mr. Hershco joined the arguments submitted by the UH Defendants in their motion in addition to submitting his own motion pursuant to Rules 50 and 59.  Although this double-filing has required the court to expend extra effort to compare the motions - significant parts of which are duplicative - the court has addressed all of Mr. Hershco's arguments, wherever they may be found.

(Verdict.)  In addition, the jury found by clear and convincing evidence that defendants defrauded plaintiffs in connection with plaintiffs' home purchase and financing transactions.  (*Id.*)  The jury also found that defendants conspired with one or more other defendants to engage in the fraudulent activity.  (*Id.*)

Moreover, the jury found sufficient facts to pierce the corporate veil and hold Mr. Hershco individually liable for the fraud, conspiracy, and GBL § 349 claims, having found that Mr. Hershco "exercised complete control over [the UH Defendants]" in connection with each plaintiff's home purchase transaction, and that Mr. Hershco committed fraud or some other wrong against each plaintiff through his domination over the UH Defendants.  (*Id.*)  In addition, the jury found that Mr. Hershco, as a corporate officer of the UH Defendants, participated in or knowingly approved of wrongful conduct.  (*Id.*)

**B. Awards of Compensatory and Punitive Damages**

The jury awarded compensatory and punitive damages to plaintiffs as summarized below:

**Damages Awarded to Sandra Barkley[4]**

| | |
|---|---|
| Compensatory Damages for Unfair and Deceptive Practices | $1,000 |
| Punitive Damages for Unfair and Deceptive Practices | $1,000 from Yaron Hershco<br>$1,000 from each UH Defendant<br>$1,000 from Olympia<br>$1,000 from Ben Turner |
| Compensatory Damages for Fraud | $45,000 |
| Punitive Damages for Fraud | $25,000 from Yaron Hershco<br>$5,000 from each UH Defendant<br>$10,000 from Olympia<br>$10,000 from Ben Turner |
| Compensatory Damages for Conspiracy to Defraud | $45,000 |

**Damages Awarded to Rodney and Sylvia Gibbons[5]**

| | |
|---|---|
| Compensatory Damages for Unfair and Deceptive Practices | $1,000 |
| Punitive Damages for Unfair and Deceptive Practices | $1,000 from Yaron Hershco<br>$1,000 from each UH Defendant<br>$1,000 from Olympia |
| Compensatory Damages for Fraud | $57,500 |
| Punitive Damages for Fraud | $35,000 from Yaron Hershco<br>$5,000 from each UH Defendant<br>$10,000 from Olympia |
| Compensatory Damages for Conspiracy to Defraud | $57,500 |

---

[4] Unless indicated otherwise, Messrs. Hershco and Turner, Olympia, and the UH Defendants are jointly and severally liable for the damages listed.

[5] Unless indicated otherwise, Mr. Hershco, Olympia, and the UH Defendants are jointly and severally liable for the damages listed.

**Damages Awarded to Mary Lodge**[6]

| | |
|---|---|
| Compensatory Damages for Unfair and Deceptive Practices | $1,000 |
| Punitive Damages for Unfair and Deceptive Practices | $1,000 from Yaron Hershco $1,000 from each UH Defendant $1,000 from Olympia |
| Compensatory Damages for Fraud | $50,000 |
| Punitive Damages for Fraud | $35,000 from Yaron Hershco $5,000 from each UH Defendant $10,000 from Olympia |
| Compensatory Damages for Conspiracy to Defraud | $50,000 |

**Damages Awarded to Dewitt Mathis**[7]

| | |
|---|---|
| Compensatory Damages for Unfair and Deceptive Practices | $1,000 |
| Punitive Damages for Unfair and Deceptive Practices | $1,000 from Yaron Hershco $1,000 from each UH Defendant $1,000 from Alliance |
| Compensatory Damages for Fraud | $65,000 |
| Punitive Damages for Fraud | $35,000 from Yaron Hershco $5,000 from each UH Defendant $10,000 from Alliance |
| Compensatory Damages for Conspiracy to Defraud | $65,000 |

---

[6] Unless indicated otherwise, Mr. Hershco, Olympia, and the UH Defendants are jointly and severally liable for the damages listed.

[7] Unless indicated otherwise, Mr. Hershco, Alliance, and the UH Defendants are jointly and severally liable for the damages listed.

**Damages Awarded to Miles and Lisa McDale**[8]

| | |
|---|---|
| Compensatory Damages for Unfair and Deceptive Practices | $1,000 |
| Punitive Damages for Unfair and Deceptive Practices | $1,000 from Yaron Hershco $1,000 from each UH Defendant $1,000 from Alliance $1,000 from Ben Turner |
| Compensatory Damages for Fraud | $75,000 |
| Punitive Damages for Fraud | $25,000 from Yaron Hershco $5,000 from each UH Defendant $10,000 from Alliance $10,000 from Ben Turner |
| Compensatory Damages for Conspiracy to Defraud | $75,000 |

**Damages Awarded to Charlene Washington**[9]

| | |
|---|---|
| Compensatory Damages for Unfair and Deceptive Practices | $1,000 |
| Punitive Damages for Unfair and Deceptive Practices | $1,000 from Yaron Hershco $1,000 from each UH Defendant $1,000 from Alliance |
| Compensatory Damages for Fraud | $25,000 |
| Punitive Damages for Fraud | $35,000 from Yaron Hershco $5,000 from each UH Defendant $10,000 from Alliance |
| Compensatory Damages for Conspiracy to Defraud | $25,000 |

---

[8] Unless indicated otherwise, Messrs. Hershco and Turner, Alliance, and the UH Defendants are jointly and severally liable for the damages listed.

[9] Unless indicated otherwise, Mr. Hershco, Alliance, and the UH Defendants are jointly and severally liable for the damages listed.

## DISCUSSION

**II.  Defendants' Rule 50(b) Motions to Set Aside the Verdict**

   **A. Legal Standard**

Rule 50(a) of the Federal Rules of Civil Procedure permits a party to move for judgment as a matter of law before a case is submitted to the jury.  Fed. R. Civ. P. 50(a).  A motion made pursuant to Rule 50(a) "must specify the judgment sought and the law and facts that entitle the movant to the judgment." *Id*.  If the court denies a party's Rule 50(a) motion, the movant may file a renewed motion for judgment as a matter of law no later than 28 days after entry of judgment.[10]  Fed. R. Civ. P. 50(b).  "In ruling on the renewed motion, the court may: (1) allow judgment on the verdict, if the jury returned a verdict; (2) order a new trial; or (3) direct the entry of judgment as a matter of law."  *Id*.

"In considering a motion for judgment as a matter of law, the district court 'must draw all reasonable inferences in favor of the nonmoving party.'"  *Zellner v. Summerlin*, 494 F.3d 344, 370 (2d Cir. 2007) (quoting *Reeves v. Sanderson Plumbing*, 530 U.S. 133, 150 (2000)).  The court must not, however, make credibility determinations or weigh the evidence because "'[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury

_____

[10] The parties do not dispute that defendants' Rule 50(b) and 59 motions are timely.

functions, not those of a judge.'" *Id.* (quoting *Reeves*, 530
U.S. at 150). Consequently, "'although the court should review
the record as a whole, it must disregard all evidence favorable
to the moving party that the jury is not required to believe.'"
*Id.; see also Katara v. D.E. Jones Commodities, Inc.*, 835 F.2d
966, 970 (2d Cir. 1987) (a court "cannot assess the weight of
conflicting evidence, pass on the credibility of the witnesses,
or substitute its judgment for that of the jury") (internal
quotation marks omitted).

        The movant thus bears a heavy burden, because "a court
may grant a motion for judgment as a matter of law 'only if it
can conclude that, with credibility assessments made against the
moving party and all inferences drawn against the moving party,
a reasonable juror would have been *compelled* to accept the view
of the moving party.'" *Zellner*, 494 F.3d at 370-71 (quoting
*Piesco v. Koch*, 12 F.3d 332, 343 (2d Cir. 1993)). In other
words, the court may grant a Rule 50(b) motion for judgment as a
matter of law only if the record contains "'such a complete
absence of evidence supporting the verdict that the jury's
findings could only have been the result of sheer surmise and
conjecture, or . . . such an overwhelming amount of evidence in
favor of the movant that reasonable and fair minded men could
not arrive at a verdict against [it].'" *Concerned Area
Residents for Env't v. Southview Farm*, 34 F.3d 114, 117 (2d Cir.

11

1994) (quoting *Song v. Ives Lab., Inc.*, 957 F.2d 1041, 1046 (2d Cir. 1992)).   The court reviews the moving defendants' Rule 50(b) motions in light of these considerations.

**B. Procedural Waiver**

As an initial matter, plaintiffs argue that the moving defendants' Rule 50(b) motions for judgment as a matter of law are procedurally flawed to the extent that the movants' Rule 50(a) motions failed to reference the specific grounds upon which the Rule 50(b) motions rest.  (Pls.' Opp'n at 3-5.) According to plaintiffs, defendants waived two specific arguments now present before the court:  (1) the "specific merger clause" in the plaintiffs' contracts of sale renders plaintiffs' fraud claims inactionable, and (2) plaintiffs failed to present sufficient evidence to support the jury's award of compensatory damages.  (*Id.* at 4-5.)

Defendants do not deny their failure to raise either issue; instead, defendants urge the court not to "apply a procedural 'gotcha'" by declining to consider defendants' unpreserved arguments. (Defs.' Reply at 6.)  In addition, defendants argue that despite their "procedural oversight," the court should nonetheless consider their arguments to avoid a manifest injustice.  (*Id.* at 7.)

1. **Legal Standard**

A party moving for judgment as a matter of law
pursuant to Rule 50(a) "must specify the grounds upon which the
motion relies." *Lambert v. Genesee Hosp.*, 10 F.3d 46, 53-54 (2d
Cir. 1993), *overruled on other grounds by Kasten v. Saint-Gobain
Performance Plastics Corp.*, 131 S. Ct. 1325 (2011). A renewed
motion for judgment as a matter of law pursuant to Rule 50(b)
must follow an earlier motion on the same subject because
"'[t]he very purpose of Rule 50(b)'s requiring a prior motion
for a directed verdict is to give the other party an opportunity
to cure the defects in proof that might otherwise preclude him
[or her] from taking the case to the jury.'" *Broadnax v. City
of New Haven*, 415 F.3d 265, 268 (2d Cir. 2005) (quoting *Cruz v.
Local Union No. 3 of the Int'l Bhd. of Elec. Workers*, 34 F.3d
1148, 1155 (2d Cir. 1994)). Accordingly, the court may reach a
forfeited issue only if ignoring the issue would "result in
manifest injustice" or if the issue involved is "purely legal
error." *AIG Global Secs. Lending Corp. v. Banc of Am. Secs.,
LLC*, 386 F. App'x 5, 6 (2d Cir. 2010).

2. **Application**

At the close of plaintiff's case-in-chief, pursuant to
Rule 50(a), defendants moved to dismiss Mr. Hershco as an
individual defendant on grounds that plaintiffs had presented
insufficient evidence to pierce the corporate veil because they

13

had failed to establish that Mr. Hershco, the owner and
principal of the UH Defendants, abused the corporate form in
furtherance of fraud.  (Tr. XIII at 269-77.)  In addition,
defendants argued that there was "no proof of fraud,"
particularly because plaintiffs entered into their home
purchases in "arm's length deal[s] with [their] eyes wide open,
with legal counsel at [the] table."  (*Id*. at 279-83.)
Defendants also asserted that plaintiffs failed to present
sufficient evidence of civil conspiracy because there was no
evidence of fraud, conspiracy, or the steering of lawyers or
lenders.  (*Id*. at 281.)  Moreover, defendants contended that
there was no evidence to support plaintiffs' claims that the
prices of plaintiffs' homes were inflated; that defendants
knowingly saddled plaintiffs with unaffordable mortgages; or
that plaintiffs were unsophisticated buyers with no financial
acumen.  (*Id*. at 281-83.)  Defendants further argued that
plaintiffs had failed to meet the burden of proof with respect
to plaintiffs' racial discrimination claims.  (*Id*. at 277-86.)

          Defendants did not, however, articulate in their Rule
50(a) motions (1) that plaintiffs' fraud claims were
inactionable due to the "specific merger clause" in plaintiffs'
contracts of sale; or (2) that plaintiffs failed to prove
sufficient evidence of compensatory damages.  Consequently,
because neither of the unpreserved issues involves purely legal

14

questions and the court finds no risk of manifest injustice, the court will not reach the issues here.

**C. Fraud**

In support of their motion for judgment as a matter of law with respect to plaintiffs' fraud claims, defendants advance numerous arguments, all of which lack merit.

### 1.   Doctrine of *Caveat Emptor* Does Not Apply

Defendants first argue that plaintiffs' fraud claim is barred by the doctrine of *caveat emptor* because the transactions at issue were "all at arm's length between parties of ordinary intelligence and experience." (Defs.' Mem. at 8-10.) Defendants assert that because plaintiffs were sophisticated and "experienced buyers [who] understood the options available to them in the real estate property market," plaintiffs' reliance on defendants' representations regarding the value or quality of their home purchases was unjustified, and therefore an improper basis for plaintiffs' fraud claims. (*Id.* at 8.)

Under the doctrine of *caveat emptor*, New York "imposes a duty on buyers of real estate to independently ascertain or verify the value of the property at issue." *M & T Mortg. Corp. v. White*, 736 F. Supp. 2d 538, 558 (E.D.N.Y. 2010) (citing *London v. Courduff*, 529 N.Y.S.2d 874 (N.Y. App. Div. 2d Dep't 1988)). Thus, it is "settled law in New York that the seller of real property is under no duty to speak *when the parties deal at*

15

arm[']s length"[11] and "[t]he mere silence of the seller, without some act or conduct which deceived the purchaser, does not amount to a concealment that is actionable as a fraud." *Id.* (citing *London*, 529 N.Y.S.2d at 874).

Courts have found exceptions to the rule of *caveat emptor*, however, where sellers concealed facts or induced buyers to refrain from making independent inquiries into the terms of a real estate deal. *See, e.g., Wilson v. Toussie,* 260 F. Supp. 2d 530, 540 (E.D.N.Y. 2003) (noting that there are exceptions to the rule if "the misstatement of value was made in conjunction with a larger scheme or conspiracy to defraud"); *Bethka v. Jensen*, 672 N.Y.S.2d 494, 494–95 (N.Y. App. Div. 1998) (noting that the rule does not apply where "some conduct . . . on the part of the seller rises to the level of 'active concealment'").

Furthermore, some courts have declined to apply the rule of *caveat emptor* to bar fraud claims in cases with allegations that defendants deliberately steered plaintiffs to other members of the conspiracy in order to prevent their discovery of the true value of the properties at issue. *See, e.g., Banks v. Consumer Home Mortg., Inc.*, No. 01–CV–8508, 2003 WL 21251584, at *9 (E.D.N.Y. Mar. 28, 2003) ("[I]t is clear that plaintiffs' allegations of steering . . . involve deliberate

---

[11] An arm's-length transaction is one that occurs when "a willing buyer [is] under no compulsion to buy and a willing seller [is] under no compulsion to sell." *Arthur Props., S.A. v. ABA Gallery, Inc.*, No. 11-cv-4409, 2011 WL 5910192, at *3 (S.D.N.Y. Nov. 28, 2011).

efforts to discourage plaintiffs from looking beyond the members
of the alleged conspiracy for assistance.").  In addition, where
plaintiffs are "vulnerable, unsophisticated, first-time home
buyers hoodwinked by a sophisticated, layered, business
operation involving multiple individuals and entities," the
parties are *not* at arm's length and therefore not subject to the
doctrine of *caveat emptor*.  *M & T Mortg.*, 736 F. Supp. 2d at
559.

     The court finds that the doctrine of *caveat emptor*
does not apply to the instant action in light of the evidence at
trial that (1) plaintiffs were unsophisticated and vulnerable
potential home buyers; (2) defendants steered plaintiffs to a
sophisticated, layered business operation comprised of
attorneys, lenders, and inspectors who were part of defendants'
overall conspiracy to prevent plaintiffs from discovering the
true value, condition, and affordability of the homes plaintiffs
ultimately purchased from defendants; and (3) defendants' active
concealment of serious defects in the homes defendants sold to
plaintiffs rose to a level of actionable fraud.

     First, the court finds no merit in defendants'
contention that plaintiffs' home purchase transactions were
conducted at arm's length and that plaintiffs were sophisticated
and experienced homebuyers (*see* Defs.' Mem. at 8-10).  The
moving defendants cite to evidence that the McDales had on one

17

prior occasion entered into a contract to buy a home in Pennsylvania (*see* Tr. II at 41-43); that Mr. Mathis had previously consulted a real estate agency called City Developers to view homes and to obtain financing for another home that he did not ultimately purchase (*see* Tr. IX at 212-16); and that Ms. Lodge was added to the deed of a property and had some experience with taking out a mortgage and selling that property (*see* Tr. III at 24-27).

The court finds that the foregoing is far from compelling evidence that plaintiffs were "sophisticated" and "experienced" home buyers, however.  The cited evidence merely supports a finding that, at best, some plaintiffs had some degree of prior *exposure* to the home purchasing process before conducting the transactions at issue in this action.[12]  The McDales' prior experience with entry into a contract for sale with respect to a *single* home did not render them "sophisticated" home buyers.  Mr. Mathis repeatedly stated that his knowledge of the financing and home purchasing process was limited to what City Developers had told him, and that he "just kept going with what they [City Developers] were telling [him]." (*See* Tr. IX at 230.)  Moreover, the simple addition of Ms.

---

[12] Notably, defendants' statement that "plaintiffs' own expert, Dominick Pompeo, could not conclude the transactions for any plaintiff were anything other than arms['s] length" (*see* Defs.' Mem. at 8 (citing Tr. VII at 129)) is misleading, as Mr. Pompeo did not testify at all regarding the arm's-length or non-arm's-length nature of the plaintiffs' transactions.  (*See* Tr. VII at 129.)

Lodge's name to a property deed did not give her experience in purchasing a home.

Second, the evidence at trial showed that defendants steered plaintiffs to attorneys, lenders, and inspectors who were involved in the overall conspiracy, thereby discouraging plaintiffs from obtaining independent advice about the terms of the transactions and the true value, condition, and affordability of the homes. (Tr. I at 81-82; Tr. II at 179-82; Tr. III at 34, 41; Tr. IV at 112; Tr. IX at 163-65; Tr. X at 156, 162; Tr. XII at 35-36; 38.) As Ms. Lodge testified, "[e]verything came in a package deal," meaning that "you got attorneys set up for you," "[y]ou got your mortgage people set up for you," and there was an "[i]nspector set up for you," and "everything was like a push, push deal." (Tr. III at 137-38.) Moreover, plaintiffs testified that they trusted their respective attorneys to protect their interests during the course of the home purchase transaction. (Tr. II at 125-26; Tr. III at 42; Tr. IV at 115-16; Tr. IX at 181-82; Tr. X at 157; Tr. XII at 37-38.) The evidence thus supports a finding that plaintiffs were "vulnerable [and] unsophisticated" first- or at best, second-time home buyers who were "hoodwinked by a sophisticated, layered, business operation involving multiple individuals and entities," and that the transactions were *not*

conducted at arm's length.  *M & T Mortg.*, 736 F. Supp. 2d at 559.

Finally, as detailed in Section II.C.3 *infra*, the evidence at trial established that defendants actively concealed serious defects in the homes they sold to each plaintiff, and such concealment was actionable as fraud.  In light of the foregoing, the court finds that the doctrine of *caveat emptor* does not apply to bar plaintiffs' fraud claim.

### 2. Plaintiffs' Fraud Claim Asserts More Than a Breach-of-Contract Claim

The moving defendants also argue that they are entitled to judgment as a matter of law with respect to plaintiffs' fraud claim because "the only alleged wrongdoing merely constitutes a breach of contract." (Defs.' Mem. at 13 (citing *Van Neil v. Berger*, 632 N.Y.S.2d 48, 48 (N.Y. App. Div. 1995)); Defs.' Reply at 5.)  The moving defendants specifically contend that plaintiffs failed to present any evidence that the UH Defendants did not intend to honor their one-year warranty to make necessary repairs at plaintiffs' homes, and that "[t]o the contrary, there was ample evidence adduced at trial demonstrating that United Homes returned to plaintiffs' homes and performed promised repairs after closing." (*See* Defs.' Mem. at 13-14.)

20

The moving defendants' argument rests on the premise that "[a] cause of action for fraud is not stated where the only fraud alleged relates to a breach of contract." *Van Neil*, 632 N.Y.S.2d at 48; *see also Wall v. CSX Transp., Inc.*, 471 F.3d 410, 416 (2d Cir. 2006) (generally, "a fraud claim may not be used as a means of restating what is, in substance, a claim for breach of contract") (internal quotation marks omitted). Notwithstanding, "New York law specifically recognizes causes of action for fraud in the inducement [of a contract] when the misrepresentation is collateral to the contract it induced." *Id.*

The moving defendants' myopic view that plaintiffs' fraud claim rests entirely on the theory that defendants breached the contracts of home sale by failing to perform necessary repairs per the one-year warranty is misplaced. On the contrary, the trial record contains ample evidence to support other grounds for plaintiffs' fraud claim. The evidence at trial established that the UH Defendants' employees or agents repeatedly assured plaintiffs that United Homes would fully renovate plaintiffs' homes, and repeatedly promised that requested repairs would be completed before the closing. (Tr. I at 96-97 ; Tr. II at 32-33, 158, 165, 188; Tr. III at 48; Tr. IV at 132-33; Tr. IX at 171-74; Tr. X at 168-70.) In fact, however, the homes were not newly renovated; rather, each home

21

harbored serious defects that were undiscoverable or difficult to discover until after plaintiffs moved in.  Such defects included:

- malfunctioning heating systems and code violations, drafty windows, and insufficient insulation (*see* Tr. II at 18-20; Tr. IV at 146; Tr. IX at 187, 194-96; Tr. X at 184-86, 194; Tr. XII at 55-58);

- rotten, shoddy, and improperly installed flooring concealed beneath carpets (*see* Tr. III at 58; Tr. IV at 149); Tr. X at 191-92; Tr. XII at 55-56, 64-65);

- leaking roofs, ceilings, and walls (*see* Tr. IV at 145, 156; Tr. IX at 203; Tr. XII at 55-56);

- construction debris hidden under the carpets in the house or buried in the backyard (*see* Tr. IV at 155; Tr. IX at 196-98);

- electrical and plumbing problems, including leaky fixtures (*see* Tr. II at 24-25; Tr. III at 60-62; Tr. IX at 183-86, 189, 193; Tr. X at 185, 188-89, 193-94; Tr. XII at 55-56);

- flooding, which resulted in water damage or the back up of raw sewage into the home, and broken and open pipes, clogged drains, and sewage lines (*see* Tr. II at

20-21, 26-27; Tr. IV at 144-46, 148-49, 151; Tr. IX at

183-85; Tr. X at 181-87; Tr. XII at 55-63); and

- improperly installed, cracked tiles in the kitchen

    (Tr. X at 189-91).

All of these conditions later came to light when plaintiffs

called upon the UH Defendants to perform additional repairs.

Thus, plaintiffs' fraud claims were based in part on defendants'

misrepresentations of the homes as "newly renovated," not merely

breach of contract.

Moreover, plaintiffs' fraud claims also arose out of

the UH Defendants' misrepresentations of their intent to

renovate or perform necessary repairs at plaintiffs' homes.  The

court acknowledges that, as defendants point out (*see* Defs.'

Mem. at 13), "[a] present expression of the intent to perform a

future act is actionable as fraud only if actually made with a

preconceived and undisclosed intention of not performing it,"

*Tanzman v. La Pietra*, 778 N.Y.S.2d 199, 201 (N.Y. App. Div.

2004) (internal quotation omitted), and thus, "a claim based

upon statements of future intention . . . requires proof of a

present intent to deceive."  *Marcraft Recreation Corp. v.

Francis Devlin Co.*, 506 F. Supp. 1081, 1087 (S.D.N.Y. 1981).

The court notes, however, that "fraudulent intent 'is rarely

susceptible to direct proof and must ordinarily be established

by circumstantial evidence and the legitimate inference arising

23

therefrom.'" *Century Pac., Inc. v. Hilton Hotels Corp.*, 528 F.
Supp. 2d 206, 222 (S.D.N.Y. 2007) (quoting *Enzo Biochem, Inc. v.
Johnson & Johnson*, No. 87-CV-6125, 1992 WL 309613, at *11
(S.D.N.Y. Oct. 15, 1992)).

The record contains ample evidence that although the
UH Defendants promised to perform repairs, they did not intend
to properly and fully renovate plaintiffs' homes before closing
or perform the necessary repairs.  Although defendants cite to
various portions of the trial record that indicate that the UH
Defendants performed *some* of the promised repairs for each
plaintiff (*see* Defs.' Mem. at 14), the record reflects that many
of those repairs were inadequate and failed to permanently
address the underlying problems.

At the McDales' home, the UH Defendants used "very
thin wood . . . .[that] felt like it was going to give at any
moment" to repair the floor; unclogged a drainage pipe that soon
re-clogged, resulting in the backup of sewage into the home; and
installed a non-functional wireless doorbell system instead of
the requested doorbell.  (Tr. II at 21-22, 25-27.)  The
Gibbonses' leaky roof continued to leak even after the UH
Defendants "repaired" it.  (Tr. IV at 156-57.)  Due to the UH
Defendants' shoddy repairs in Mr. Mathis's home, water drips
from the skylight window and water continues to seep into the
basement during every heavy rain; the circuit breaker is still

24

frequently triggered; and a radiator continues to leak.  (Tr. IX at 184-85, 193-95; 203).

Despite the UH Defendants' lackluster attempts to fix various conditions in Ms. Barkley's home, the front door still leaks and creates a puddle inside the home every time it rains; the floor of the basement is half-cement, half-dirt, and cracked; approximately five gallons of water collects in the basement every time it rains; and the light switches shock or pop every time they are flipped on or off.  (Tr. X at 182-89.) Ms. Washington's ceiling continues to "bubble" with leakage, and the basement walls leak every time it rains.  (Tr. XII at 57-60.)

In addition to the aforementioned failed "attempts" to perform repairs, the record is replete with evidence of numerous other repairs that the UH Defendants promised to undertake and completely failed to perform.  As Ms. Washington testified, "They [UH Defendants] patched problems.  They didn't fix anything."  (Tr. XII at 139.)  The list of items that the UH Defendants failed to even attempt to repair include:  unsealed or clogged drainage and sewage pipes; walls that needed painting or sanding; termite-damaged floor joints and rotted sections of a basement window hatch; leaning basement stairs; basement drains to prevent rain seepage; uneven floors or floors with holes concealed beneath carpet; a bathroom sink that overflowed

25

because it was detached or leaning; faulty radiators; and
leaking fixtures that caused leaks between floors.  (Tr. II at
26-27, 109; Tr. III at 50; Tr. IV at 132, 147, 153-56; Tr. IX at
187; Tr. X at 183-85, 193-94.)  In light of the foregoing, the
court finds that the record contained ample evidence from which
the jury could find that the defendants did not intend to
fulfill the promises regarding repairs and renovations that they
made to induce plaintiffs to purchase their homes.  Thus, the
court finds that plaintiffs' fraud claim does not merely assert
a breach-of-contract claim.

### 3.    Plaintiffs Presented Sufficient and Clear and Convincing Evidence of Fraud

The moving defendants also contend that plaintiffs
failed to establish at trial, by clear and convincing evidence,
each element of the fraud claim.  (Defs.' Mem. at 14-27; Defs.'
Reply at 2-4.)  In particular, the moving defendants assert that
there was insufficient evidence to establish that (1) plaintiffs
paid more than what their houses were worth; (2) plaintiffs
received unaffordable mortgages; and (3) plaintiffs were
deceived as to the state of renovations and repairs.  (Defs.'
Mem. at 15.)  The court finds no merit in these arguments and
finds that plaintiffs presented more than sufficient evidence at
trial for the jury to find, by clear and convincing evidence,
every element of plaintiffs' fraud claim.

26

### a. Elements of Fraud Claim

"The elements of fraud under New York law are: '[1] a misrepresentation or a material omission of fact which was false and known to be false by defendant, [2] made for the purpose of inducing the other party to rely upon it, [3] justifiable reliance of the other party on the misrepresentation or material omission, and [4] injury.'" *Premium Mortg. Corp. v. Equifax, Inc.*, 583 F.3d 103, 108 (2d Cir. 2009) (quoting *Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 421 (1996)).

Each element of a fraud claim must be established by clear and convincing evidence at trial. *Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.*, 500 F.3d 171, 181 (2d Cir. 2007). Clear and convincing evidence is "'[e]vidence indicating that the thing to be proved is highly probable or reasonably certain.'" *Ragbir v. Holder*, 389 F. App'x 80, 84-85 (2d Cir. 2010) (quoting *Black's Law Dictionary* 636 (9th ed. 2009)). "This [clear and convincing] evidentiary standard demands a high order of proof . . . and forbids the awarding of relief whenever the evidence is loose, equivocal or contradictory." *Abrahami v. UPC Constr. Co.*, 638 N.Y.S.2d 11, 13 (1996) (citations omitted) (internal quotations omitted). Consequently, fraud may not be "'assumed on doubtful evidence or circumstances of mere suspicion.'" *Fire & Cas. Ins. Co. of Conn. v. 2207 7th Ave. Rest. Corp.*, No. 03-CV-4739, 2004 WL 1933781, at *3 (S.D.N.Y.

Aug. 30, 2004) (quoting *Brayer v. John Hancock Mut. Life Ins. Co.*, 179 F.2d 925, 928 (2d Cir. 1950)).

"Clear and convincing evidence may, however, be circumstantial." *Century Pac.*, 528 F. Supp. 2d at 219; *see also Deem v. Lockheed Corp.*, No. 87-CV-7017, 1991 WL 196171, at *6 (S.D.N.Y. Sept. 25, 1991) ("[F]raud is rarely susceptible of direct proof and must ordinarily be established by circumstantial evidence and the legitimate inferences arising therefrom." (internal quotation marks omitted)).

### b. Evidence at Trial

#### i. Material Misrepresentations and Omissions

The court finds that the evidence at trial was more than adequate to sustain each plaintiffs' fraud claim against defendants. First, as discussed *supra* in Section II.C.2, the evidence established that defendants knowingly misrepresented the homes plaintiffs purchased as "newly renovated." Essentially, defendants "concealed from the plaintiffs the poor, dilapidated condition of [the] houses, and the extent of the repairs and renovations that were needed so that the houses would approximate the values ascribed to them in the appraisal," which constitutes the type of material misrepresentation upon which plaintiffs may ground a fraud claim. *M & T Mortg.*, 736 F. Supp. at 564. Moreover, by steering plaintiffs to certain

28

lenders, attorneys, and inspectors (*see* Tr. I at 81-82; Tr. II at 179-82; Tr. III at 34, 41; Tr. IV at 112; Tr. IX at 163-65; Tr. X at 156, 162; Tr. XII at 35-36, 38), and pressuring plaintiffs to close quickly, defendants further prevented plaintiffs from discovering the true condition of their home purchases.

The concealment of true property conditions and steering prevented plaintiffs from discovering or seeking to determine the true value of the properties.  The degree to which defendants' appraisals misrepresented the actual value of each home was established through the testimony of plaintiffs' real-estate appraisal expert Dominick Pompeo, who independently appraised the fair market value of each plaintiff's home as of the date of each home purchase.  Mr. Pompeo determined that the actual value of each home was significantly lower than the values reflected in the appraised value represented by defendants to plaintiffs prior to each plaintiffs' purchase and lower than the price that each plaintiff paid for their home. (Tr. VII at 43-60.)  The discrepancies are set forth in the table below[13]:

---

[13]  Although the moving defendants contend that Mr. Pompeo's appraisal values were "fatally flawed because he did not explain why his appraised values differed from the appraisals performed at the time of sale," the court finds that Mr. Pompeo explained the bases for his appraisals – inspection of the property, review of zoning and tax information, and comparison against sales of comparable properties (*see* Tr. VII at 60-61) – and that the issue defendants raise goes to the weight of the evidence, an issue inappropriate for determination in a Rule 50 motion.  *See Katara*, 835 F.2d

| Plaintiff | Pompeo Appraisal | Appraisal Amount at Time of Purchase | Purchase Price |
|---|---|---|---|
| Mathis | $202,000 | $325,000 | $325,000 |
| Lodge | $235,000 | $419,000 | $420,000 |
| Barkley | $235,000 | $359,000 | $359,000 |
| Gibbons | $245,000 | $359,000 | $359,000 |
| McDale | $220,000 | $365,000 | $370,000 |
| Washington | $180,000 | $315,000 | $337,000 |

Second, the evidence at trial established that when plaintiffs expressed hesitation about purchasing the homes because of the high monthly mortgage payments, defendants misrepresented the zoning of plaintiffs' properties and defendants' ability and intention to procure tenants who could pay sufficient rent to enable plaintiffs to afford the mortgages.  The UH Defendants' employees and agents promised plaintiffs that United Homes would find tenants who could pay at least $1,600 to $1,700 in rent, and that the tenants would be ready to move in and begin paying rent as soon as each plaintiff moved into his or her home.  (Tr. II at 37, 177-78, 181-82; Tr. III at 46; Tr. IV at 102-03, 136-37; Tr. X at 154, 160-61; Tr. XII at 30, 45.)   In fact, however, the UH Defendants did not

at 970 (court "cannot assess the weight of conflicting evidence, pass on the credibility of the witnesses, or substitute its judgment for that of the jury").

succeed in acquiring tenants for plaintiffs until several (up to eight) months after plaintiffs moved in, and the rental payments plaintiffs received were substantially lower than the promised amounts ($944 to $1,450), which caused financial difficulties for the plaintiffs. (Tr. II at 37; Tr. III at 54-56; Tr. IV at 136-39; Tr. X at 177; Tr. XII at 53.) In some instances, the plaintiff's home was not zoned for the number of tenants promised. (Tr. II at 192; Tr. III at 33.)

Third, as discussed *supra* in Section III.C.2, the evidence at trial showed that defendants assured plaintiffs, both verbally and in the contracts of sale, that United Homes would perform any necessary repairs in the homes within one year of purchase. The jury could infer that defendants' promises amounted to misrepresentation based on defendants' failure to perform some repairs at all, and defendants' shoddy and ineffective repairs on others. Consequently, the court finds that there was sufficient, clear and convincing evidence that defendants knowingly made material misrepresentations or omissions of fact which were false and known by defendants to be false, or which defendants did not genuinely believe to be accurate.

### ii. Intent to Induce Plaintiffs' Reliance

As noted earlier, "fraudulent intent 'is rarely susceptible to direct proof and must ordinarily be established

31

by circumstantial evidence and the legitimate inference arising therefrom.'" *Century Pac.*, 528 F. Supp. 2d at 222 (quoting *Enzo Biochem*, 1992 WL 309613, at *11). The court finds that the trial evidence was sufficient for the jury to infer that defendants made the material misrepresentations described *supra* for the purpose of inducing plaintiffs to purchase and finance their homes.

Agents and employees of the UH Defendants, and the attorneys to whom defendants steered plaintiffs, repeatedly assured plaintiffs that United Homes would fully renovate their homes and repeatedly promised that requested repairs would be completed before the closing. (Tr. I at 96-97; Tr. II at 32-33, 158, 165, 188; Tr. III at 48; Tr. IV at 102, 132-33; Tr. IX at 171-74; Tr. X at 168-70.) In addition, when plaintiffs expressed concerns about the affordability of their mortgages, defendants represented that plaintiffs could find tenants who would pay sufficient rent to allow plaintiffs to pay their mortgages. (Tr. II at 177-78, 181-82; Tr. III at 46; Tr. IV at 102-03; Tr. IX at 169, 244; Tr. X at 153-54, 160-61; Tr. XII at 30, 45.) Drawing all reasonable inferences in favor of plaintiffs, the court finds that the evidence was sufficient for the jury to conclude that defendants made the material misrepresentations described in Section III.C.3.b.i to induce plaintiffs to purchase and finance the homes.

32

### iii.  Justifiable Reliance

"'Under New York law, a plaintiff must establish that his reliance was justifiable, both in the sense that the party claiming to have been defrauded was justified in believing the representation and that he was justified in acting upon it.'" *Century Pac.*, 528 F. Supp. 2d at 228 (quoting *Compania Sud-Americana de Vapores, S.A. v. IBJ Schroder Bank & Trust Co.*, 785 F. Supp. 411, 419 (S.D.N.Y. 1992)).  Where a defendant intentionally steers a plaintiff to a lawyer, and convinces the plaintiff to trust defendants and that lawyer, and "consciously [leads] [plaintiff] down a false path of trust so as to profit from [plaintiff's] ignorance, that is sufficient to establish reasonable reliance."  *Phillips v. Better Homes Depot, Inc.*, No. 02-cv-1168, 2003 WL 25867736, at *16 (E.D.N.Y. Nov. 12, 2003); *see also Banks*, 2003 WL 21251584, at *9 (finding reasonable reliance where defendants "deliberately steered" homebuyer plaintiffs to mortgage lender and attorney "in order to thwart an independent evaluation of the property").

Here, the trial record shows that defendants steered plaintiffs to attorneys and lenders, and that plaintiffs, who were inexperienced homebuyers,[14] trusted those professionals to protect plaintiffs' interests.  (Tr. I at 81-82, 105, 110-11; Tr. II at 179-82; Tr. III at 34, 41-42, 159; Tr. IV at 112; Tr.

---

[14] *See* discussion *supra* in Section III.C.1.

IX at 163-65; Tr. X at 156-58, 162; Tr. XII at 35-39.)  The attorneys shepherded plaintiffs through the closing process, instructing them to sign the contracts and downplaying the need to read the documents.  Raj Maddiwar, the lawyer assigned to represent the McDales at their closing told them that "as [the McDales'] lawyer he would read the document because I [Mr. McDale] wouldn't understand the lawyer's speak as he called it" and that "I [Mr. McDale] should sign the document if he [the lawyer] says it's okay."  (Tr. I at 111.)  When Mr. McDale received documents to sign, he initially reviewed the documents before signing, but Mr. Maddiwar became "highly upset" and told Mr. McDale that there was no need for Mr. McDale to review the documents because "it was just going to slow the process up." (*Id.*)

Similarly, Ms. Lodge testified that she trusted Michael Cheatham, the attorney to whom United Homes steered her, to protect her interests, but that he let her down.  (Tr. III at 159.)  For example, Ms. Lodge expected Mr. Cheatham to explain the terms of the mortgage and the contract with her before closing, but instead, "[e]verything was a rush, rush to sign a paper" and that "[w]ith him [Mr. Cheatham] it was just, you know, like you sign here, you sign here." (*Id.*)  She protested and said, "[W]ait, let me read. I can't read everything. Let me

34

read some of what's going on," but he did not take the time to
do so or to explain the documents to her.  (*Id.* at 159-61.)

       Mr. Cheatham also represented Ms. Washington, and
simply told her at closing that "I'm going to tell you what
these documents are and you can sign them."  (Tr. XII at 49.)
Mr. Cheatham did not review the documents with Ms. Washington.
(*Id.*)  Instead, he would ask her, "Are you going to live in the
house?" and when she answered in the affirmative, he replied,
"Sign here."  (*Id.*)

       The UH Defendants steered the Gibbonses to attorney
Marios Sfantos.  (Tr. IV at 114-15.)  The jury heard that Mr.
Sfantos failed to review the relevant contract documents with
the Gibbonses prior to closing, and the UH Defendants told the
Gibbonses that they did not need to read the documents before
signing because Mr. Sfantos had already reviewed them.  (*Id.* at
120.)  In addition, Mr. Sfantos himself told the Gibbonses that
"everything's going to be all right" and "[y]ou don't have to
worry about anything" because Mr. Sfantos had already read the
papers and "everything look[ed] good."  (*Id.* at 115-16.)  Mr.
Sfantos also represented Mr. Mathis, and at the closing, Mr.
Sfantos just told Mr. Mathis to sign the contracts as Mr.
Sfantos handed them over.  (Tr. IX at 164-65, 178.)

       At the closing for Ms. Barkley's home purchase, Ms.
Barkley attempted to read the stack of documents before signing

them. (Tr. X at 170.) Ben Turner, the attorney to whom the UH
Defendants steered Ms. Barkley, advised her that he had already
reviewed the papers and that everything was okay, and urged Ms.
Barkley to just initial and sign the papers quickly, which she
did because her closing began in the evening. (*Id.*)

In addition, counsel for the Gibbonses, Ms. Lodge, and
Ms. Barkley also reassured those plaintiffs that their mortgages
would be affordable because United Homes would provide paying
tenants whose rental payments would significantly alleviate the
plaintiffs' financial burden. (Tr. III at 52-53; Tr. IV at 115;
Tr. X at 156.)

As the jury found, the trial evidence thus establishes
that defendants induced plaintiffs' reliance by holding United
Homes out as a "one-stop shop," by steering plaintiffs to
attorneys, lenders, and inspectors, and by creating a "false
path of trust" in which plaintiffs believed that the UH
Defendants and their attorneys had plaintiffs' best interests in
mind. The court finds that this deliberate steering lulled
plaintiffs into a false sense of security that inhibited
plaintiffs from seeking independent evaluations of the
properties or the affordability of the mortgages, and that
plaintiffs' reliance on defendants' misrepresentations was
reasonable.

36

### iv.   Damages

Finally, the court finds that plaintiffs presented substantial evidence of the injuries they sustained due to defendants' misrepresentations.  As discussed *supra* in Section III.C.2, plaintiffs endured inconvenience, frustration, and physical damage to their homes due to the unexpectedly poor condition of their homes.  In addition, plaintiffs incurred substantial repair expenses to make their homes habitable because defendants failed to repair the properties as promised. (Tr. II at 36-38; Tr. III at 58-66; Tr. IV at 155-58; Tr. IX at 187-205; Tr. X at 37, 181-95; Tr. XII at 55-66, 77.)  Moreover, most plaintiffs experienced significant financial hardships due to (1) defendants' failure to timely secure tenants; (2) defendants' misrepresentation regarding the ready availability of tenants with the ability to make sufficient rental payments; and (3) defendants' misrepresentations about the legal occupancy status of various homes.[15]  (Tr. II at 36-38, 192; Tr. III at 33, 66; Tr. IV at 161; Tr. X at 177-78, 197.) Plaintiffs also suffered from damages due to the overappraisal

---

[15] Defendants represented to the McDales that their house was a legal five-bedroom house, which was not true.  (Tr. II at 192.)  After the McDales moved in, they learned that the home was not a legal five-bedroom, which decreased the potential rental income for their upstairs apartment.  (*Id.*) Similarly, the UH Defendants told Ms. Lodge that she would be able to rent out two units to tenants to provide sufficient income to support her mortgage payments, but the home is a legal two-family home, not a legal three-family home.  (Tr. III at 33.)

of their properties.  (Tr. II at 36-38; Tr. III at 66; Tr. IV at 155-58; Tr. IX at 205; Tr. X at 177-79; Tr. XII at 134-35.)

Accordingly, the court finds that plaintiffs presented sufficient evidence to support the jury's finding, by a clear and convincing standard, as to each element of plaintiffs' fraud claim, and denies defendants' motion for judgment as a matter of law with respect to the fraud claim.

**D. Civil Conspiracy**

The moving defendants seek judgment as a matter of law with respect to plaintiffs' civil conspiracy claims on the mistaken grounds that "'[t]here is no substantive tort of conspiracy' under New York law." (Defs.' Mem. at 29; Hershco Mem. at 10-12 (quoting *Alexander & Alexander of NY, Inc. v. Fritzen*, 68 N.Y.2d 968, 969 (1986).)  As each case to which defendants cite acknowledges, however, a claim of civil conspiracy is not an *independent* cause of action, but is viable when predicated upon the tortious conduct of a defendant. *See, e.g.*, *Alexander*, 68 N.Y.2d at 969 ("Allegations of conspiracy are permitted only to connect the actions of separate defendants with an otherwise actionable tort." (citation omitted)); *Keller v. Levy*, 265 A.D. 723, 724 (N.Y. App. Div. 1943) ("[O]rdinarily, a charge of conspiracy, in and of itself, does not give ground for civil relief, unless followed by allegations of overt acts, and resulting injury.").  Here, plaintiffs' civil conspiracy

38

claims are related to their underlying claims for fraud, which survive defendants' motion for judgment as a matter of law for the reasons set forth *supra*.

Furthermore, plaintiffs' civil conspiracy claims survive defendants' motion for judgment as a matter of law because there is sufficient evidence in the record to establish each element of civil conspiracy.  To establish a claim of civil conspiracy, plaintiffs must demonstrate the underlying tort, plus the following four elements: (1) an agreement between two or more parties; (2) an overt act in furtherance of the agreement; (3) the parties' intentional participation in the furtherance of a plan or purpose; and (4) resulting damage or injury.  *Meisel v. Grunberg*, 651 F. Supp. 2d 98, 119 (S.D.N.Y. 2009).

The court has discussed each of the above four factors in the context of plaintiffs' fraud causes of action and will briefly summarize the evidence as it applies to plaintiffs' civil conspiracy claims.  As to the first element, the evidence at trial indicated the existence of an agreement between the UH Defendants, lawyers, appraisers, inspectors, and lenders to sell distressed and defective properties to the plaintiffs.  As to the second and third elements, the UH Defendants, *inter alia*, arranged for plaintiffs to meet with lawyers and lenders in defendants' offices, performed cosmetic repairs on plaintiffs'

39

homes, pressured plaintiffs to close quickly on the
transactions, and discouraged the plaintiffs from obtaining
independent advice about the terms of the transactions and from
conducting thorough and independent inspections.  Finally, by
purchasing homes with hidden defects, superficial repairs and
unaffordable mortgages, plaintiffs unquestionably suffered
damages as a result of the conspiracy.  Thus, defendants' motion
for judgment as a matter of law with respect to plaintiffs'
civil conspiracy claims is denied.

### E. Punitive Damages for Fraud and Civil Conspiracy Claims

The moving defendants further argue that the jury's
award of punitive damages for plaintiffs' fraud and civil
conspiracy claims should be set aside because (1) the record
evidence does not demonstrate any basis for the jury's findings
that defendants committed fraud or conspiracy to commit fraud;
and (2) the punitive damages awards are so "grossly excessive"
that they violate defendants' due process rights.  (Defs.' Mem.
at 32-34; Hershco Mem. at 12-15.)

As an initial matter, as discussed at length *supra*,
the court finds that the trial record contains sufficient
evidence to support the fraud and civil conspiracy causes of
action.  Accordingly, defendants' motion to set aside the jury's
punitive damages awards on this basis is denied.

40

The court notes that the parties disagree as to whether the standard of proof for punitive damages awards is clear and convincing or preponderance of the evidence. (*Compare* Defs.' Mem. at 33 *with* Pls.' Mem. at 30.)  The conflict is understandable, given the lack of clarity and conflicting authority surrounding the required burden of proof.  *See Greenbaum v. Svenska Handelsbanken*, *N.Y.*, 979 F. Supp. 973, 975-82 (S.D.N.Y. 1997) (citing cases and discussing at length the contradictions regarding the evidentiary standard required for awards of punitive damages); *compare id.* at 982 (concluding that New York law requires proof of punitive damages by a preponderance of the evidence) *with Randi A.J. v. Long Island Surgi-Center*, 46 A.D.3d 74, 86 (2007) (holding that clear and convincing evidence is required to impose punitive damages).  The court finds that under either standard, there was sufficient evidence to satisfy the stringent legal standards that govern punitive damages awards.

In order to award punitive damages, a jury must find that "defendant[s'] conduct evinced a high degree of moral turpitude and demonstrated such wanton dishonesty as to imply a criminal indifference to civil obligations." *Walker v. Sheldon*, 10 N.Y.2d 401, 405 (1961).  The evidence at trial summarized earlier in this Memorandum and Order established that defendants engaged in an elaborate, organized scheme to prey on and deceive

naïve, inexperienced home buyers in order to significantly profit at their expense.  Defendants promised plaintiffs a "newly renovated home" and gave them assurances regarding affordability and the quality of the homes, and steered them to lenders, attorneys, and inspectors in order to protect their overall scheme.  As a result of defendants' scheme, plaintiffs were saddled with mortgages they could not afford and defective homes whose values were vastly overappraised in light of the extensive repairs that were needed to make them habitable.  The court finds that such conduct demonstrates defendants' "high degree of moral turpitude" and "wanton dishonesty as to imply a criminal indifference to civil obligations."  *Id.*

Moreover, the court rejects defendants' contention that the punitive damages awards violate their due process rights because the damages amounts are constitutionally excessive.  (Defs.' Mem. at 33-34.)  As the parties note, the Supreme Court has identified three guideposts to determine whether an award is "grossly excessive":  (1) the degree of reprehensibility of defendants' conduct; (2) the disparity between the harm or potential harm suffered by plaintiffs and the punitive damages award; and (3) the difference between the punitive damages award and the civil penalties authorized or imposed in comparable cases.  *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 574-75 (1996).

42

"In assessing the reprehensibility of a defendant's
conduct, the Supreme Court has instructed that courts should
'consider[ ] whether:  the harm caused was physical as opposed
to economic; the tortious conduct evinced an indifference to or
a reckless disregard of the health or safety of others; the
target of the conduct had financial vulnerability; the conduct
involved repeated actions or was an isolated incident; and the
harm was the result of intentional malice, trickery, or deceit,
or mere accident.'"  *Thomas v. iStar Fin., Inc.*, 652 F.3d 141,
148 (2d Cir. 2011) (quoting *State Farm Mut. Auto. Ins. Co. v.
Campbell*, 538 U.S. 408, 419 (2003)).

The evidence at trial established that the harms
caused by defendants' conduct were primarily economic, although
the court recognizes that plaintiffs also experienced
significant physical hardship, risks to their health and safety,
frustration, stress, and anxiety due to defendants'
misrepresentations.  In addition, the shoddy construction of the
homes resulted in conditions – including inadequate heat, mold
and mildew, and raw sewage leaking into the home - that posed
significant health hazards, reflecting defendants' reckless
disregard for the health and safety of others.  Moreover, the
fact that this trial involved six different actions and
households demonstrates that defendants' actions were not
isolated and could not be said to have arisen by "mere

43

accident."  Accordingly, the court finds that the first
guidepost weighs in favor of a finding that the punitive damages
awards were not excessive.

The second consideration, "the disparity between the
actual or potential harm suffered by the plaintiff and the
punitive damages award," calls for the court's comparison of the
punitive damages and compensatory damages awarded by the jury,
which is set forth below:

| Plaintiff | Total Punitive Damages for Fraud | Total Compensatory Damages for Fraud and Conspiracy to Defraud | Ratio |
|---|---|---|---|
| Sandra Barkley | $60,000 | $90,000 | .67:1 |
| Rodney and Sylvia Gibbons | $60,000 | $115,000 | .52:1 |
| Mary Lodge | $60,000 | $100,000 | .60:1 |
| Dewitt Mathis | $60,000 | $130,000 | .46:1 |
| Miles and Lisa McDale | $60,000 | $150,000 | .40:1 |
| Charlene Washington | $60,000 | $50,000 | 1.2:1 |

The Supreme Court concluded in *State Farm* that "a[ punitive
damages] award of more than four times the amount of
compensatory damages might be close to the line of
constitutional impropriety."  538 U.S. at 425.  "There are,
however, 'no rigid benchmarks' for this analysis, and '[w]hen
compensatory damages are substantial, then a lesser ratio,
perhaps only equal to compensatory damages, can reach the
outermost limit of the due process guarantee.'"  *Thomas*, 652
F.3d at 149 (quoting *State Farm*, 538 U.S. at 425).  Here, with
the exception of Ms. Washington's award, the jury's award of

punitive damages for fraud was significantly less than the total compensatory damages the jury awarded to each plaintiff for fraud and conspiracy to defraud.  The court finds all of the punitive damages awards to be clearly within the bounds of constitutional propriety and the realm of reason.  Consequently, the court finds that the second factor also weighs in favor of a finding that the punitive damages award was not excessive.

The court does not factor in the third guidepost, "the difference between the punitive damages award and the civil penalties authorized or imposed in comparable cases," because neither party cites civil penalties authorized or imposed in comparable cases, nor has the court's independent research identified comparable examples.  Accordingly, having reviewed and balanced all relevant factors, the court finds that the punitive damages awards to the plaintiffs are not constitutionally excessive.

**F. General Business Law Section 349**

**1. Sufficiency of the Evidence**

The court finds no merit in the moving defendants' contention that plaintiffs produced insufficient evidence of their GBL § 349 claim for deceptive practices.  In order to find a party liable under GBL § 349: "(1) the defendant's challenged acts or practices must have been directed at consumers, (2) the acts or practices must have been misleading in a material way,

45

and (3) the plaintiff must have sustained injury as a result." *Cohen v. JP Morgan & Chase Co.*, 498 F.3d 111, 126 (2d Cir. 2007).  As plaintiffs note and defendants do not dispute, the jury was not required to consider the first element because the court deemed it satisfied as a matter of law.  (*See* Pls.' Mem. at 10; Defs.' Reply at 13; ECF No. 564, Jury Instructions, at 31.)

As to the second and third elements, as discussed in detail *supra* in Sections III.C.2 and III.C.3, plaintiffs have presented ample evidence from which the jury could find that defendants' acts or practices were deceptive or misleading in a material way and that each plaintiff was injured because of those acts.  Accordingly, the court denies defendants' motion for judgment as a matter of law with respect to the GBL § 349 claim.

### 2.    Punitive Damages

The moving defendants argue that the punitive damages awarded under GBL § 349 are "excessive as a matter of law and must be stricken" because "[n]o punitive damage award is allowed under [GBL § 349(h)] if the compensatory damages equal or exceed $1,000." (Defs.' Mem. at 31–32; Hershco Mem. at 16.) Plaintiffs assert that this argument is waived because the moving defendants failed to raise it earlier and object to the jury instructions on punitive damages under GBL § 349.  (Pls.'

46

Mem. at 22-23.)  Plaintiffs also contend that even if defendants
were permitted to raise this challenge at this juncture, the
cases defendants cite are distinguishable.  (*Id.*)

The court finds that defendants waived their argument
regarding punitive damages under GBL § 349.  Despite having a
full and fair opportunity to object to the jury instructions and
the verdict sheet, and to voice defendants' position that GBL
§ 349 does not allow the grant of punitive damages where
compensatory damages equal or exceed $1,000, defendants did not
do so.  Accordingly, the objection is waived and the court will
not set aside the jury's punitive damage award.[16]  *See Veerman v.
Deep Blue Group L.L.C.*, No. 08 Civ. 5042, 2010 WL 4449067, at
*5-6 (S.D.N.Y. Nov. 3, 2010) (denying defendants' Rule 50(b)
motion to vacate jury's award of punitive damages because
defendants had failed to raise relevant objections to jury
instructions and verdict sheet); *see also Queenie, Ltd. v.
Nygard Int'l*, 204 F. Supp. 2d 601, 606 (S.D.N.Y. 2002) (same).

**G. Piercing the Corporate Veil**

Mr. Hershco argues that there is insufficient evidence
to pierce the corporate veil and impose individual liability on

---

[16] Even if the court decided defendants' motion on its merits, however, the
court would uphold the jury's punitive damages award because GBL § 349(h)
restricts the court's award of treble damages, but does not govern the award
of punitive damages, which plaintiffs may seek in addition to treble
damages.  *See Wilner v. Allstate Ins. Co.*, 71 A.D.3d 155, 167 (N.Y. App.
Div. 2010) (noting that although treble damages awarded under GBL § 349(h)
are capped at $1,000, "plaintiffs may seek both treble damages and punitive
damages").

him, particularly because a court should permit veil-piercing only under "extraordinary circumstances," *Murray v. Miner*, 74 F.3d 402, 404 (2d Cir. 1996), and plaintiffs did not present sufficient evidence for the jury to find that Mr. Hershco's domination over the UH Defendants was the "instrument of fraud or otherwise resulted in wrongful or inequitable consequences." (Hershco Mem. at 3 (quoting *TNS Holdings, Inc. v. MKE Sec. Corp.*, 92 N.Y.2d 335, 339 (1998)); Defs.' Reply at 8-10.)  Mr. Hershco contends that "the overwhelming evidence demonstrated [his] complete lack of involvement in [plaintiffs'] various transactions," as evidenced by the facts that, for example, no plaintiff except Ms. Barkley ever met Mr. Hershco; he was not present at the closings of plaintiffs' homes; and the majority of plaintiffs were unaware that Mr. Hershco owned the UH Defendants.  (Hershco Mem. at 3-5.)  In addition, although Mr. Hershco acknowledges that the evidence at trial established his failure to observe corporate formalities with his businesses, he argues that plaintiffs failed to establish the required nexus between Mr. Hershco's abuse of the corporate form and fraudulent conduct.  (*Id.* at 5-8.)

Plaintiffs counter that the evidence at trial established Mr. Hershco's involvement in designing and orchestrating the fraudulent scheme and demonstrated that Mr.

Hershco abused the corporate form for the sole purpose of carrying out that scheme.  (Pls.' Mem. at 10.)

### 1.    Legal Standard

"A corporation is an entity that is created by law and endowed with a separate and distinct existence from that of its owners." *Am. Protein Corp. v. AB Volvo*, 844 F.2d 56, 60 (2d Cir. 1988).  "Because a principal purpose for organizing a corporation is to permit its owners to limit their liability, there is a presumption of separateness between a corporation and its owners, which is entitled to substantial weight." *Id*. (internal citation omitted).

In determining whether to pierce the corporate veil to hold an owner liable for the acts of its corporation, the Second Circuit has found that under New York law, "[c]ontrol is the key." *Id*.  Specifically, "[t]he parent must exercise complete domination 'in respect to the transaction attacked' so that the subsidiary had 'at the time' no separate will of its own, and such domination must have been used to 'commit fraud or wrong' against plaintiff, which proximately caused plaintiff's injury." *Id*. (quoting *Lowendahl v. Baltimore & Ohio R.R.*, 287 N.Y.S. 62, 76 (N.Y. App. Div. 1936), *aff'd*, 6 N.E.2d 56 (1936)).  Factors indicating an owner's control over a corporation include "lack of normal corporate formality in the subsidiary's existence,

under-capitalization, and personal use of the subsidiary's funds by the parent or owner." *Am. Protein*, 844 F.2d at 60.

## 2. Application

The court finds that the evidence at trial was more than sufficient to establish that Mr. Hershco exercised complete domination over the UH Defendants with respect to plaintiffs' home purchases such that the UH Defendants had "no separate will[s] of [their] own," and Mr. Hershco used such domination to defraud plaintiffs.  Expert witness Alan Blass testified that Mr. Hershco orchestrated the inner workings of each of the UH Defendants "as a man with 21 pockets in his coat constantly moving cash from one pocket to another as he needed it, whether it was for cash flow purposes or for lending purposes or for some other unknown purposes." (Tr. XI at 108; *see also id*. at 76-95 (deposition testimony of Boaz Smorlarchik, United Homes representative, regarding entities' practices).)  Mr. Blass testified that, as a result, "all of the corporate lines were totally blurred" among the UH Defendants, such that it could not be determined "where [a particular company] was operating," "who was working for" that company, which company was borrowing money from others, or "where each of the loans stood." (*Id*. at 121.) In addition, the companies were interdependent; for example, the companies shared employees, lent money among themselves without

charging interest or imposing due dates for repayment, and often received revenue for sales made or paid for expenses incurred, by other companies.  (Tr. XI at 78-80, 84-85, 169-72.)

The evidence further established that Mr. Hershco abused the corporate form in order to perpetrate the fraudulent transactions at issue in this action.  Mr. Hershco testified that he set up new companies such as the UH Defendants for the express purpose of purchasing, rehabilitating, and reselling properties.  (Tr. X at 125-27; Tr. XI at 82.)  In addition, Mr. Hershco's testimony established that besides being the president and sole owner of his companies, he was also involved in acquiring properties, overseeing construction, and securing financing for the transactions.  (Tr. X at 78-79, 82-88, 134-35.)  Moreover, even though Mr. Hershco did not personally meet any plaintiffs except Ms. Barkley, his signature appeared on each of the deeds through which the homes were conveyed to plaintiffs.  (*Id.* at 96-100.)

Mr. Hershco's abuse of the corporate form and failure to observe corporate formalities enabled him to "put the monies where [they were] needed to pay the companies" and their outside lenders, thus enabling him to perpetuate the property-flipping scheme that included sales of homes to plaintiffs.  (Tr. XI at 169-70.)  The evidence thus amply demonstrated that Mr. Hershco solely and completely dominated and controlled the UH Defendants

51

without regard for the corporate form to the extent that he became the alter ego of the corporation in perpetuating the fraud.   Thus, there was sufficient evidence to pierce the corporate veil and hold Mr. Hershco individually liable for the fraud committed by the UH Defendants.

Although Mr. Hershco further argues that there was insufficient evidence to hold him liable for deceptive practices in violation of GBL § 349 (*see* Hershco Mem. at 9-10), this argument has no merit in light of the court's finding that there was sufficient evidence to pierce the corporate veil.   Because there was sufficient evidence to find that the UH Defendants engaged in deceptive practices in violation of GBL § 349, the claim is also sustained as to Mr. Hershco, the alter ego of the UH Defendants.

## III. Defendants' Rule 59 Motions for a New Trial

### A. Legal Standard

"A motion for a new trial ordinarily should not be granted unless the trial court is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice."   *Medforms, Inc. v. Healthcare Mgmt. Solutions, Inc.*, 290 F.3d 98, 106 (2d Cir. 2002) (internal quotation marks omitted).   The standard applied in reviewing a party's motion for a new trial "depends on on whether that party objected contemporaneously to the purported errors."   *Marcic v.*

*Reinauer Transp. Cos.*, 397 F.3d 120, 124 (2d Cir. 2005).  Where
objections have been preserved through contemporaneous
objection, a new trial is warranted if "the district court
committed errors that were a 'clear abuse of discretion' that
were 'clearly prejudicial to the outcome of the trial.'"  *Id.*
(quoting *Pescatore v. Pan Am. World Airways, Inc.,* 97 F.3d 1, 17
(2d Cir. 1996)); *see also Vogelfang v. Riverhead Cnty. Jail*, No.
04-CV-1727, 2012 WL 1450560, at *6 (E.D.N.Y. Apr. 19, 2012)
(same).

Where claimed errors were not preserved
contemporaneously at trial, "a new trial will be granted only
for error that was 'so serious and flagrant that it goes to the
very integrity of the trial'" because "failure to object
deprives the trial court of the opportunity to correct the error
during trial."  *Marcic*, 397 F.3d at 124 (quoting *Greenway v.
Buffalo Hilton Hotel*, 143 F.3d 47, 51 (2d Cir. 1998)); *see also
Lore v. City of Syracuse*, 670 F.3d 127, 160 (2d Cir. 2012)
(internal citations omitted) (party's failure to object at trial
to substance of verdict form "waives its right to a new trial on
that ground and has no right to object to such matters on appeal
. . . unless the error is fundamental").

**B. Application**

The moving defendants move for a new trial pursuant to
Rule 59 on grounds that the interests of justice require a new

trial in light of "numerous significant errors that occurred during the trial" that substantially prejudiced defendants. (Defs.' Mem. at 42; Hershco Mem. at 16.)  In particular, defendants contend that (1) the jury charges failed to specify that the punitive damages award for fraud must be supported by clear and convincing evidence; (2) the jury charges regarding the fraud claim were vague and failed to advise the jury that *all* elements of fraud must be satisfied; and (3) the jury charge regarding misrepresentation for the fraud claim was not modified to include instructions regarding expressions of opinion; and (4) the verdict sheet erroneously omitted the element of reliance to support the fraud claim.  (Defs.' Mem. at 42-43; Hershco Mem. at 15-18.)

Federal Rule of Civil Procedure 51 ("Rule 51") requires parties to make objections to jury instructions before the court issues the jury charge.  Fed. R. Civ. P. 51(c)(2)(A). Where a litigant fails to comply with the objection requirements of Rule 51, the court may review the jury instructions only for "'fundamental error,' which is more stringent than the 'plain error' standard applicable in criminal appeals." *Cash v. Cnty of Erie*, 654 F.3d 324, 341 n.8 (2d Cir. 2011).

The moving defendants raise the aforementioned jury instruction and verdict sheet issues for the first time in their Rule 59 motions.  All parties had multiple opportunities to

submit proposed jury instructions and proposed verdict sheets
prior to trial and prior to charging the jury.  Yet defendants
all failed to request changes to the jury instructions and
verdict sheet that would address the concerns noted above.
Moreover, the court held a charging conference during which all
parties had yet another opportunity to request changes to the
proposed jury charges and verdict sheet.  (*See* Tr. XIV.)   In
fact, the court provided the parties with three different
versions of the jury charges in an attempt to incorporate the
parties' requests.  (See ECF Nos. 562, 563, Draft Jury
Instructions; ECF No. 564, Jury Instructions.)  Although
defendants requested a number of other changes to the charges,
they failed to request the modifications that they raise here.

       The moving defendants also had ample opportunity to
submit proposed verdict sheets and object to plaintiffs'
proposed verdict sheets, but again failed to do so until now.
On April 4, 2011, prior to the commencement of this three-week
trial, plaintiffs submitted their proposed verdict sheets.  (ECF
No. 536, Plaintiffs' Proposed Verdict Sheet.)  No defendant
submitted proposed verdict sheets, although they had been
ordered to do so.  (See ECF No. 495, Pretrial Scheduling Order
¶ 6(v).)  After the final pretrial conference, the court
directed the parties to meet and confer in an attempt to resolve
any disputes regarding pretrial submissions - including jury

instructions – and to agree on proposed verdict sheets. (See
Minute Order dated 4/11/2011.) On April 15, 2011, plaintiffs
filed a joint status report, noting that after conferring with
counsel for the UH Defendants and Hershco, the verdict sheets
had been modified, but that the UH Defendants and Hershco
continued to object to the instructions regarding piercing the
corporate veil. (ECF No. 544, Status Report dated 4/15/2011, at
3.) Moreover, at trial, the parties again discussed changes to
the proposed verdict sheets and submitted revised versions for
the jury. (*See* Tr. XIV.) At no point did the moving defendants
object to language in the verdict sheet concerning the mention
of the reliance element of the fraud claim. Consequently, the
court reviews the moving defendants' objections for fundamental
errors that are "so serious and flagrant that [they go] to the
very integrity of the trial." *Greenway*, 143 F.3d at 51.

      The court finds no fundamental error requiring a new
trial, or any error "so serious and flagrant" as to threaten the
integrity of the trial or deprive the jury of legal guidance, or
have any effect on the outcome of the verdict. Moreover, in any
event, defendants' arguments are spurious. First, with respect
to the jury instruction regarding the "clear and convincing"
standard of proof that defendants claim is necessary to sustain
a punitive damages, the court again notes that there is
conflicting authority and a lack of clarity surrounding the

required burden of proof in the Second Circuit.  *See Greenbaum*,
979 F. Supp. at 975 (citing cases and discussing at length the
contradictions regarding the evidentiary standard required for
awards of punitive damages); *compare id.* at 982 (concluding that
New York law requires proof of punitive damages by a
preponderance of the evidence) *with Randi A.J.*, 46 A.D.3d at 86
(holding that clear and convincing evidence is required to
impose punitive damages).  Moreover, as discussed above, under
either standard, there was sufficient evidence to sustain the
jury's award of punitive damages.  *See Altria Group, Inc. v.
United States*, 658 F.3d 276, 286 (2d Cir. 2011) (quoting *Boyce
v. Soundview Tech. Grp., Inc.*, 464 F.3d 376, 390 (2d Cir. 2006))
("Viewing the instructions 'as a whole,' a new trial will not be
granted unless a jury instruction 'misleads the jury as to the
correct legal standard or does not adequately inform the jury on
the law' and the error is not harmless.").

     Second, the court finds no error in the jury
instructions with respect to fraud.  The court first instructed
the jury that "[i]n order to recover for fraud, the plaintiffs
must prove, by clear and convincing evidence, the following
elements," then listed the elements of the fraud claim.  (Tr.
XVI at 14.)  "'A new trial is required if, considering the
instruction as a whole, the cited errors were not harmless but
in fact prejudiced the objecting party.'"  *D'Cunha v.*

57

*Genovese/Eckerd Corp*., 415 F. App'x 275, 278 (2d Cir. 2011) (quoting *Girden v. Sandals Int'l*, 262 F.3d 195, 203 (2d Cir. 2001)). Considering the court's instruction as a whole, the court finds no error in the jury instructions, particularly because the court's instruction made clear that a finding of fraud was conditional on finding of each element by clear and convincing evidence:

> In order for plaintiffs to prevail on their claims of fraud, the defendants *must* have made a misrepresentation or a material omission of fact . . . . *If* you find that the defendants made material representations of fact or failed to disclose material facts despite having a duty to do so, *you must then determine* if the representations were false. . . . *If* you find that the defendant did make the representations that each plaintiff is claiming they did, *you must then determine* if the defendant knew that the representations were false, or recklessly made the representations without regard to whether they were true or false. . . . *If* you decide that the defendants did in fact make false representations to the plaintiffs, *you must then decide* if any misrepresentations made by the defendants were made for the purpose of inducing plaintiffs to purchase and finance the subject properties . . . . *If* you find that the representations were made in order to induce the plaintiffs to rely on them, *you must next decide* if the plaintiffs were justified in relying on the defendants' representations.

(Tr. XVI at 15-17 (emphasis added).) The language of the jury instructions made clear that a verdict for plaintiffs on the fraud claim required the jury to find all elements of the claim.

Third, the court finds no error in its jury charges regarding misrepresentation.  The jury charge as a whole made clear that the fraud claim must have rested on a *fact*, not an opinion, and that plaintiffs' theory was that "all of the defendants' misrepresentations to them were offered as fact, not opinion." (*Id*. at 8.)  Moreover, the requirement that the fraud claim be based on a misrepresentation or omission of a material *fact* was mentioned at least eight times during the instructions on the elements of fraud.  (*Id*. at 15-17.)  Similarly, when read as a whole together with the jury instructions, the verdict sheet makes clear that reliance is a required element of fraud. *See Velez v. City of New York*, No. 04-CV-1775, 2012 WL 1237646, at *5 (E.D.N.Y. Apr. 12, 2012) (considering jury instructions and verdict sheet as a whole in Rule 59 motion).  Accordingly, the court finds no error in the jury instructions or the verdict sheet, much less fundamental error.

## CONCLUSION

For the foregoing reasons, the court denies the moving defendants' motions pursuant to Rule 50(b) and 59.

**SO ORDERED.**

Dated:     June 20, 2012
           Brooklyn, New York

                                        /s/
                              _____
                              **KIYO A. MATSUMOTO**
                              United States District Court
                              Eastern District of New York